**HARDIN THOMPSON, P.C.**
Michael F. Schleigh, Esquire
*PA Attorney #88407*
Wells Fargo Building
123 S. Broad Street, Suite 2235
Philadelphia, Pennsylvania 19109
Direct: (267) 459-8366 | Fax: (267) 486-9002 | Email: mschleigh@hardinlawpc.net
*Counsel for Defendant, County of Delaware*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **HECTOR FIGUEROA** | : | <u>**CIVIL ACTION**</u> |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | Case No. 2:23-cv-00515 |
| **COUNTY OF DELAWARE** | : | |
| | : | |
| Defendant. | : | |

---

<u>**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**</u>

AND NOW comes Defendant, County of Delaware (hereinafter "Defendant"), by and through

its attorneys, Michael Schleigh and Hardin Thompson, P.C., and submits This Statement of

Undisputed Facts in Support of Defendant's Motion for Summary Judgment, and in support

thereof, avers as follows:

1.      Plaintiff Hector Figueroa alleges in this matter that he was wrongly terminated

from his position as the Assistant Director of Labor Relation for Defendant, County of Delaware

(hereinafter "Defendant") as retaliation for purportedly reporting   investigative findings of gender

discrimination against a member of Delaware County supervision that if left unaddressed would

1

subject the County to liability under the Pennsylvania Human Relations Act and Title VII of the Civil Rights Act of 1964. *See* Docket No. 10.

2.     Plaintiff's Complaint raises causes of action pursuant to the Pennsylvania Whistleblower law, 43 P.S. § 1421 *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Id.

3.     Defendant has filed an Answer denying these allegations. *See* Docket No. 11.

4.     Defendant relevantly further raised the following affirmative defenses in its Answer:

   a.  Plaintiff did not file a good faith report of wrongdoing or waste and therefore is precluded from any recovery under the Pennsylvania Whistleblower Law:

   b.  No impermissible factor played any role whatsoever in any of Plaintiff's complained of personnel actions as Plaintiff was terminated for a legitimate non-discriminatory reason and not in retaliation for any alleged protected conduct. Moreover, even if an impermissible motive was a factor in any of these decisions, which the Defendant denies, the Defendant would have made the same decision for legitimate, non-discriminatory and non-retaliatory business reasons;

   c.  Plaintiff's claims are barred by the Mixed Motive defense

   d.  Plaintiff's claims are barred because he was Employed at-will/Lawful Termination

Id.

2

**Fact concerning the Time and Terms of Plaintiff's Employment**

5.      It is undisputed that Plaintiff was initially hired as the Assistant Director of Labor Relations by Defendant on or about March 21, 2022.  See Hector Figueroa Personnel File D EEOC Production 00052, attached as Exhibit 1.

6.      Plaintiff is legally trained, and holds a Juris Doctorate from the University of Buffalo. He however, has never passed a bar examination or been admitted to the bar of any state. *See* transcript of Deposition of Plaintiff from October 24, 2023 attached as Exhibit 2, at 10:9 – 15; 20:13 – 24; 24:14 to 25:1.

7.      Plaintiff had approximately 18 years of experience in human relations matters at the times relevant to this matter. Id. at 10:19 – 21.

8.      Before being placed in a permanent position, Plaintiff had been working for Defendant on a contract basis through a staffing agency. Id. at 11:19 – 25; 34:3 - 15.

9.      As a term of his employment he was subject to a ninety (90) day probation period during which he could be fired for any reason. *See* Delaware County Employee Handbook attached as Exhibit 3 at p. 4. A new probationary period started at any time of rehire.

10.     Thereafter he voluntarily quit on May 3, 2022. See Hector Figueroa Personnel File D EEOC Production 00042, attached as Exhibit 4.  *See also* Exhibit 2 at 42:12 – 25.

11.     With respect to the above separation, Plaintiff did not provide any exit memorandum or written project updates, and claims his superior did not so request same. Id. at 49:16 to 50:10.

12.     Thereafter, Plaintiff was rehired by Defendant in the same role on June 13, 2022. See Id. at 48:16 – 22; 54:3 – 11. *See also* Hector Figueroa Personnel File D EEOC Production 00051, attached hereto as Exhibit 5

13.     As a term of his employment he was subject to a new ninety (90) day probation period during which he could be fired for any reason.

14.     Thereafter, Defendant terminated Plaintiff on August 23, 2022 effective August 24, 2022.  Hector Figueroa Personnel File D EEOC Production 00040-00041, attached hereto as Exhibit 6.  *See also* Exhibit 2 at 110:13 – 17; 112:1 - 15.

15.     At the time of his firing, Plaintiff admits he was informed because his actions put the County is legal jeopardy in a meeting with Executive Director Howard Lazarus ("Lazarus") and Assistant Executive Director Marc Woolley ("Woolley"). Id. at 113:21 to 114:7, 22 - 25.

16.     Plaintiff admits that he was an at will employee. Id. at 114:10 – 14.

17.     Probationary employees of Defendant can be terminated without cause. *See* Deposition of November, 2023 of Howard Lazarus attached as Exhibit 7, at 122:13 to 123:1.

18.     Plaintiff was terminated during the probationary period that began when he was rehired in June of 2022. Id. at 123:3 – 6; 123:19 to 124:3; 127:9 - 14.

19.     For all times employed by Defendant, Plaintiff was assigned the email designated FigueroaH@co.Delaware.PA.us.  Exhibit 2, at 95:5 - 16.


**Plaintiff's Job Responsibilities and Command Structure of Defendant**

20.     Plaintiff's general job responsibilities included assisting Defendant in preparing documents, policies and information for Human Resources/Personnel issues and Union Negotiations, as well as investigating workplace claims of discrimination and union grievances. *See* Exhibit 2 at 19:22 to 20:12; 30:5 – 11; 34:16 to 36:5.

21.     Plaintiff's direct report was Jamal Johnson. *See* Transcript of the December 27, 2023 deposition of Marc Woolley attached as Exhibit 8, at 7:14 – 18.

22.     Plaintiff and Mr. Johnson were the only persons in their department who conducted employee investigations. *See* Exhibit 2 at 54:12 to 55:1.

23.     It was the practice and policy of the department to advise the target of an investigation that an investigation was occurring and describe the general allegations against them. Id. at 224:17 to 225:8, 21 – 25; 226:1 - 10.

24.     When Plaintiff was first employed, Jamal Johnson reported directly to Executive Director, Howard Lazarus.   Thereafter, Jamal Johnson was also required to report to Assistant Executive Director Marc Woolley ("Woolley"). Exhibit 7 at 115:9 – 11.

25.     Woolley is an African American man. Exhibit 2 at 88:18 – 21.

26.     Johnson and Woolley both reported to the County Executive Director, Howard Lazarus, for all time relevant to this litigation. *See* Exhibit 7 at 6:24 to 7:12, 17 – 24.

27.     Plaintiff states that during his tenure he never felt overworked, overextended, or not given the resources to complete his job. He further states that he did not feel the need to seek assistance from Mr. Johnson with his assignments generally. *See* Exhibit 2 at 56:14 to 55:1.

28.     Plaintiff admits that in his position he was expected to be familiar with the employee handbook and the Defendant's practices and procedures. Id. at 230:9 – 17.

29.     For all times relevant to this matter, Lauren Footman was the County of Delaware Diversity, Equity and Inclusion Officer. *See* Transcript of the Deposition of Lauren Footman, County of Delaware Diversity, Equity and Inclusion Officer date November 3, 2023 attached as Exhibit 9 at 5:8 -9; 8:11 – 17. In this position, she sometimes participated in investigations conducted by the Personnel/Human Relations Department, at other times she forwarded on issued that she requested be investigated. Id. at 10:18 to 12:6; 20 -23;.

30.     Footman is an African American woman. Exhibit 2 at 88:10 – 11.

**Plaintiff's Mishandling of Purchasing Department Complaints**

31.     The policy of he Personnel Department was that if a superior employee wanted to write-up a subordinate or make a complaint, it had to be reviewed by the department first. *See* Exhibit 2 at 61:14 to 62:5.

32.     Upon receipt of any such documented write-ups or complaint, the Personnel Department was to address such issues "as quickly as possible", with an expectation that same would at least be acknowledged as being received by the department within 24 – 28 hours. Id. at 62:17 to 63:11. There was an expectation that any such issue would at least be addressed within three weeks. Id. at 63:12 – 15.

33.     On July 1, 2022 in the evening, Lisa Jackson ("Jackson"), the Director of Purchasing made a complaint about one of her subordinates, Franklin Fitzgerald, Jr. ("Fitzgerald") that was emailed to Plaintiff directly. *See* July 1, 2022 email from Jackson to Plaintiff, with attachments attached as Exhibits 10 and 11 respectively.

34.     Jackson is an African American woman.  Exhibit 2 at 88: 6 – 9.

35.     Fitzgerald is an African American man. Id. at 88:1 – 5.

36.     The Purchasing Department shared a suite with the Controller's Office. Exhibit 8, at 34:7 – 11.

37.     July 1, 2022 was a Friday.

38.     Plaintiff acknowledged that he likely received the aforementioned email from Jackson, but could not recall if he timely responded to same in writing or her approved the requested discipline. *See* Exhibit 2 at 118:15 to 125:23.

39.     Plaintiff admitted that had the requested discipline been approved and a record of same has been placed in Fitzgerald's file, it would be available as a reference for investigations that came later. Id. at 125:25 to 126:4.

40.     On July 5, 2022, Munsanda Brown of the Personnel Dept forwarded an email from Fitzgerald noting he was requesting a transfer out of the Purchasing Department. Id. at 127:21 to 128:22. *See also* the email referenced as Exhibit F-3 in the testimony attached hereto as Exhibit 12.

41.     July 5, 2022 was a Tuesday.

42.     From when he left his office on July 1, 2022 until when he returned to work, Plaintiff did not check his work email (it being July 4, 2022 weekend) again until July 4, 2022. Id. at 129:24 to 130:20.

43.     Despite admitting the strong likelihood that Jackson's request for employee discipline and Fitzgerald's request to be transferred out of Jackson's department co-existed in his email inbox at the same time, this raised no concerns with Plaintiff. Id. at 130:22 to 131:12; 132:2 - 9.

44.     On July 28, 2022, Jackson made a second complaint about Fitzgerald that was directed to Plaintiff with a request for review and guidance per instruction she had been given. Id. at 207:15 – 19; 208:8 to 210:10. *See also* Exhibit F-14 referenced therein attached hereto as Exhibit 20.  Said notice also included a copy of her prior July 1, 2022 complaint about Fitzgerald. Id.

45.     Plaintiff could not offer any explanation as to whether he ever acknowledged, responded to or addressed this second complaint in any way. Id. at 210:3 - 5, 11 – 25.

46.     Thereafter, Fitzgerald made a complaint about Jackson's behavior to Munsanda Brown of the Personnel Department that was forwarded to Plaintiff to investigate. This led him set

up interviews within three days. Exhibit 2 at 66:10 to 73:19. In his initial deposition testimony, Plaintiff denied being aware of Jackson's early July 1, 2022 complaints about Fitzgerald.

47.     By August 5, 2022 Plaintiff and Johnson had advised Woolley that they had completed their investigation despite not interviewing Jackson. Id. at 88:23 to 89:16.

48.     Plaintiff conceded that before making recommendations as to the disputes between Jackson and Fitzgerald, the proper thing to do would have been to interview Jackson. Id. at 90:8 – 19; 91:9 – 19.

49.     Plaintiff further conceded that in the absence of an interview of Jackson, he should have considered any earlier attempts by Jackson to discipline Fitzgerald, but that he had no knowledge of said complaints. Id. at 92:6 – 15.

50.     While Plaintiff claims that he never completed an interview of Jackson before August 5, 2022 because she went on vacation for two weeks, he further admits that he never interviewed her when she returned. Id. at 110:17 to 111:1. Plaintiff claims that Johnson was solely responsible for the investigation around this time. Id. at 111:10 – 25.

51.     Plaintiff also stated that he never consulted Fitzgerald's personnel file for any historical context of his employment or past issues as part of his investigation. Id. at 126:19 to 127:7.

52.     Plaintiff understood that Fitzgerald wanted to be transferred out of the Purchasing Department. Id. at 99:10 – 14.

53.     It was decided that Fitzgerald should be moved to another department while the investigation was being conducted so that Fitzgerald and Jackson would not have additional incidents. Id. at 227:25 to 228:9.

54.     Woolley, who was Jackson's direct supervisor, objected to the recommendations made by Johnson and Plaintiff to suspend Jackson because they never completed their investigation by interviewing Jackson or witnesses in the Controller's Office (who may not be as prejudiced as Jackson's staff) – they had simply not performed a thorough investigation to his satisfaction so that that the Defendant would not be subject to a future action by Jackson for wrongful employment action. Exhibit 8 at 27:4 to 28:2.

55.     After Johnson reported to Woolley that Jackson had failed to report for an interview, Woolley instructed Jackson to sit for it, and instructed Johnson that he or his inferior employees were to complete it. He further instructed them to complete interviews of other employees from the Controller's office who may have witnessed disputes between Fitzgerald and Jackson. Id. at 28:2 – 14; 28:19 to 29:8; 35:8 – 19; 43:15 to 44:2.

56.     Woolley's main objection to the Jackson investigation was the lack of a proper process rather than the recommendations. Id. at 33:8 – 19.

57.     When Woolley made his objections to the thoroughness of the investigation known to Lazarus, Lazarus agreed that placing Jackson on administrative leave would be premature. Id. at 39:2 – 11; 42:10 – 12.  *See also* Exhibit 7 at 66:15to 67:12.

58.     Woolley also raised the issue that as Jackson's direct supervisor, he was not consulted on Johnson's recommendation.  Exhibit 8 at 45:14 – 23; 46:7 - 15.

59.     Woolley noted that if Plaintiff was having problems arranging Jackson's interview he expected that Plaintiff would have reported this to Johnson, and Johnson would have then requested Woolley or Lazarus to compel Jackson to give the interview. Id. at 56:21 to 57:6.

60.     Around this same time, Lazarus had a discussion with Jackson wherein Jackson raised the issue that Plaintiff and the Personnel Department never addressed her concerns and

complaints that were made about Fitzgerald before Fitzgerald complained about Jackson. *See* Exhibit 7 at 102:16 to 103:15.

61.     Woolley noted that had Johnson's department ever completed a full investigation of the Jackson Complaint and came back with a recommendation for suspension or termination of Jackson, he would not have objected to it. Exhibit 8 at 75:11 to 76:6; 87:13 to 88:2.

62.     At the time of his firing, the incidents concerning the Purchasing Department investigations, and particularly of Jackson, were not discussed according to Plaintiff. Exhibit 2 at 114:19 – 21. Nor has he ever been told or been given any information that his hiring was related to his investigation of Jackson led to his firing. Id. at 116:21 to 117:2.

63.     Woolley also stated that his recommendation on firing Plaintiff was not based on his handling of the investigation of Jackson. Exhibit 8 at 46:20 – 23.

64.     At the time that Plaintiff was terminated, Johnson was also demoted, and Woolley took oversight of Johnson's department. Id. at 47:23 to 48:5; 48:17 to 50:6.

65.     Around this time, Footman and Woolley also met with Johnson to discuss how Jackson's complaints prior to Fitzgerald's complaint should not have been ignored, and to decide how to implement policies so such matters would be handled properly in the future. Exhibit 9 at 18:16 to 19:10; 25:18 to 34:3; 48:5 to 49:10.

66.     Footman raised a concern to Lazarus that she was seeing a pattern of minority women department heads being placed on administrative leave and concerns that progressive discipline needed to be applied. Id. at 34:14 – 19; 35:2 – 7; 35:20 to 36:15.

67.     Footman also had concerns about the fairness of the Fitzgerald investigation because recommendations were made against Jackson without interviewing her, particularly where she had made recommendations to Plaintiff and Johnson that they needed to report the non-

cooperation of any interviewees to their superiors for further action. Id. at 36:16 to 37:19; 40:8 – 18; 42:13 to 43:1;

68.     After Plaintiff's firing, Johnson was still in charge of the investigation of Fitzgerald's complaint against Jackson, and to the best of Woolley's knowledge, it was never completed. Exhibit 8 at 44:16 – 20; 66:18 - 21. *See also* Exhibit 7 (Lazarus) at 84:13 to 85:9; 108:9 to 109:10.

69.     Johnson never advised Woolley that he was unable to interview Jackson after he was demoted, and never completed the full investigation of Fitzgerald's complaint as required by Woolley. Exhibit 8 at 86:1 to 87:12; 90:8 - 16.

70.     While the Jackson investigation was ongoing, Woolley made the decision to physically place Fitzgerald as a buyer at the Fair Acres facility while his position remained within Procurement with no change of job benefits or salary so that Fitzgerald would not be exposed to Jackson's alleged abuse further. Id. at 62:1 – 19; 63:24 to 64:19; 65:24 to 66:8; 70:11 to 71:3; 73:15 - 24.

71.     Lazarus agreed with the reasoning to physically move Fitzgerald away from Jackson with the intent to transfer him to a similar position to what he already had. Exhibit 7 at 44:24 to 46:3; 93:19 to 94:10; 95:14 – 21.

72.     Fitzgerald voluntarily resigned before his transfer from the Purchasing Department was completed. Id. at 30:21 to 31:18; 35:14 - 19.

**Plaintiff's Mishandling of Internet Technology Department Complaints**

73.     Plaintiff was also assigned to investigate some concerns raised by a Jason McFarland in the internet Technology Department ("IT") about a female co-worker who has made unwanted advances towards him. Id. at 132:15 17, 22 – 25; 133:1 -5.

11

74.     Plaintiff admitted that Mr. McFarland complained about the way Plaintiff conducted his interview of him to Lazarus. Id. at 133:7 10 134:18.

75.     Initially McFarland reported the behavior on June 27, 2022, but Plaintiff refused to launch an investigation unless McFarland produced a written statement. McFarland attached this statement to an email to Plaintiff dated July 1, 2023. Id. at 135:6 to 138:8. *See also* Exhibit F-4 referenced therein attached hereto as Exhibit 13.

76.     In his email McFarland, which was copied to Lazarus and Woolley, McFarland complained as follows in relevant part:

> John said that Hector would rather not do anything and let the matter be resolved on its own, to which I was not happy about to say the least.
> I told John that was not acceptable and I believe that someone from H.R. needs to do something because I do not feel comfortable in my own Department, which I have been employed in for over 25 years. John agreed and spoke to Hector again and told him that it was not acceptable to do nothing.
> . . .
>
> John asked if I would be able to meet with Hector and play the voicemail for him. i met with Hector on Wednesday 6/29 where I played the voice mail for him and explained to him all that had happened up to that point. I also let Hector know that I was not ok with just doing nothing like he suggested to John Becht. He said that he thinks John misunderstood what he meant by that, and said that he would rather see if things would work out on their own. I thought that was the whole point of reporting the harassment so that someone from HR would speak with Regine so that she would not continue to contact me or make me feel uncomfortable. After leaving Hector's office, he told me that he was going to have a conversation with her.
>
> [The statement continues to describe how despite the above intervention, the other employ continued to contact McFarland via text message after hours on June 29, 2022]
>
> Once again since no one had addressed this issue with her, I was sent another message that night around 10:30pm that was not appropriate and did not make me feel as though I was being taken seriously by the H.R. department. How many times can you say that you feel uncomfortable and do not want to have any contact before something is done? I guarantee if the roles were reversed and this was a female being sent the exact same messages that something would have been done on Day 1.

I spoke with my director the next morning to let him know that there was another message sent and it seemed as though she was still not contacted by HR and told that she was not to contact me.

While I was speaking with John about the latest message, Hector came into John's office. At this point I was told that i would need to write up a statement regarding everything that had happened.

I asked, why would I have to do that, since I had already reported the incident on Monday 6/27 and I already met with you and gave you a printout of the messages that were sent along with a note that was left on my desk from her? I asked if there was a form that could be filled out? Hector informed me, there is no form and that this is the way HR handles these things. Hector got loud and was unprofessional raising his voice stating that I needed to just type up what had happened, a very different demeanor than when I had met with him one day earlier. I find it confusing that this was reported on Monday and now on Thursday, no one has even spoken to her about any of the complaints that were reported to HR.

I wonder if I was a woman reporting sexual harassment to HR would it take this long for the man to be brought into the office?

Id.

77.     In responding to McFarland, Plaintiff confused McFarland with the County's labor counsel, John McLoughlin and sent him a response, needlessly bringing an attorney who charges the County by the hour into this particular issue. *Compare* Exhibit 2 at 58:3 to 59:24 with Id. at 132:11 – 21; 141:5 to 147:24. *See also* Exhibit F-5 referenced therein and attached hereto as Exhibit 14.  This error was later pointed out to Plaintiff by Johnson on which Woolley and Lazarus were also copied. Exhibit 2 at 148:18 to 150:3. *See* also Deposition Exhibit F-6 referenced therein and attached hereto as Exhibit 15.

78.     The eventual proper investigation ended up in the employee of which McFarland complained about being terminated for her behavior.

79.     Plaintiff denied that conducting this investigation effected his ability to address the aforementioned complaint in the Procurement Department which arose around the same time. Exhibit 2 at 139:5 to 140:22.

80.     The only assistance Plaintiff requested from his superior Mr. Johnson was in setting up an interview with McFarland that led to his statement. Id. at 140:23 to 141:5.

81.     Although the complained about employee was ultimately terminated, Plaintiff originally had recommended progressive discipline, because he never took the time to learn that she was in her probationary period and could be terminated for any reason, Id. at 230:18 to 231:16; 232:8 to 237:7. *See also* Deposition Exhibit F-19 referenced therein and attached hereto as Exhibit 24.

82.     Lazarus was disappointed with Plaintiff's investigation of this particular personnel issue because the complained about employee could easily have been dismissed during her probationary period without cause. Exhibit 7 at  121:16 to 123:1.

**Plaintiff's Mishandling of Pay Disparity Complaints**

83.     On June 29, 2022, Footman forwarded a request to Plaintiff to investigate a pay disparity issue involving a member of a state worker's union.  Plaintiff acknowledged receiving it. Exhibit 2 at  237:19 to 238:20; 239:6 - 9. *See* also Deposition Exhibit F-20 referenced therein and attached hereto as Exhibit 25.  A copy of this correspondence was copied to Woolley. Id.

84.     Plaintiff admitted that he never reviewed the forwarded emails of Lazarus' assistant in Footman's email that provided the details of the pay disparity issues. Id. at 239:11 to 242:11.

85.     Plaintiff's complete failure to follow up on this investigation request led to Footman sending him a reminder that it had not been completed on August 14, 2022. *See* Exhibit 25.

86.     Even after this reminder, Plaintiff admits he took no initiative to begin the requested investigation. Id. at 242:16 to 243:3.

87.     He admits that he never requested help in addressing this matter. Id. at 243:4 – 10.

88.     This assignment never appeared on a work track logging that Plaintiff had been asked to create by Woolley. Id. at 243:11 – 18.

89.     Woolley stated that he was aware that Plaintiff never performed this task asked of him. Exhibit 8 at 59:12 – 21.

### Plaintiff's Mishandling of County Prison Union Issues

90.     At the time he was offered a full-time position that one of the issues Defendant was dealing with was assuming control of a privately run county prison known as the George W. Hill Correctional Facility ("County Prison"). Exhibit 7 at 118:11 to 119:1. *See also* Affidavit of Warden Laura Williams attached as Exhibit 26.

91. As part of the transition, although the County Prison had its own Human Relations Department, it was expected to report to and seek guidance from the central Human Relations/Personnel Department that was headed by Jamal Johnson. Exhibit 26.

92. The County Prison was expected to take direction and input from Mr. Johnson's department on the handling of personnel matters, including but not limited to, union negotiations, personnel investigations, and such things as separating alleged victims from alleged abusers while discrimination claims are being investigated.  Id.

93.     Plaintiff was aware of this initiative and that he was going to be involved in the mechanism of the change of control. *See* Exhibit 2 at 40:14 to 41:2.

94.     Plaintiff was specifically aware that the county was taking the position that all correctional facility personnel had to reapply for a position when management changed, and this

posed specific challenges because the president and vice president of one of the prison unions were under investigation for claims of abusing inmates and Warden Williams did not want to rehire them. Id. at 41:3 to 42:3; 60:18 to 61:9.

95.    On February 10, 22, at the direction of labor counsel (Archer & Greiner), Warden Williams forwarded the CBA's for the Correctional Officers and the Sergeants to Plaintiff, as he was designated as the appropriate entity to begin outreach to schedule meetings with the respective union leadership. Exhibit 26.

96.    On February 18, 2022, Warden Williams sent a follow up email to Plaintiff to ask if he had engaged any of the unions. Id.

97.    Plaintiff  responded on February 19, 2022, that he had not made any follow up. Id.

98.    The County's special labor counsel, attorneys Carlton Johnson and Shelley Smith also engaged in follow up with Plaintiff to ensure that contact would be made. Id.

99.    By March of 2022, Warden Williams became aware that the outreach had not occurred and a phone number was provided to Plaintiff again on March 16, 2022. Id.

100.    Warden Williams became aware that Plaintiff called Stephen Richman, Esquire, counsel for the Delaware County Prison Employees Independent Union  ("DCPEIU") on March 16, 2022. Id.

101.    At that time, Plaintiff still had no communication with the Sergeant's union. Id.

102.    On March 23, 2022, Warden Williams began to notice that Plaintiff was emailing Jamal.Johnson@crozer.org  (apparently a former employer of Johnson) and not his county-issued email address, such that necessary emails were not reaching Johnson through his official email. Although this was addressed multiple times, this error was continuing from Plaintiff. Id.

103.    On March 25, 2022, a meeting was held in which Plaintiff, Johnson, Patrick Doran (Archer & Greiner), Tom Kohn (DCPEIU counsel), Stephen Richman (DCPEIU counsel), Ashley Gwaku and Frank Kwanning attended. The purpose of this meeting was to provide the employment Terms and Conditions during the upcoming transition. Plaintiff and Johnson volunteered to provide the following information to the representatives of DCPEIU: benefit comparison from GEO to County, Dues checkoff, pay cycles, county pension/retirement benefits. Warden Williams recorded minutes for this meeting and sent a summary email on March 25, 2022. Warden Williams sent a follow up email on March 20, 2022 to have this information sent to the union prior to the April 6, 2022 transition. With prompting, this information was sent.  Id.

104.    On April 5, 2022, Warden Williams provided information for the Sergeant's Union to Plaintiff and Johnson. Id.

105.    On April 6, 2022, The County of Delaware fully assumed the operation of the County Prison. Id.

106.    On April 8, 2022, Stephen Richman reached out to Plaintiff regarding a number of requests. This was forwarded to Warden Williams who immediately included John McLaughlin (newly assigned legal counsel with Campbell Durant) for review. Warden Williams did not receive any further emails about this request from Plaintiff until June 24, 2022 at which time he claimed he has sent me multiple follow up requests, which he in fact did not. Mr. Figueroa copied DCPEIU counsel Mr. Richman on this email. Id.

107.    Plaintiff admits that he was involved in the prison union negotiations, and that prior to leaving his position for the first time that he has received communication from counsel for the union, Mr. Richman requesting information and documents. He further admits that he did not satisfy this request before he left. Exhibit 2 at 60:1 – 17; 153:19 – 3; 154:7 to 157:6 to 159:6;

162:22 to 163:24.. Plaintiff gave no indication to Attorney Richman that he was leaving working for the County and no instruction as to who Attorney Richman should contact in the future. Id. *See also* Deposition Exhibit F-7 referenced therein and attached as Exhibit 16 hereto.

108.    In the period in which Plaintiff was in between his periods of employment with the Defendant, Attorney Richman had Plaintiff's private cell phone number, but never called him. Exhibit 2 at 165:1 – 7.

109.    When Plaintiff returned to working for the County on or around June 13, 2022 he found that his email was still active and he had received an email directed solely to him from Attorney Richman again seeking the information in his April 8, 2022 correspondence. Exhibit 2 at 159:9 to 162:8;. *See also* Deposition Exhibit F-8 referenced therein and attached as Exhibit 17 hereto.  On both his June 13th and initial June 15th correspondences to Attorney Richman, Plaintiff did not copy any other County personnel. Id.

110.    In his June 15, 2022 correspondence to Plaintiff, Attorney Richman stated:

I understand your situation but I made the original request for the information on April 8, so it has been over two months without any response from the County. The information is absolutely necessary for the Union to move forward. If the information is not immediately forthcoming, applicable unfair labor practice charges will be filed with the Pennsylvania Labor Relations Board. Additionally, it is the Union's understanding that the County has implemented a number of new policies and has plans that to implement more in the near future. The Union has not been provided with any notice or information about these policies, which affect the working conditions of the bargaining unit employees. Please provide this information as soon as possible. The Union looks forward to the County honoring its lawful obligations in the regard promptly

Exhibit 17.

111.    Despite receiving a warning that an unfair labor practices was being complicated, Plaintiff did not follow up with Warden Williams to get the information requested by the corrections officers union until June 24, 2022 – nine days later – when another demand for

documents and information was made by Attorney Richman. Exhibit 2 at 178:14 to 186:23. *See also* Deposition Exhibit F-10 referenced therein and attached as Exhibit "18". *See also* Exhibit 26.

112.    Warden Williams raised complaints about Plaintiff's handling of the preparations for the union negotiations, including not keeping her and labor counsel informed of the matter and consulting her for availability for negotiations events. *See* Exhibit 26. Warden Williams conveyed these concerns to Woolley, Lazarus and Footman. Id.

113.    Plaintiff admits that he knew he should be on contact with County attorney Mclaughlin during this time and was confusing him with Complainant McFarland of the IT Department due to the fact both matters were being handled simultaneously. Exhibit 2 at 187:21 to 188:9.

114.    In fact, an unfair labor practices complaint was filed by the corrections officer's union due to the delays in providing the information that had been originally requested in April 2022, and the County's Labor counsel, Mr. McLaughlin was able to have the date moved back by he himself provided requested information in or around August 3, 2022 that Plaintiff was supposed to provide to the aforesaid union. In response to learning of Mr. McLaughlin's actions, Plaintiff admitted that he was not paying enough attention to the matter. Exhibit 2 at 221:1 to 222:20. *See also* Deposition Exhibit F-17 referenced therein and attached as Exhibit "23". *See also* Exhibit 8 at 59:3 – 11. *See also* Exhibit 26.

115.    Lazarus was further aware that in addition to Plaintiff's failure to timely provide documents requested by the aforementioned unions, he would show up for late for negotiation meetings or not at all, and was often not prepare when he did show up. Exhibit 7 at 119:2 to 120:8.

### Plaintiff's Mishandling of County Prison Personnel Complaints

116.    Plaintiff was involved in investigations against correctional officers employed at the County Prison.

117.    In response to a request from the Human Relations/Personnel Department, Warden Williams indicated that her staff would agree to help coordinate the necessary staff interviews in an email dated July 29, 2022. In response to same, Plaintiff indicated that he would expeditiously examine three of the witnesses. Exhibit 2 (Figueroa) at 213:7 to 215:9. *See also* Deposition Exhibit F-15 referenced therein and attached hereto as Exhibit 21.  Notably, Messrs. Woolley and Lazarus copied on Plaintiff's correspondence. Id.

118.    Plaintiff admits that he never interviewed any prison guards. Exhibit 2 (Figueroa) at 211:1 to 213:5.

119.    Warden Williams requested and was granted a meeting with Woolley in which she, Johnson and Footman attended to discuss how the personnel investigations at the prison were being conducted, and Warden Williams concerns and displeasure regarding same. *See* Exhibit 26, (Williams Aff.).

120.    Plaintiff's failure to complete all related interviews was documented in a memorandum by Footman with expectations on when they were to be completed. *See* Deposition Exhibit F-16 attached hereto as Exhibit 22. Said Memorandum was copied to Woolley. Id.  *See also* Exhibit 9 (Footman) at 74:8 to 77:24; 79:8  - 24. *See* Exhibit 26 (Williams Aff.).

121.    As a result of Plaintiff's failure to properly and timely conduct investigations of prison personnel, one of the complainants quit her position, opening the County to possible liability for a constructive discharge suit. *See* Exhibit 26 (Williams Aff.).

122.    While the investigations ultimately led to the proper termination of employees not meeting the standards of the County, Warden Williams found that the process was conducted in an untimely manner. *See* Exhibit 26 (Williams Aff.).

## Plaintiff's Firing was the Result of Poor Job Performance Overall

123.    Approximately one to two weeks prior to being fired, Plaintiff admits that Woolley requested that Plaintiff provide him information about how Plaintiff keeps track of all of his assignments. Exhibit 2 (Figueroa) at 190:13 to 191:9.

124.    In response to Woolley's request, Plaintiff provided an email that summarized some of his ongoing projects. Exhibit 2 (Figueroa) at 193:4 to 195:10. Plaintiff admits that Woolley was dissatisfied with the information he provided.  *See also* Deposition Exhibit F-11 referenced therein and attached as Exhibit "19".

125.    Woolley explained that these responses were insufficient for him, because as his superior he wanted to be able to dynamically track the various issues the Human Relations/Personnel Department was working on, and how he told Plaintiff that his efforts to meet this need was insufficient. Exhibit 8 (Woolley) at 11:23 to 10:13; 78:23 to 80:2; 80:19 to 81:22. *See also* Exhibit 9 (Footman) at 81:7 to 82:24

126.    Lazarus agreed that Plaintiff's inability to keep track of his assignments was a deficit in his performance. Exhibit 7 (Lazarus) at 120:9 to 121:15.

127.    Plaintiff also admits that he completed projects a "little late". Exhibit 2 (Figueroa) at 247:20 to 248:2.

128.    Prior to his termination, Plaintiff had been counseled that his work was subpar. Exhibit 8 (Woolley) at 8:18 – 23; 10:14 to 11:8.

129.     Footman advised Woolley that it was her opinion that, "[Plaintiff] doesn't  follow

up. He's not timely. And not transparent." Exhibit 9 (Footman) at 78:17 – 24.

130.     In preparation for a discussion with the elected Councilmembers of the County of

Delaware, Woolley prepare a memorandum of talking points as to why Johnson should be demoted

and Plaintiff terminated. Exhibit 8 (Woolley)  at 74:3 – 16; 76:20 to 77:3; 83:10 to 84:15. *See also*

Deposition Exhibit 11 referenced therein as Exhibit 19.

131.     Based on Woolley's recommendations and input, Plaintiff was  terminated due to a

"culmination of events that occurred under his watch that placed the County in jeopardy with

regard to relations -- relationships between the employees, unionized employees, non-represented

employees, employees in general, and so there was a series of these events, and that culminated in

his termination." Id at 9:12 – 22; 12:14 – 23.

132.     Plaintiffs' inability to perform his job functions properly forced his supervisor,

Johnson, to cover for him which caused Johnson to underperform his job duties. Exhibit 7

(Lazarus) at 15:23 to 17:19; 22:1 to 23:3.

133.     Lazarus' decision was based on the input and advice of Woolley as stated in his

aforementioned talking points memorandum prepare for presentation to County Council. Id. at

25:9 to 26:4.

**WHEREFORE**, Defendant Delaware County respectfully requests that judgment be entered in its favor and against Plaintiff, together with all costs of and attorneys' fees permitted by law.

Respectfully Submitted,

**HARDIN THOMPSON, PC**

_____

BY:     Michael F. Schleigh, Esquire
*Counsel for Defendant, County of Delaware*

DATED: