1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT

3                   OF PENNSYLVANIA

4              * * * * * * * *

5   HECTOR FIGUEROA,            *

6       Plaintiff            *   Case No.

7       vs.                  *   2:23-cv-00515

8   COUNTY OF DELAWARE,        *

9       Defendant            *

10             * * * * * * * *

11

12              DEPOSITION OF

13          HECTOR FIGUEROA

14          October 24, 2023

15

16

17

18

19

20

21

                    **ORIGINAL**

22

23

24   Any reproduction of this transcript is prohibited

25    without authorization by the certifying agency.

Page 10

1   your hand or get that close to you.

2   A.I appreciate that.

3   Q.Okay.

4   It's not meant to be offensive.  Today is the day

5   of your deposition.  Have you ever given a deposition

6   before?

7   A.No.

8   Q.All right.

9   I understand you have a J.D.?

10  A.Yes.

11  Q.Did you take any classes in civil procedure, or

12  discovery, evidence, things like that?  Are you ---

13  A.Yes.  I ---.

14  Q.--- generally ---

15  A.Yes, I did.

16  Q.--- generally familiar with what a deposition is?

17  A.Yes.

18  Q.Okay.

19  And how long have you had a career involving human

20  relations?

21  A.It started in 2004.

22  Q.Okay.

23  A.And I've been doing it ever since then.

24  Q.So just under 20 years, and you've never had the

25  fortunate experience of giving a deposition?

1    A. No.

2    Q. All right.

3    I'm going to go over what I hopefully will be some

4    agreeable ground rules that will help keep the record

5    pretty clear, help the Court Reporter keep order and

6    hopefully be fair to both of us.

7    Okay?

8    All right.

9    The first thing we both need to understand is that

10   everything that's being said is being taken down by the

11   Court Reporter to make a transcript that will be as

12   accurate as possible.  For that reason, you have to

13   answer all of your questions out loud.

14   A. Sure.

15   Q. Okay.

16   Great.  Although I have a style that I'm told is

17   very conversational, and it's not unusual to --- people

18   talk over one another in a conversation.  It does make

19   it hard to a court reporter.  So if you could try and

20   answer a question when I'm finished asking it, that

21   would be helpful in making sure the record is clear.

22   Okay?

23   A. Okay.

24   Q. If at any point today you don't understand a

25   question that I'm asking, it's perfectly okay to advise

Page 19

1    Q. You ever volunteer anything about your experience

2    there?

3    A. No.

4    Q. Okay.

5    All right.

6    Turning back to when you started with Delaware

7    County through the Aston Carter position.

8    A. Uh-huh (yes).

9    Q. What was --- that was an instruction I missed

10   earlier.  In the course of normal conversation, uh-uh

11   or uh-huh, shaking of the head, nodding of the head,

12   things like that, perfectly understood by the other

13   speaker in context.

14   A. Not a problem.

15   Q. On a dry record, it won't be understood.  So when

16   you speak answer that's a negative or affirmative, use

17   yes or no.

18   A. Sure.

19   Q. Things like that.

20   Okay?

21   All right.

22   Going back to the question when you were there in

23   the beginning of March of 2022 through the Aston Carter

24   placement, what was your understanding of what your

25   duties were going to be?

1  A.That of Assistant Director of Labor Relations.

2  Q.That's the title.  Did you understand your ---

3  duties were going to be?

4  A.Yes.

5  Q.What did you think you'd be doing?

6  A.Basically dealing with union grievances, any

7  investigations that arrived from those, addressing

8  complaints that came in from the unions and/or

9  employees and possibly arranging for union

10 negotiations.

11 Q.Okay.

12 A.Or preparations for union negotiations.

13 Q.I know you have a J.D.  What's the full extent of

14 your education?

15 A.Pardon?

16 Q.I said, I understand you have a J.D.

17 A.Yes.

18 Q.Juris Doctorate.  What's the full extent of your

19 education?

20 A.I have a bachelor's in History from the University

21 of Buffalo.  I also have my J.D. from the University of

22 Buffalo.  Now, I originally went to Baruch College in

23 New York City between the years of 1970 and '74, but I

24 dropped out in '74.

25 Q.And what college was that?  I'm sorry.

Page 24

```
 1   it.

 2   Q.Which I did last month.

 3   A.So --- pardon?

 4   Q.Which I did last month.

 5   A.So I handle all of the labor relations within the

 6   City of Buffalo --- I mean, within the City of New York

 7   City for close to three years.

 8   Q.Okay.

 9   When did you move down to the Bear, Delaware area.

10   A.To give you an approximate date, ---

11   Q.That's fine.

12   A.--- not good, but I'd say about 21 years ago

13   because we purchased the house and it was brand new.

14   Q.Did you ever sit for a bar exam?

15   A.Twice.

16   Q.And how'd that go?

17   A.Failed it.

18   Q.Sorry to hear that.  Any that you passed?

19   A.Pardon?

20   Q.Are there any that you passed?

21   A.No.  I --- I called it a game when I took the

22   Pennsylvania Bar and missed it by four points, and

23   that's when I said, you know, enough is enough, because

24   I was already beyond 40-years old.  I already had two

25   daughters and a wife, and those --- so let me go to
```

Page 25

1    work and I never looked back.

2    Q. Okay.

3    And what field did you get into when you made that

4    decision?

5    A. I originally got into education.  I became the

6    education director for the Urban League.  There were a

7    couple other jobs too, but I was brought here.  I had a

8    very good --- well, a very close friend of mine who was

9    the Medical Director for Coventry Healthcare, and he

10   said, listen, they need a compliance manager, but you

11   have to move to Delaware.  That's why I ended up in

12   Delaware.

13   Q. How'd you end up in human relations?

14   A. Basically, when I went to Charleston and I was

15   their chief of staff there and one of my departments

16   that I was ---.  Well, I had --- they reported directly

17   to me from HR, so I was in charge of it.

18   Q. Do you have any certifications or anything ---

19   A. No.

20   Q. --- human-resources related?

21   Human relations?

22   A. No.  No SHRM or anything like that, no.

23   COURT REPORTER:

24   No what?

25   THE WITNESS:

Page 30

1   A. Sorry about that.

2   Q. No, it's all right.  Like I said, if you need to

3   correct something, just speak up.

4   All right.

5   When you assumed the position in March of '22 with

6   the County, you said you were handling union

7   grievances, investigations, union complaints, employee

8   complaints and that includes both union and nonunion

9   ---

10  A. Yes.

11  Q. --- employees?

12  We're doing it again.  You know where I'm going,

13  and that's okay, but my ---

14  A. I know, I know.

15  Q. --- my mouth got to stop moving so she can get it

16  down.

17  A. Not a problem.

18  Q. And did you have an office on campus at the County

19  building?

20  A. Yes.

21  Q. All right.

22  Where was it?

23  A. If I remember correctly, it was on the second

24  floor.

25  Q. Okay.

1    later, but that's his normal time.

2    Q.Okay.

3    And when you took up this position, were you

4    replacing anyone?

5    A.No.

6    Q.Were you a brand new hire?

7    A.It was a new position.

8    Q.It how did you get hired for that position?

9    A.It's a good question because I had been hired, I

10   had been sent there by Aston Carter.  I interviewed

11   with Howard Lazarus and Jamal.  The day after I

12   interviewed with them, I got offered the position on a

13   contract basis.  And then about three weeks, four weeks

14   after I was there, I was offered a job by Jamal as a

15   full-time employee.

16   Q.And to the extent you may remember, what was

17   explained to you at the time of your interview by Mr.

18   Johnson and Mr. Lazarus about what they needed you to

19   do, what challenges they were looking at and hoping you

20   may help with?

21   A.Their major challenge at that time was the union

22   negotiations that they were very concerned about.

23   Specifically that it was coming up pretty soon, which

24   was the park police and I think it's SEIU, I'm not

25   quite sure.  I don't remember right now, but that was

Page 35

1    their major concern at that time and also just to make

2    sure that someone was there to address any sort of

3    grievances that may have occurred.

4    Q. Okay.

5    Were you given any historical perspective of what

6    the impressions were of the personnel department, what

7    things they were hoping to accomplish going forward?

8    A. Yes, as a matter of fact, the impression that I

9    was given is that at one time the personnel department

10   was in total disarray and within a very short time

11   before I got there, they were really getting their act

12   together.  But that was the initial impression I got,

13   that they were rebuilding.

14   Q. And how did they see you as part of that?

15   A. At first I was just a contract employee, so

16   getting some sort of visual, some sort of idea of what

17   they expected of me was basically what I was supposed

18   to do as per the instructions, but then when they did

19   hire me, they felt that I was going to be a vital part

20   of the entire revitalization.

21   Q. When you say it's in disarray, what was your

22   understanding that would lead to that conclusion?

23   A. Well, as you may know, there was a big political

24   change in the County of Delaware that I wasn't aware of

25   until I got there.  And prior to Jamal getting there,

1   HR wasn't respected very much and I think there were a

2   lot of concerns about HR, but insofar as whether or not

3   anyone gave me any finite details insofar as dipping

4   into the weeds, they just said that it was rebuilding,

5   it was in disarray.

6   Q. How soon before the interview did Aston Carter

7   tell you this position might be open and that you're

8   being considered for it?

9   A. The day after I interviewed.  So I interviewed one

10  day, and they told me the very next day that I had been

11  hired.

12  Q. I either poorly phrased it or you didn't answer my

13  --- understand my question, so I'll try again.  How

14  soon before the interview ---

15  A. Oh ---.

16  Q. --- did Aston Carter tell you about it, and what

17  did they tell you about it?

18  A. About a week.

19  Q. Okay.

20  A. They said we have this position available.  They

21  were concerned because they had never dealt with that

22  before, with that sort of position.  They said, listen,

23  we have this available.  We've never done one of these

24  before.  We're referring you because we feel that

25  you're a good candidate.  Please do your best, and I

Page 40

1   ATTORNEY SCHLEIGH:

2   Yeah.

3   COURT REPORTER:

4   And you want mini and regular size?

5   ATTORNEY SCHLEIGH:

6   Sure.

7   COURT REPORTER:

8   Okay.

9   Thank you.

10   ATTORNEY SCHLEIGH:

11   Thank you for your patience.

12   All right.

13   BY ATTORNEY SCHLEIGH:

14   Q. We were talking about one of the things that you

15   were going to be working on as you got involved in

16   March '22 was the fact that the prison was in the

17   process of privatizing and there was employment

18   decisions to be made.

19   What else do you recall about that part?

20   A. There was specifically --- well, a lot of the

21   individuals had to be reinterviewed prior to going back

22   in, but one of the sticking points that became an issue

23   is that there were two individuals from the prison.

24   One was the president of the union, the other one was

25   the vice president of the union that had been accused

1   of physical violence against the inmates, and she did

2   not want to hire them back.

3   Q. When you say she, you're talking about the warden?

4   A. Yes, the warden.

5   Q. That would be Warden Lisa Williams?  Or was it

6   Linda?

7   A. I know her last name was Williams.  I'm not quite

8   sure.  I don't know her first name.

9   Q. Okay.

10  A. And that became an issue.

11  Q. How so?

12  A. Well, she absolutely refused to rehire them, and

13  then the union kept on insisting that they be hired,

14  and it became an issue.  Well, I had already left when

15  --- well, I was told to leave prior to the negotiations

16  ending, but that had been a very big issue, that the

17  union wanted them to be rehired and the warden didn't

18  want them back.  And on top of that, myself and Jamal

19  agreed that they should not be hired because they had

20  very poor records of physical violence against inmates,

21  and the violence had been documented, too, so that's

22  why.

23  Q. And because of their positions, they were part of

24  the collective bargaining agreement ---

25  A. Yes.

Page 42

1   Q.---for that union.

2   Right?

3   A.Yeah.

4   Q.Now, there was a period where you went from being

5   a contract employee, and then you said you were hired

6   full time.

7   Was there a break between the two?

8   A.No, as a matter of fact, I had been a contract

9   employee for about three to four weeks, and then Jamal

10   and Mr. Lazarus came into my office and said, we're

11   hiring you full time.

12   Q.Is there a period where you had left?

13   A.Yes.  As a matter of fact, I don't remember the

14   dates exactly, but I took a position with a firm called

15   AVI at Penn Medicine, but I was only there for maybe

16   three to four weeks and then I went back to the County.

17

18   Q.Okay.

19   Can you narrow down what the time frame of that

20   was, like, date-wise or month-wise?

21   A.I think it was between April and May that I was at

22   AVI.  I wasn't there very long, and then I went back to

23   the county.  I started questioning my decision as to

24   why I went to AVI, and I had made a very bad mistake.

25   So I approached Jamal about going back.

1    this is not the place for me.

2    Q.Okay.

3    Anything else other than that?

4    A.That's it.  I just didn't feel that I was at the

5    right place.

6    Q.Did you feel like it was a lack of respect?

7    A.No.  Well, I don't know, to be frank with you.  I

8    just felt that it was location-wise, and where I was

9    positioned within the building was not so much the

10   office.  I was next to the food processing area.  And

11   again, I felt very uncomfortable.  I just didn't want

12   to be there.

13   Q.Were there any issues with your job performance

14   while you were with AVI?

15   A.No.  No, none.

16   Q.How did your rejoining the county get initiated?

17   A.I contacted Jamal and I said, listen, verbatim I

18   said, can I go back?  And he said, well, let's see what

19   we can do, because when I left, I left with ---under

20   very, very, very nice conditions.  And he said, let's

21   see what we can do.  I guess he approached Howard

22   Lazarus and they approved it.

23   Q.When you left the first time, they took you out

24   for drinks or something, right?

25   A.Yeah.  They took me out for lunch.

Page 49

1    Q. Okay.

2    Who was in attendance at that?

3    A. The entire HR staff.  To give you their exact

4    names, I can't remember.

5    Q. Okay.

6    A. But I would say that close to 80 percent of the

7    staff was there.

8    Q. People from outside HR as well?

9    A. No.

10   Q. How about Lauren Footman?  Did she ever ---

11   A. No.

12   Q. --- go out there with you?

13   A. No.  I don't believe she had been ---.  I don't

14   quite remember whether or not she was already on staff

15   at that time.

16   Q. When you left the first time and took the position

17   with AVI, did you have to do like, any exit memos or

18   status reports for whatever you were working on?

19   A. No.

20   Q. Were you ever asked to?

21   A. NO.

22   Q. Was there any way that you updated your direct

23   reports as to what you were leaving undone?

24   A. Well, I gave Jamal a ---.  I used to give him

25   daily updates, insofar as what was outstanding, but

1    insofar as anything written, I don't think I did.

2    Q.Okay.

3    So when you say you gave him updates, was that

4    done orally?

5    A.Yes.  I used to go to his office every morning.

6    Q.Was there like an end-of-day meeting as well?

7    A.No.

8    Again, I'm trying to remember whether or not I

9    gave him anything in writing, but quite frankly, I

10   can't remember right now.

11   Q.That's fine.  Is there anything that might refresh

12   your reflection?

13   A.I would have to rifle through all of my emails,

14   but my computer was left there and all the emails that

15   were in the computer were there.

16   Q.Were there any type of regular reports you had to

17   make while you were working for the office during the

18   first period?

19   A.No.  I just made sure that I would get together

20   with him and let him know what was going on.  There may

21   have been times that I sent them emails insofar as the

22   investigations that were ongoing, but I don't have

23   copies of those.

24   Q.I understand.  Did you review anything in

25   preparation for your deposition day?  And I don't want

1   only about 15 of us were left after that.

2   Q.Okay.

3   When you came back after being at AVI, was there

4   any change to what your job responsibilities were?

5   A.No.

6   Q.Okay.

7   A.Just to make sure --- I think the emphasis got a

8   little bit more --- the emphasis stayed on the

9   negotiations and on making sure that any sort of

10  investigations addressed, but nothing really

11  outstanding changed.

12  Q.Did you have coworkers in your unit who also were

13  doing investigations?

14  A.No.  Just Jamal and myself.

15  Q.Who else was in your unit?

16  A.It was just myself and Jamal.  I mean, I dealt

17  with ---.  Everybody else that was there had their own

18  distinct duties.  I dealt with --- I used to get

19  referrals from

20  Q.Everybody.

21  A.Else that was there, had their own distinct with.

22  I used to get referrals from Munsanda Brown and also

23  from ---I can't remember her name she was deeply

24  involved with FMLA and extended leave.  I got some

25  referrals from them, but I was the only one doing what

Page 55

1    I did, along with Jamal.

2    Q.Okay.

3    What was your understanding of what Ms. Brown's

4    responsibilities were?

5    A.She was recruiting.  She specifically dealt with

6    recruiting.  There were times, of course, that

7    complaints because she had been there longer than I.  I

8    guess they felt comfortable with her.  There were some

9    complaints that were forwarded to her, and she would

10   forward them to me, but that's about it.

11   Q.Okay.

12   Was there any other office workers in your

13   department or anything like that?

14   A.Yeah.  There was --- they were involved primarily

15   with making sure that the documentation with new

16   employees came in, were done.  There was another

17   individual that was involved with putting together

18   training, extensive training for new employees and for

19   old employees.  There was another individual that was

20   firmly involved with retirement and the requirements

21   thereof.  There were three people involved with that,

22   but I didn't deal with them much.

23   Q.Okay.

24   A.I mean, we were familiar, but insofar as working

25   on projects together?  No.

Page 56

1   Q. You wouldn't have reported to them; they wouldn't

2   report to you?

3   A. No.

4   Q. Did you have any responsibilities with, let's say,

5   something like subpoena compliance?

6   A. There were a number of subpoenas that came

7   through, and I would give those for follow up to the

8   lady that dealt with FMLA and extended leaves, because

9   a lot of them had to do with those, but that was about

10  it.

11  Q. Did you ever handle any subpoena compliance

12  yourself?

13  A. No.

14  Q. Was there ever a time ever while you're working

15  for the County where you thought your workload was too

16  high?

17  A. No.

18  Q. Okay.

19  Did you ---?

20  A. No, I don't think so.  I mean, everything was, in

21  my view, everything was handled as they should have

22  been handled.  There was never a time that it was

23  overextended.

24  Q. Was there ever a point while you're working for

25  the County at any time where you asked for any

1  assistance with any of the assignments that have been

2  given to you?

3  A.Can you rephrase that?  I mean, I don't understand

4  what you're asking.

5  Q.Is there any point where you asked for any

6  assistance with any assignments that you've been given

7  that you were expected to perform yourself and you felt

8  you were unable to?

9  A.No.  It wasn't that I wasn't able to, is that I

10  usually used to turn to Jamal sometimes because of the

11  fact that he was ---.  His role, everything that had to

12  do with unions, as per the regulations, had to go to

13  him.  So when it came, when there were issues that had

14  to do with union negotiations and the finer points of

15  it, insofar as what he was aware of, I would share with

16  him and at times ask for help.  But other than that,

17  no.

18  Q.Were there ever times that you felt that he was

19  unresponsive to any of your requests?

20  A.No.

21  Q.Okay.

22  Is there any time where you felt Mr. Johnson

23  wasn't giving you the support you needed as a direct

24  report?

25  A.No.  He was --- quite frankly, he was the best

Page 58

1   supervisor that --- one of the best that I've ever had.

2

3   Q.In the course of working on any of the union

4   projects, did you come into contact with any outside

5   attorneys?

6   A.Oh, yeah.

7   Q.Who were working for the County?  Let me ---

8   A.Well, ---

9   Q.--- narrow the scope.

10  A.There was one -- there was one individual, I can't

11  --- I think it was --- last name was McFarland.  I

12  can't recall right now.  He actually used to

13  participate in all the union negotiations that we had.

14  Q.Okay.

15  And you think his name is McFarland?

16  A.I can't quite remember, but I think so.  I'm not

17  quite sure.

18  Q.Okay.

19  A.I can't remember right now.

20  Q.Did you ever meet Mr. McFarland face to face?

21  A.Oh, yeah, plenty of times.

22  Q.So what do you look like?

23  A.He had grayish hair, had a mustache from what I

24  remember correctly.  I guess he was about maybe five-

25  five, five-six, maybe five-seven.  If he tipped the

Page 59

1   scales, it was anywhere between 190 pounds.  It was a

2   lot.  Very well dressed, very well mannered.

3   Q.Do you remember what firm Mr. McFarland was

4   associated with?

5   A.No, I don't remember.

6   Q.Does the name Campbell Durant sound familiar?

7   A.Yes.  There were a couple of attorneys that I

8   initially dealt with, Jamal and I were dealing with

9   initially with the union negotiations, with the prison

10  that came from there.  But Jamal and Mr. Lazarus and

11  myself --- well, mostly those two, decided that their

12  participation should be limited insofar as the union

13  negotiations were concerned and that they should be

14  given just a certain portion of it.  But insofar as

15  upfront union negotiations, no, the County decided to

16  leave them out of that.

17  Q.Why was that?

18  A.I guess it had to do with some history.  The

19  feeling was that they were more of a --- not a

20  detriment, but that ---.   And again, I'm trying to

21  remember, it was just a general feeling that their

22  participation was it wasn't providing anything, so the

23  decision was made not to let them participate to the

24  fullest extent.

25  Q.Okay.

1   Were you involved in prison union negotiations

2   prior to you going to AVI?

3   A.Prior to myself going to AVI there were --- that

4   was at the very beginning of it.

5   Q.Okay.

6   A.I remember distinctly that prior to me leaving,

7   there was an email that was sent by Mr. Richman, who is

8   the attorney for the union, asking for some very

9   specific information that he had required to actually

10  begin the negotiations, but that was about it.  When I

11  got back --- when I went back, I had discovered that

12  --- because I had sent a copy of that message to Jamal

13  and to other individuals in the County, that he was

14  requesting information.  When I got back to the County,

15  I discovered that they had not taken care of that.  So

16  I just tried to make sure that he got everything that

17  he wanted.

18  Q.Did you have any problems accomplishing that task?

19  A.Well, it was very extensive.  All right?  That's

20  where the situation having to do with the other two

21  individuals that were not being hired came into play.

22  Q.Just to reference earlier testimony, you're

23  talking about the president, vice president ---

24  A.Yes, yes.

25  Q.--- and prison security guard union?

Page 61

1   A. Yes, and that came into play at that time.  And

2   that --- again, that wasn't something that I got

3   involved in.  That was a strict decision that was made

4   by the warden, that she just refused to rehire them.

5   What I did at that time is that I got in touch

6   with Mr. Richman.  I said, listen, what is it that you

7   need right now to start the negotiations?  And I think

8   he gave me a couple of things, and I immediately took

9   care of that and sent that to him.

10  Q. Was the Campbell Durant Law Firm involved in that?

11  A. No.

12  Q. Okay.

13  All right.

14  Was there a practice, or protocol or procedure in

15  place that if a department head wanted to write up or

16  discipline an employee, that it had to be reviewed by

17  HR first?  Generally speaking?

18  A. Uh-huh (yes).

19  Q. You have to speak your answer out loud?

20  A. Well, yeah.  We made an effort to let everybody

21  know that if there was a write up, if there was a

22  complaint, whether it had to do with behavior and/or

23  performance, that it'd be run by us.

24  Q. And that was across the board for every

25  department?

Page 62

1   A.I would have to say, yes, they should have known,

2   but I know that Jamal made it a point of making sure

3   that everybody knew that everything had to go through

4   him or myself, insofar as, anything that had to do with

5   performance and/or behavior.

6   Q.Okay.

7   And how is that communicated to the various

8   departments?

9   A.That, I don't know.

10   Q.Okay.

11   A.I'm not quite sure.

12   Q.All right.

13   Would you have been involved in communicating that

14   to the departments in any way?

15   A.No.

16   Q.All right.

17   If a proposed form of write up or discipline came

18   in to your department for review, what was the expected

19   time to review, comment and contact that department

20   head to provide further advice?

21   A.We would like to take care of them as quickly as

22   possible.  There wasn't any sort of specific time frame

23   that was attached to each one of them, but depending

24   upon the complaint and the follow-up interviews that

25   had to be taken care of, we would try to take care of

them as quickly as possible. But of course, that --- you have to take into account that when a complaint is filed, there have to be interviews that have to be taken care of, timeframes have to be agreed to, but we try to take care of them as quickly as possible.

Q.How about just a simple acknowledgement that you've received it? How long would that take?

A.I would have to say that once either myself or Jamal got a complaint, we would try to get a response to the parties involved as quickly as possible. I'd say within 24 to 48 hours, if we could, yes.

Q.And if a proposed write up or discipline is provided, would you expect something to be acted one way or the other within three weeks?

A.Oh, yeah.

Q.Okay.

All right.

How did you personally keep track of what projects you were working on while you were with the department?

A.I had --- I had my own little crib sheet, insofar as, making sure that these things were outstanding. I know Jamal had put something together rather --- it was rather extensive, insofar as, giving a detailed report insofar as to what was outstanding. But I had to keep track of them one way or another. So I just kept my

Page 66

1   Q. And how about your to-do list?  Was that something

2   you kept?

3   A. No, I didn't keep that because, again, there was

4   that big calendar that comes on the desk.

5   Q. That's how you did your to-do list?

6   A. Well, I --- I updated it daily.  I had the

7   calendar, what I would put in there as well.  I was

8   pending for that day or for the week and stuff like

9   that, but other than that ---.

10  Q. Now, we're aware, I think we can all fairly say,

11  that there was some disputes between Lisa Jackson, who

12  was the head of the purchasing department, and one of

13  the buyers by the name of Franklin Fitzgerald.

14  Fair?

15  A. Yes.

16  Q. Okay.

17  How did it first come to your attention?

18  A. It didn't come directly to me first.  The

19  complaint was taken by Munsanda Brown, and then she

20  immediately referred it to me.  Well, not immediately,

21  but she just told me what was going on and she said you

22  have to --- you have to look into this.  So it didn't

23  come to me directly.  It came to her first.

24  Q. Do you remember when Munsanda first informed you

25  about it?

Page 67

1   A. Can I look at my ---?

2   Q. If it helps you refresh your recollection, by all

3   means.

4   COURT REPORTER:

5   How do you spell Munsanda?

6   THE WITNESS:

7   M-U-N-S-A-N-D-A.

8   COURT REPORTER:

9   Thank you.

10  THE WITNESS:

11  And last name is Brown.

12                          ---

13  (WHEREUPON, WITNESS REVIEWS.)

14                          ---

15  ATTORNEY SCHLEIGH:

16  It might be D-E, but I'm not sure.

17  ATTORNEY COHEN:

18  It's A.

19  ATTORNEY SCHLEIGH:

20  Is it?

21  ATTORNEY COHEN:

22  Pretty sure.  You're saying at the end,

23  an E?

24  ATTORNEY SCHLEIGH:

25  Yeah.

1   THE WITNESS:

2   That had to be --- I don't have the date

3   here, but it had to be, I guess, in the middle of July?

4    Yeah, probably the middle of July because I don't have

5   the date right here.

6   BY ATTORNEY SCHLEIGH:

7   Q.Okay.

8   Not able to better approximate it than that?

9   A.I would have to give you either the first or

10  second week of July.  Around the first and second week.

11  Q.Is that the first time you became aware that there

12  was an issue between Franklin and Ms. Jackson?

13  A.Yes.

14  Q.Nothing before that?

15  A.No.

16  Q.Okay.

17  And how was it communicated by Ms. Brown to you?

18  A.She told me to go into her office, that she had

19  been approached by Franklin Fitzgerald, but by that

20  time there was nothing in writing just yet.  She just

21  told me, listen, this gentleman came to my office and

22  there's this complaint, he has a lot of concerns.  And

23  that's when it all started?

24  Q.That's when it started?

25  A.Yeah.  That's when I became aware of it.

Page 69

1   Q. As a resulting of that report being made to you,

2   what, if anything, did you do?

3   A. I called Franklin in just to get his take on it,

4   insofar as what had occurred.  I told Jamal of what the

5   complaint was all about, and we both agreed that the

6   rest of the staff within purchasing had to be

7   interviewed also, and we started doing that.

8   Q. Do you remember approximately how soon after Ms.

9   Brown made you aware of this issue that you spoke with

10  Mr. Fitzgerald?

11  A. Hold on for a second.

12  Q. And you're just referring to your Amended

13  Complaint?

14  A. Yeah.

15  Q. Okay.

16  A. Bear with me.

17  Okay?

18  Q. Sure.

19                        ---

20  (WHEREUPON, WITNESS REVIEWS.)

21                        ---

22  THE WITNESS:

23  I know that the rest of the staff was

24  interviewed on August 2nd and August 3rd.  Insofar as

25  the day, that the exact date that Munsanda Brown had

1  brought to my attention, I can't recall.  I do know

2  that on July 28th, Ms. Jackson had issued a

3  disciplinary action against Mr. Fitzgerald.

4  Oh, one more thing.

5  ATTORNEY SCHLEIGH:

6  Uh-huh (yes).

7  THE WITNESS:

8  We did interview Mr. Fitzgerald on August

9  1st.  When I say we, it was myself and Jamal Johnson.

10  So you figure if in fact he got --- the disciplinary

11  action, was issued on the 28th, he was interviewed on

12  the first.

13  BY ATTORNEY SCHLEIGH:

14  Q.So what triggered the interview?  Was it Munsanda

15  Brown's communication or was it the disciplinary

16  action?

17  A.Munsanda Brown's because, you know, he complained

18  to her, and then not long after that, the disciplinary

19  action was filed against him and that's when all the

20  interviews were initiated, right after that he got the

21  disciplinary on July 28th.  We interviewed everybody

22  within a couple of days right after that.

23  Q.Earlier, I believe you said that Ms. Brown came to

24  you sometime in the first two weeks of July?

25  A.Well, I don't have an approximate date, insofar as

Page 71

1    that's concerned.

2    Q.Okay.

3    A.I'm just going off the top of my head maybe.

4    Q.I understand.  How soon after she communicated

5    that to you, did you and Mr. Johnson make the decision

6    to interview all members of purchasing?

7    A.Within three days.

8    Q.Okay.

9    A.Three or four days.

10   Q.So Brown talks to you and then within three to

11   four days, you and Johnson meet and make a decision to

12   interview members of the purchasing department?

13   A.Yes.

14   Q.Okay.

15   How long does it take to set up interviews with

16   people in the purchasing department?

17   A.It was done as quickly as possible, but because of

18   the weight of the complaint, so we try to schedule them

19   as quickly as possible.  I would say between 24, 48,

20   every 72 hours after the initial complaint was

21   rendered.

22   Q.Okay.

23   Does that thinking through that affect your

24   understanding as to when Ms. Brown first contacted you?

25   A.Well, if I was to think through that, then I would

1    have to elevate the date and so forth, right, before

2    the interview started.  So I'd say maybe by the end of

3    July.

4    Q.Can you say whether Ms. Brown contacted you before

5    or after you became --- excuse me.  Let's try that

6    again.

7    Did you start initiating the investigation after

8    Ms. Brown contacted you?  Do you recall whether that

9    was before or after you learned of Ms. Jackson's July

10   28th disciplinary action?

11   ATTORNEY COHEN:

12   I'm going to object.  It's confusing to

13   me.

14   ATTORNEY SCHLEIGH:

15   I'm trying to understand the timeline.

16   BY ATTORNEY SCHLEIGH:

17   Q.Did Ms. Brown talk to you before or after you

18   became aware of Ms. Brown's July 28th disciplinary

19   action?

20   A.I would have to say before because I wasn't even

21   aware of it.

22   Q.Okay.

23   How did you become aware of the disciplinary

24   action?

25   A.I think, if I remember correctly, she --- I'm

1  trying to remember.  I think she had forwarded that

2  disciplinary reaction to Mr. Johnson.

3  Q.Okay.

4  A.And him and I, if I remember correctly, we decided

5  to immediately start interviewing individuals just to

6  address the issue.

7  Q.Was that the first time she'd ever made you aware

8  that she intended to take any discipline action against

9  Mr. Fitzgerald?

10  A.Yes.

11  Q.Did you ever have any discussions with Mr. Johnson

12  as to whether Ms. Brown had ever sought to take earlier

13  disciplinary action against Mr. Fitzgerald?

14  A.You mean Ms. Jackson?

15  Q.I may have misspoken let's try that again.

16  Were you ever aware, through Mr. Johnson, that Ms.

17  Jackson had intended to take any disciplinary action

18  prior to July 28, 2002 (sic), against Mr. Fitzgerald?

19  A.Not that I'm aware of, no.

20  Q.Okay.

21  All right.

22  So tell me about how you conducted your interviews

23  related to Mr. Fitzgerald's complaints.

24  A.Well, you usually start the interview by taking

25  all the information pertaining to the employee, how

Page 88

1    And I know this, and I'm sure you know this,

2    Franklin Fitzgerald was a black male.  Right?

3    A. Yes.

4    Q. He wasn't West African?

5    A. No, he wasn't.  No, he was not.

6    Q. And when we're talking about Lisa Jackson, she was

7    an African female.

8    Right?

9    A. Yes.

10   Q. Lauren Footman was an African female?

11   A. Yes.

12   Q. Okay.

13   Just wanted to get that on the record so that we

14   all know what we're talking about.

15   A. That's okay.

16   Q. All right.

17   Marc Woollery (sic) --- Woolley.  I keep getting

18   him --- I keep thinking of Chuck Woollery.  So forgive

19   me.  Marc Woolley ---

20   A. Is African-American.

21   Q. Is African-American.

22   All right.

23   When did you start having communications with Marc

24   about your investigation of Ms. Jackson?

25   A. Let's see.  Hold on for a second, let me refresh

Page 89

1    my memory real quick.

2    Q. Yep.

3    A. It wasn't too far after that.  We finished our

4    investigations by May --- by Thursday, August 4, and we

5    made Mr. Woolley aware on the 5th that we had completed

6    our investigations.

7    Q. Okay.

8    A. Our interviews, rather.

9    Q. All right.

10   And when you informed Marc Woolley that the

11   interviews had been completed, had you completed an

12   interview of Ms. Jackson?

13   A. No.  As a matter of fact, Ms. Jackson was

14   scheduled to be interviewed, but she had decided to go

15   on vacation, so we didn't --- I didn't get a chance to

16   interview her.

17   Q. Do you know if her vacation had been prescheduled?

18   A. That, I don't know.

19   Q. Okay.

20   Did she, in fact, go on vacation?

21   A. Was she on vacation?

22   Q. Are you aware whether or not she actually did go

23   on vacation?

24   A. No.

25   Q. Okay.

Page 90

1   A. She wasn't there, though.

2   Q. All right.

3   Does the personnel department need to approve

4   vacations?

5   A. No.  In this particular case, because of the fact

6   that she reported to Mr. Woolley, Mr. Woolley would

7   have to approve that vacation.

8   Q. And did you advise Mr. Woolley that you're unable

9   to interview Ms. Jackson because she was going on

10  vacation?

11  A. I think Jamal did that, not myself.

12  Q. And was there any discussion about interviewing

13  her once she returned?

14  A. Well, in order to complete it --- to complete the

15  investigations, the proper thing to do is to interview

16  her, but by this time, I think I didn't get a chance to

17  interview her.  I don't know if, in fact, Jamal had

18  interviewed her.

19  Hold on for a second.

20                          ---

21  (WHEREUPON, WITNESS REVIEWS.)

22                          ---

23  THE WITNESS:

24  No.   I know I didn't get a chance to

25  interview her.  I don't know if, in fact, Jamal had

HECTOR FIGUEROA vs
COUNTY OF DELAWARE                                    HECTOR FIGUEROA

Page 91

1    interviewed her.

2    BY ATTORNEY SCHLEIGH:

3    Q.Hypothetically speaking, what is the importance of

4    interviewing the object of an employee complaint, in

5    this case, a manager, for concluding an investigation

6    and reaching an opinion?

7    A.Can you rephrase that?  I'm sorry.

8    Q.Sure.  Let's start here.  Is it important to

9    interview the object of an employee complaint?

10   A.Yes.

11   Q.Okay.

12   Why is it important?

13   A.Because there's always two sides to every story.

14   There's a story of the individual that supposedly is

15   being harassed, and then there's always the story of

16   the person who is supposedly causing the harassment.

17   So it's always good to get everybody's opinion.

18   Q.Okay.

19   To put it in the colloquial, do you think Lisa

20   Jackson was ducking the investigation?

21   A.Good question.

22   Q.I'm asking your opinion here.

23   A.You know what?  Maybe.  I don't know.  I'm trying

24   to give you an honest answer without being prejudicial

25   in any way, shape or form.  She may have been.  I'm not

Page 92

1   quite sure.   I know all I know is that the movements

2   were so quick and so fast and the opinions, and I just

3   don't know whether or not it was convenient for her not

4   to be there.

5   Q.Okay.

6   In considering Lisa Jackson's version of events

7   without the benefit of an interview, would you have

8   considered things about whether she attempted to

9   discipline Mr. Fitzgerald on earlier occasions?

10  A.I think she may have.   When I interviewed the

11  other individuals from the department, they made it

12  sound like she had --- that the behavior of Mr.

13  Fitzgerald had been ongoing and consistent.   Now,

14  whether or not there had been any other formalized

15  complaints against Mr. Fitzgerald, I don't know.

16  Q.Okay.

17  Was there anything from your investigation that

18  would suggest to you that even though you felt that the

19  complaints about Ms. Jackson were substantiated, you

20  may have also felt that Mr. Fitzgerald may have acted

21  insubordinate?

22  A.Well, let's put it this way.   If, in fact, Mr.

23  Jackson was treated, allegedly treated, the way that he

24  said that he was treated, I would think that there

25  would be some sort of pushback coming from Mr.

Page 95

1   made a couple of efforts, but other than that, I don't

2   remember whether or not --- how many he did, I'm not

3   quite sure.

4   Q.Okay.

5   Just so we're clear, when you say he, you're

6   referring to Mr. Johnson?

7   A.Yes, Mr. Johnson.  Jamal Johnson, yes.

8   Q.Are you aware of whether you or Mr. Johnson or

9   the combination of the two of you ever went to a

10  person further up the chain of command in order to get

11  assistance in obtaining Ms. Jackson's interview?

12  A.Well, I think what we did, Mr. Johnson and

13  myself, is that we had given Mr. William, Mr. Lazarus,

14  a transcript or I think a copy or an indication that

15  all the interviews were completed. And according to

16  Mr. Johnson --- well, I don't know what happened after

17  that.  All I know is that we informed them that we

18  have finished everything.  And therein that's when Mr.

19  Woolley said that maybe Mr. Fitzgerald should be moved

20  and that a confidential search should begin to replace

21  Director Jackson.

22  Q.Okay.

23  I appreciate that answer, but my question was,

24  did you do anything to obtain the compliance of Ms.

25  Jackson to give an interview?

Page 99

1  Do you have any understanding as to whether Mr.

2  Fitzgerald stayed in the purchasing department while

3  Ms. Jackson was on vacation he was in danger of being

4  otherwise treated poorly, retaliated against, or

5  mistreated by Ms. Jackson?

6  A. All I know is that as of August 4th of 2022, the

7  efforts started to be made insofar as having Mr.

8  Fitzgerald move to either Ms. Locke's department or to

9  Fair Acres.

10  Q. To your understanding, was there a desire of Mr.

11  Fitzgerald to stay in the purchasing department?

12  A. No, there wasn't.

13  Q. So he wanted to be transferred?

14  A. Yeah.

15  Q. Were you aware of any other employees of

16  purchasing during that time that you were conducting

17  this investigation that wanted to be transferred out

18  of the purchasing department?

19  A. Yes, there were.

20  Q. Who?

21  A. As a matter of fact, Michael McGough,

22  M-C-G-O-U-G-H, had made it very clear that he wanted

23  to get transferred.  And if my memory serves me right,

24  Andrew Furman also made the same sort of --- how can I

25  say suggestions.

1   employment with Delaware County, did you ever have any

2   conversations with Ms. Jackson?

3   A. Just casual.  I mean, she was a co-worker.  We

4   were seeing each other in the lunchroom or in the hall

5   and say hello, but that's about it.

6   Q. And did you try to continue having investigation

7   or have an interview with her?  What was going on?

8   A. See, the thing is, you're asking whether I had

9   any interactions with her prior to the investigation.

10  Q. You misunderstand my question.  After she left

11  for vacation.

12  A. For vacation?

13  Q. I guess that was early August of 2022, until you

14  left, I think it was August 23rd.

15  A. 23rd, yeah.

16  Q. Okay.

17  August 23rd, '22.  In that period of time, did

18  you ever have an interaction with Ms. Jackson again?

19  A. No, but I can safely say that CPO Johnson and

20  myself did make an effort to get her into our office,

21  but she never came.

22  Q. What did you do?

23  A. Well, I know he had reached out to her.  I don't

24  know whether or not he did it verbally or an email

25  form or whatever or something like that, but she was

1    Q. Tell me about the events that eventually resulted

2    in your termination.  What happened?

3    A. I don't know what happened.  All right.  I'm

4    going to be blunt.  I was invited to a meeting that it

5    was to be held around 3:30 in the afternoon on August

6    22nd.  I believe it was August 22nd or early August

7    23rd.  I made an inquiry, insofar I had gone to Mr.

8    Lazarus' office and I said, what's this all about?

9    And I was given a response, well, we don't know.

10   When I went downstairs to the room where Common

11   Council gets together, I knew I was going to get

12   fired, because usually when we had terminated

13   individuals up in HR, we would usually have a police

14   officer right outside the office just in case.  And

15   when I went downstairs, I saw that.

16   Q. For clarification you're talking about park

17   police officers?

18   A. Yeah, park police officer.  The funny thing is, I

19   had just negotiated their contract.  I knew the guy

20   who was there.

21   Q. And when you say County Council Chambers, I think

22   you're talking about the first floor.

23   A. No, the meeting was --- yeah, on the first floor.

24   Q. First floor where they had public meetings?

25   A. Yeah, I think that's the second floor.  I'm

1    never available.

2    Q.When the instruction came that she could not be

3    terminated, did that mean that any other form of

4    discipline or other type of action was off the table?

5    A.I think during that time there was some sort of

6    discussion of having her go on administrative leave or

7    something to that effect, but it never came to play.

8    It never occurred.

9    Q.Okay.

10   Were you expected to continue the investigation

11   and still interview her after they told you she

12   wouldn't be terminated?

13   A.Well, as a matter of fact, after we gave all of

14   the interviews, the results of the interviews to Mr.

15   Woolley, and after a decision had been made that she

16   was not to be terminated, I think Mr. Johnson took

17   charge of the case then because it was a little bit  -

18   -- how can I say?  Yeah, Mr. Johnson took care of it

19   after that because the players that were involved were

20   way above my pay grade, and he took charge of it after

21   that, I believe.

22   Q.Okay.

23   Were you kept informed of any status of ongoing

24   investigation after that?

25   A.No.

Page 113

1    sorry, that's the second floor, which means that were

2    up on the third floor.  I'm sorry.

3    Q.On the third floor?

4    A.All I know is that I had to take the elevator

5    down to go to the conference room.  Oh, wait.  Yeah,

6    exactly.

7    Q.Okay.

8    Let's make sure we're same as in terms.  The

9    conference room, is that the County Council ---

10   A.Yes.

11   Q.--- room?  That would be on the first floor right

12   outside the elevator bay?

13   A.Yes.

14   Q.It's got the opening or stairwell that goes down

15   to the security area near the cafeteria.

16   A.That's it.

17   Q.Okay.  All right.

18   So you came out of the elevator bay.  There was

19   already a park police ---

20   A.Right outside the door.

21   Q.--- officer outside the door, okay.  And not sure

22   the day, but it would have been around 3:30 in the

23   afternoon.

24   A.It's actually 3:30 in the afternoon.

25   Q.What happened?

Page 114

1   A.I walk in.  Mr. Woolley tells me, you're being

2   terminated because you put the county into legal

3   jeopardy.  And that was it.  I asked him for

4   documentation.  He says he didn't want to give me

5   anything, and I walked out.

6   Q.Who was present at that meeting?

7   A.Mr. Lazarus and Mr. Woolley.

8   Q.Did Mr. Lazarus say anything?

9   A.No.

10  Q.Just so we're clear, you weren't a member of the

11  union or anything yourself?

12  A.No.

13  Q.At-will employee, right?

14  A.At-will, yeah.

15  Q.And Mr. Woolley gave you no other context for why

16  you were being fired?

17  A.No, I did ask him for documentation.  He didn't

18  say anything.  He just said, you fired.

19  Q.So he never specifically said you're being fired

20  in relation to your investigation of Lisa Jackson?

21  A.No.

22  Q.Did he say that you're fired in relation to

23  investigation of any other matter?

24  A.No.  He just said, you've put the county in legal

25  jeopardy and we're letting you go.  That was it.  Then

1   your car was parked, they were giving you the ability

2   to get your car out and leave.

3   Right?

4   A.Yeah.

5   Q.Okay.

6   Did you find that behavior, under the

7   circumstances, reprehensible?

8   A.Yes, I did.  I felt like a common criminal.

9   Q.Okay.

10  Did they make sure that you actually drove out of

11  the building?

12  A.Yes.

13  Q.All the way to the gate?

14  A.Yes.

15  Q.Okay.

16  The one on Third Street or one on Olive.

17  A.County building --- the courthouse is here.  The

18  one on this side.  So I would have to say that would

19  be on Olive because that's where the entrance and the

20  exit is, the parking lot.

21  Q.Have you ever been presented with anything that

22  suggested your termination was based upon your

23  investigation of Jackson?

24  A.No.

25  Q.Has any member of staff of the county indicated

1    to you that it was based upon your investigation of

2    Jackson?

3    A. No.

4    Q. Why do you believe that termination is related to

5    your investigation of Jackson?

6    A. Because of all the factors that were involved

7    with that.  Because of all the players that were

8    involved with that.  And I believe it was a result of

9    that because all the actions that were taken towards

10   Ms. Jackson or territory employees were the most

11   relevant things that were going on at that time, in

12   that time period.  So I related them all, and I said,

13   this has to be the reason why.

14   Q. Were there any other investigations you were

15   involved in around the same time the issues that

16   Jackson was going on that may have been mishandled in

17   any way.

18   A. No, everything ---.

19   Q. Let me finish the question, that may have

20   suggested there was a job performance issue?

21   A. No, as a matter of fact, I've got it here of all

22   the things that I was working on and Jamal was working

23   on, all the investigations were tendered and

24   completed.

25   Q. Okay.

Page 118

1   And do you think that you had any type of job

2   performance issues at all from, let's say, May of 2022

3   through August of 2022?

4   A.No, as a matter of fact, there were various

5   emails and letters sent to Mr. Lazarus and Jamal

6   saying how I was performing in my job and that

7   everybody was very happy with it.

8   Q.Well, would you agree with me that it's possible

9   for an employee to have successes, but also failures?

10  A.Yes, but I didn't have any.  As a matter of fact,

11  they also got an additional email from one of the

12  union presidents, actually, who was very dismayed with

13  the fact that I was being let go.

14  ATTORNEY SCHLEIGH:

15    Mark that Figueroa-1.

16                        ---

17  (Whereupon, Deposition Exhibit Figueroa-

18  1, Email, was marked for

19  identification.)

20                        ---

21  BY ATTORNEY SCHLEIGH:

22  Q.So we're showing you what's been marked as

23  Figueroa-1, which should be defense Bates stamp RFP

24  37.  And I'll represent it's an email from Lisa

25  Jackson dated Tuesday, July 1, 2022 10:59 p.m.  I

Page 119

1  believe it's addressed to you.  Do you recognize this?

2  A.It's addressed to me, but I don't recognize it.

3  I don't remember it.

4  Q.Okay.

5  Take a moment to look it over.  See if it

6  refreshes your recollection any.

7  A.Basically, it says that she's forwarding to me

8  the Notice of Disposition for Mr. Fitzgerald dated

9  July 1.  That's right before the holidays.

10  Q.Okay.

11  I'll represent to you ---.

12  ATTORNEY SCHLEIGH:

13  We'll mark this Figueroa-2.

14                       ---

15  (Whereupon, Deposition Exhibit Figueroa-

16  2, Notice of Disposition, was marked for

17  identification.)

18                       ---

19  BY ATTORNEY SCHLEIGH:

20  Q.What is the attachment to that email.  Do you

21  recognize that?

22  A.I vaguely recognize it.

23  Q.Okay.

24  Do you have any doubt that this was emailed to

25  you on July 1st, 2022?

Page 120

1   A.If it's addressed to me, I can't say I don't

2   doubt it.

3   Q.Do you have any recollection of anything you did

4   to respond to this email?

5   A.If you're asking me whether I tried to get in

6   touch with her to discuss this, I'm sure I did.  But I

7   can't give you an exact answer as to when.

8   Q.Okay.

9   Do you know if you sent a response to her

10  acknowledging its receipt?

11  A.No, I can't recall that.

12  Q.Do you remember starting any type of

13  investigation based upon what was written in this

14  employee notice of discipline?

15  A.Well, it was a discipline, and usually, like we

16  noted before, that a notice of discipline usually

17  doesn't incur an investigation.  It's just a notice of

18  discipline.  We initiated the investigation based upon

19  Mr. Fitzgerald's complaint.  This is not a complaint.

20   This is notice of discipline.  So usually those come

21  to our office.  All right?  Either to myself or to

22  Jamal.  But this doesn't prompt an investigation.

23  It's just a notice of discipline.

24  Q.Second sentence on F-1 says, his behavior

25  outburst today was unacceptable, and before sending

1   this notice directly to him, I'm sending to you for

2   review and guidance.  Did I get that correct?

3   A.Where do you see that?  Hold on for a second.  I

4   probably did review it.  Again, this wouldn't prompt

5   investigation.  It may have prompted some sort of

6   guidance insofar as Mr. Fitzgerald is concerned, but I

7   don't quite know when that occurred.

8   Q.Did she provide Ms. Jackson any guidance?

9   A.I don't remember.

10  Q.Do you remember giving her an email saying, yes,

11  issue this, or no, don't, or, we need to talk about

12  this further, or perhaps I can help resolve the issues

13  in your department?

14  A.No.  Again, like I said, this would just prompt a

15  response from me or from Jamal.  And the thing is,

16  it's also addressed to him, so I don't quite know

17  whether or not I directly addressed it or he directly

18  addressed it, but this would not prompt the

19  investigation.

20  Q.I understand.  Let's review the email.  It says,

21  to Hector Figueroa.

22  A.That's correct.

23  Q.Mr. Johnson was copied on it.

24  Correct?

25  A.Yes.

Page 122

```
 1   Q.The salutation says, good evening, Hector.

 2   Correct?

 3   A.Yes.

 4   Q.Can we agree it was addressed to you?

 5   A.Yes.

 6   Q.Okay.

 7   Do you remember actually providing any type of

 8   response, guidance, education, intervention in this

 9   issue?

10   A.It probably didn't need my intervention.

11   Q.All right.

12   A.The discipline she already rendered it.  Okay.

13   And Jamal and I probably thought it didn't need an

14   investigation.

15   Q.Okay.

16   Let's read sentence two again.  His

17   behavior/outburst today was unacceptable, and before

18   sending this notice directly to him, I am sending it

19   to you for your review and guidance.  Does that not

20   suggest to you that she is seeking your approval

21   before sending this?

22   A.I don't remember this.  You're asking me

23   something that occurred back in July 1st of 2022.

24   Q.Okay.

25   Well, your investigation of Ms. Jackson started
```

Page 123

1    the beginning of August of 2022.

2    A.Yes, I remember.

3    Q.So this was only a month before.

4    Right?

5    A.I remember that, yes.

6    Q.Less than a month before, practically.

7    A.I don't remember whether or not I rendered any

8    review, whether or not I actually called her into my

9    office to discuss it.  We may or may not have done it.

10   Q.Okay.

11   Do you know whether or not this employee notice

12   of discipline was ever actually issued?

13   A.That I don't know.

14   Q.Okay.

15   Well, let's take a look at what she was asking

16   you to review and provide guidance about that.  That's

17   F-2, the actual employee notice of guidance, and she's

18   attempting to write Mr. Fitzgerald on Friday, July

19   1st, 2002 (sic), for violations including neglected

20   duty, insubordination, and conduct unbecoming.  Have I

21   read that correctly?

22   A.That's what it says.

23   Q.Okay.

24   These are things that you typically review in

25   your position with the Human Resources Department.

Page 124

1    Right?

2    A. At times, yes.

3    Q. Okay.

4    And says the date of the violation, the place of

5    the violation, all being in the Central Purchasing

6    Department on July 1st, 2002.

7    Do I have that correct?

8    A. Now I remember.

9    Q. Okay.

10   A. As far as this is concerned I don't have any

11   email proof.  All right.  But it may come from her if

12   she has it.  She actually did come to my office and we

13   did discuss it.

14   Q. Okay.

15   What happened?

16   A. Basically, if I remember correctly, I told her to

17   explicitly give him a detailed listing of the things

18   that she wanted him to do, insofar as his duties were

19   concerned, because maybe, just maybe, he wasn't quite

20   sure what he was supposed to do.  But that's what I

21   suggested to her.  Now that this recollects my memory.

22   Q. Okay.

23   And do you find any of the descriptions of Mr.

24   Fitzgerald's behavior would have been appropriate for

25   someone in his position?

Page 125

1  A.I do, but then again, I would have to get his

2  take on it, because there's two sides to every story.

3  Q.Sure.  All right.

4  So based at least on the face of what's saying

5  here, when she claims that he went on the defensive

6  stating, you deferred the individual to me because

7  that's what you wanted, so that's what I did.  Do you

8  think that would be an appropriate tone and tenor of a

9  conversation with your direct report?

10  A.Well, if you look on the bottom also, all she

11  actually did with this particular case was to give

12  them a verbal reprimand.  Usually with a verbal, all

13  right, we either look at it or approve of it or give

14  the okay or something to that effect.  We don't give

15  anything in writing because it's a verbal.  The verbal

16  basically is her dictating this, putting in his

17  personnel file and then moving on from there.

18  Q.This is a memorization of a verbal reprimand?

19  A.Yes, that's what it says there.

20  Q.Do you know if your department ever approved of

21  it considering the email said they were looking for

22  your review and guidance before she issued it?

23  A.I can't tell you for sure.

24  Q.Okay.

25  Would this have given you some notice that there

Page 126

1   was an issue going on in this department before you

2   got the complaints later in the month from Mr.

3   Fitzgerald?

4   A.It would have.  However, when you see on the

5   bottom, it says a verbal review.  All right, that

6   usually prompts in my department and any other

7   department that I've worked on that's to be done by

8   the supervisor without any, how can I say, any further

9   investigation by us.

10  Q.Okay.

11  And when you consider Mr. Fitzgerald's

12  complaints, had this been approved, should it have

13  appeared in his personnel file so that it would been

14  there for reference as you conduct part of your

15  investigation?

16  A.Like I told you before, I didn't have access to

17  personnel files, and we didn't look into personnel

18  files.  I told you that before.

19  Q.I'm sorry.  Did I understand correctly that as

20  investigatory personnel of the HR department you

21  didn't have access to their personnel records?

22  A.We didn't ask for them.  All right.  Every

23  investigation that I've done at the county, I didn't

24  use personnel files.

25  Q.Why not?

Page 127

1   A. I didn't feel the need to.

2   Q. Okay.

3   So you didn't feel the need to have any

4   historical context to see whether there have been

5   prior problems?

6   A. No.  I got those primarily from the

7   investigation, from the interviews that I did.

8   Q. Do you recall what day of the week July 1st, 2022

9   was?

10  A. No.

11  Q. The county offices would have been closed on the

12  4th.  It being the 4th of July holiday.

13  A. Yes.

14  Q. Okay.

15                        ---

16  (Whereupon, Deposition Exhibit Figueroa-

17  3, Emails, was marked for

18  identification.)

19                        ---

20  BY ATTORNEY SCHLEIGH:

21  Q. I'm going to show you what's been marked as F-3,

22  Bates stamped Defendants RFP 56, 57, which is a series

23  of emails, the first of which at the top of the first

24  page is July 5th from Munsanda Brown to you.  Does

25  this refresh your recollection at all regarding when

1    Munsanda Brown would have referred Mr. Fitzgerald's

2    complaints to you?

3    A.No, this was just informing me that he had

4    requested a transfer that came from Munsanda Brown,

5    and there was other conversations that Fitz ---

6    Franklin had with Munsanda concerning that transfer.

7    But I look at things like this, all right, insofar as

8    approving transfers that at that particular time was

9    left to Munsanda because she was an assistant vice

10   president --- or assistant director of recruitment.

11   So any transfers she took care of, she usually got

12   involved in trying to find another position or another

13   department that she can transfer people to because it

14   happened in other occasions.

15   Q.I understand all that.  Appreciate your answer.

16   My question was, does that refresh your recollection

17   about when Munsanda first brought to your attention

18   that Mr. Fitzgerald had any complaints about Ms.

19   Jackson?  At least I hope that was my question.

20   A.Well, it's here.  Okay.  So I guess I have to

21   accept the fact that she did send it to me back in

22   July 5th.

23   Q.Okay, you put it down for a minute.

24   Are you the kind of person who takes your work

25   home with you?

Page 129

1   A. No.

2   Q. Okay.

3   Try and leave it at the office?

4   A. Yes.

5   Q. Do you have a smartphone?

6   A. Yes.

7   Q. Did your smartphone have your work email

8   connected to it back in 2022?

9   A. No.

10   Q. All right.

11   Is it fair to say that if you left the office for

12   a holiday weekend, you didn't look at anything until

13   you came back?

14   A. Absolutely.

15   Q. All right.

16   So I represent to you that July 4th weekend ran

17   over the evening of July 1st, 2022, until Tuesday

18   morning, July 5th, 2022.  Would that sound correct?

19   A. Know what you're asking.

20   Q. Okay.

21   This calendar ---

22   A. Okay.

23   Q. --- July '22, according to what my cell phone

24   says, okay, if you look at the 1st through the 4th,

25   July 2022.

Page 130

1    A.1st is Friday, 2nd is Saturday.

2    Q.That's a holiday weekend.

3    Right?

4    A.Okay.  Yeah.

5    Q.Did you do any work that weekend?

6    A.No.

7    Q.Did you look at any work emails that weekend?

8    A.I don't remember.

9    Q.Okay.

10   Do you think you did?

11   A.I don't know.  I can't recall.

12   Q.Let's turn back for a minute to F-1.  According

13   to F-1, Ms. Jackson sent her email out to you around

14   almost 11 o'clock on Friday, July 1st, 2022, the

15   beginning of the holiday weekend.  Ms. Brown sent her

16   email to you about Franklin Fitzgerald on Tuesday,

17   July 5th, 2022 10:22 a.m.  Would that suggest to you

18   that both Ms. Brown and Ms. Jackson's emails were

19   sitting in your inbox on the same morning?

20   A.Probably, yeah.

21   Q.Okay.

22   Did it raise any alarms to you that Mr.

23   Fitzgerald was seeking to have a transfer out of the

24   department, considering less than one business day

25   before his supervisor was trying to write him up?

Page 131

1   A.I left that decision completely up to Munsanda

2   Brown, being that she was in charge of transfers.

3   Q.Okay.

4   In the course of going through your emails that

5   day, you did go through all your emails that day.  You

6   got caught up with anything that came over the last

7   couple days.

8   Fair to say?

9   A.Probably.

10  Q.Did anything click that these two emails were

11  related?

12  A.I don't remember.

13  Q.Do you recall having any verbal communications

14  with Ms. Brown prior to July 5th, 2022, regarding Mr.

15  Fitzgerald?

16  A.I don't have any conversation with Ms. Brown

17  after that insofar as trying to come up with a plan to

18  get him transferred.

19  Q.Okay.

20  My question was, did you have any verbal

21  communications with her before the morning of July 5?

22  A.No.

23  Q.Regarding Mr. Fitzgerald.

24  A.No.

25  Q.Okay.

Page 132

1    A.Not to my knowledge.

2    Q.So it's fair to say then, that Mr. Fitzgerald's

3    desire to transfer out of purchasing was not brought

4    to your attention, at least before your email was in

5    receipt of the proposed discipline from Ms. Jackson?

6    Knowing you probably didn't read them until that

7    morning, maybe earlier that day, but they were both

8    sitting there at the same time.

9    A.Yeah.

10   Q.Okay.

11   We talked about a Mr. McFarland earlier, and you,

12   I believe, said that you thought that was the attorney

13   from Campbell Durrant firm.

14   A.I may have gotten the names all messed up.

15   Q.You may have.  Do you remember Jason McFarland

16   who worked in the IT Department?

17   A.Yes.

18   Q.Okay.

19   Do you get his name confused with john

20   McLaughlin?

21   A.Yes.

22   Q.Okay.

23   Mr. McFarland had some concerns about one of his

24   fellow employees in IT.

25   Correct?

HECTOR FIGUEROA

Page 133

```
 1   A. She was --- she was being very --- how can I say?

 2   Q. Does the word amorous sound good?

 3   A. Very what?

 4   Q. Amorous.

 5   A. Extremely.  And he found it very offensive.

 6   Q. Okay.

 7   Were there ever any concerns about how you

 8   handled that matter?

 9   A. Yes.  There were from him, anyway.

10   Q. All right.

11   And how was that addressed?

12   A. Because --- well, let me give you the context.

13   In order for me to render the investigation in this

14   particular case, I had to interview Mr. McFarland.  He

15   didn't want to get interviewed.  He absolutely refused

16   to get interviewed.  So I had the opportunity --- I

17   got to admit that I got a little bit upset and I sort

18   of raised my voice a little bit.  I said, I have to

19   interview you.  I have to address this.  And because

20   of the way that I approached him, he filed a complaint

21   with Mr. Lazarus, who came up to me and said, listen,

22   this has been done, but don't worry about it.

23   Q. All right.

24   So there was a complaint about your work,

25   although it wasn't necessarily from management.
```

Page 134

1    A.No.

2    Q.Okay.

3    And was there any concern about whether you had

4    fully investigated that matter?

5    A.Yeah, as a matter of fact, from that matter, we

6    discovered that the young lady that was being very

7    amorous was also an alcoholic, and she had bottles of

8    liquor spread all over the building, and she

9    subsequently was terminated because of that.

10   Q.And did Mr. McFarland feel like his concerns were

11   not being taken seriously at any point?  And that's

12   why you complained to Mr. Lazarus?

13   A.I think he felt that I was being a little bit too

14   pushy insofar as trying to get an interview with him.

15   But whether or not his concerns were addressed, he

16   came into my office, all right, and we talked about

17   it, but when I tried to approach him to give me a

18   detailed interview, he just wouldn't do it.

19   Q.So how did it come about that he provided a

20   statement.

21   A.What do you mean, he provided a statement?

22   Q.My understanding is he provided a written

23   statement about what happened.

24   A.I don't remember that.

25   Q.Okay.

Page 135

1   ATTORNEY SCHLEIGH:

2   Thank you.  What are we up to?

3   COURT REPORTER:

4   Four.

5                          ---

6   (Whereupon, Deposition Exhibit Figueroa-

7   4, Emails, was marked for

8   identification.)

9                          ---

10  BY ATTORNEY SCHLEIGH:

11  Q.All right.

12  I'm providing you what's been marked F-4 initial

13  emails from Marc Woolley to Lauren Footman.  But

14  embedded in that is the content of a July 1st, 2022

15  email from Jason McFarland to you, along with a bunch

16  of other people copied.  And it says, attached is my

17  statement regarding the harassment that I've received

18  from another county employee that was reported on

19  Monday, June 27.  I was informed yesterday, Thursday,

20  June 30 that I had to put this in writing in order to

21  begin an investigation.  Do you recall receiving this?

22  A.No, I don't.

23  Q.Okay.

24  Any reason to doubt that that's the email that

25  this was sent to figueroah@co.delaware.pa.us?

Page 136

1   A. No.

2   Q. I don't know why my email makes the County shield

3   a separate attachment, but it did.  But if you go to

4   page three, which starts at Bates stamp number 60,

5   starts off title Jason McFarland, IT Department

6   continues on for three pages to Bates stamp 62.  I'll

7   represent to you that that was the statement

8   attachment provided with this email.  Do you recognize

9   that?

10  A. It rings a bell.

11  Q. This is the morning of July 1st, 2022.  Did you

12  know at that point that the female employee --- and

13  just for identification that is, hopefully I'm

14  pronouncing this correctly Regine, R-E-G-I-N-E, Strey

15  S-T-R-E-Y.  At that point, had you guys reached

16  somewhere in your investigation that she was an

17  alcoholic and had bottles of liquor throughout county

18  offices?

19  A. At this particular point, it wasn't I that had

20  discovered that she had alcohol all over the building.

21   It was Jamal.

22  Q. Okay.

23  A. That's when we discovered that was the case.  I

24  did tell Mr. McFarland that --- if I remember

25  correctly, that I would address it with John Becht

1   insofar as his supervisor, and that I really thought

2   that he was making much ado about nothing.  All right?

3    But I told Jamal, and Jamal took it upon himself to

4   interview the young lady involved, and it was

5   discovered that she was an alcoholic, and she was in

6   turn, terminated.

7   Q.And the way this started unfolding was a pretty

8   serious investigation you guys had to handle.

9   Right?

10  A.Well, it was a complaint.  Right.  But I'm going

11  to be frank with you.  When I discussed it with the

12  gentleman that filed a complaint, initially, I had

13  gotten word that he had been a consummate complainer

14  throughout the entire district.

15  Q.Okay.

16  A.And that he was always complaining about things.

17  And when I met him he was --- and I met him in my

18  office, he was immediately belligerent and not nasty,

19  but very belligerent.  So I told him then, I said,

20  listen, I'm going to discuss this with John Becht, all

21  right?  But I really told him, I said, I think you're

22  making something big out of nothing.  And then I went

23  to visit him at John Becht's office, and that's when I

24  got loud with him.  I said --- not loud, but I was

25  actually very forward, and I said, I have to interview

1   you at length, and he wouldn't do it.

2   Q. Do you know when that happened, vis-a-vis the

3   timing of that email providing a statement?  Like,

4   before, after, same day?

5   A. Well, he probably filed a complaint the day after

6   that him and I had the conversation that we kind of

7   went at each other.  But the exact timing of it, I

8   can't tell you for sure.  Is this mine?

9   Q. Can hold on to for now.  Eventually, she has to

10  get them all, and we refer to them again.

11  Did you end up responding to Mr. McFarland

12  regarding his statement or follow up on that?

13  A. When he refused to interview with me, that's when

14  I referred it to Jamal.

15  Q. Okay.

16  With regard to that specific email ---

17  A. No, I didn't.

18  Q. --- provided a statement, was there any type of

19  response to that?

20  A. Well, I brought him into my office, like I stated

21  before, to discuss it, and he immediately got very

22  belligerent with me, so I let it go at that.  Then I

23  went to visit him again in John Becht's office, and he

24  got belligerent again.  That's when I told Jamal, I

25  said, listen, you got to help me with this, because

Page 139

1    this is going nowhere with this guy.

2    Q.So in that instance, you asked for help?

3    A.Yes.

4    Q.Okay.

5    And as that investigation unfolded and it was

6    determined that the female coworker was an alcoholic,

7    that put her potentially in a protected group as well.

8    Right?

9    A.You would say so, yes.

10   Q.Right.  So that you have to balance the needs of

11   both employees concerning the employment decisions

12   when they're both in protected groups.

13   Right?

14   A.Yeah.  I would agree with you.

15   Q.And was the investigation of that particular

16   complaint time consuming?

17   A.I don't remember quite well.  All I know is that

18   I don't know the exact time that it took for Jamal to

19   get all the answers that he needed, but I would

20   venture to say that it wasn't too long, maybe a week.

21   Q.Well, the investigation didn't just involve

22   talking to Mr. McFarland, it didn't just involve

23   talking to Ms. Strey, there were other employees

24   involved as well.

25   A.Right.  There was his supervisor, John Becht, and

1   another young man who was African American that I

2   ended up interviewing.

3   Q.Is that Mr. Rush?

4   A.I don't remember his name.

5   Q.Was there someone that you interviewed, and you

6   had to interview them because they end up taking the

7   female coworker home while she was intoxicated?

8   A.I think that was the young African American man

9   who had done that.

10  Q.Did you interview him or Mr. Johnson or both?

11  A.We both interviewed him and we gave him advice

12  insofar as never to do that again because he had put

13  not only him, but the county in jeopardy.

14  Q.Right.  So it was a pretty complicated series of

15  events that unfolded there.

16  A.Yeah.

17  Q.In the course of that, concerning you get the

18  statement July 1st.  You got the information about

19  Fitzgerald around that period of time.  Do you believe

20  you were overtaxed with your attention to the various

21  matters that you were expected to handle?

22  A.No.

23  Q.You never felt like you needed to ask for help?

24  A.The only time that I asked for help was when I

25  ran into a roadblock with Mr. McFarland and I said,

1    listen, I need your help with this because he's not

2    responding to me.

3    Q. And when you requested Mr. Johnson's assistance,

4    he got it for you?

5    A. Yes.

6    Q. Okay.

7    Do you know if that required him to go to

8    management above him to get the compliance of Mr.

9    McFarland?

10   A. That I don't recall.

11   Q. Okay.

12   I'm going to represent to you that you did

13   respond, or at least try to respond Mr. McFarland.

14   ATTORNEY SCHLEIGH:

15   And we'll mark this as 5.

16                              ---

17   (Whereupon, Deposition Exhibit Figueroa-

18   5, Emails, was marked for

19   identification.)

20                              ---

21   THE WITNESS:

22   All right.

23   This was my response when I initially

24   found out that he had filed a complaint against me.

25   BY ATTORNEY SCHLEIGH:

Page 142

1    Q. Okay.

2    A. And I felt the need to actually respond to it.

3    Q. Okay.

4    A. And this is that.

5    Q. All right.

6    So just for the record, we're referring to an

7    email that's dated December 21st, 2022, initially from

8    Marc Woolley to Lauren Footman.  Embedded in that is a

9    Friday, July 1st, 2022 10:28 a.m. email from Mr.

10   Figueroa to John McLaughlin.

11   Did I get that correct?

12   A. Yeah.

13   Q. Okay.

14   John McLaughlin's email address is

15   jmclaughlin@cdblaw.com.

16   A. Yeah.

17   Q. Okay.

18   John McLaughlin at Campbell Durrant was the

19   county's labor attorney.

20   Right?

21   A. Yes.

22   Q. Okay.

23   Were you trying to respond to Mr. McFarland's

24   communication?

25   A. See here's where there is an error in this email.

Page 143

1   Q. Okay.

2   A. All right.  Because I actually accuse Mr.

3   McLaughlin of getting loud with me, and that's a

4   mistake.  I got the names mixed up.  That wasn't him.

5   It was Jason McFarland that got loud with me, not Mr.

6   McLaughlin.

7   Q. All right.

8   So this was an attempt to respond to Mr.

9   McFarland's email that had been written roughly 14

10  minutes earlier.

11  Is that correct?

12  A. I don't remember.

13  Q. All right.

14  Well take a look at F-4.  We just put it down.

15  A. Yes, it is.  But like I said before, this has a

16  very grave error in it that I got the names mixed up.

17  This was supposed to have been addressed to McFarland

18  instead of McLaughlin and actually has two different

19  paragraphs in there that I got them mixed up between

20  McFarland and McLaughlin.

21  Q. Were you trying to say something to Mr.

22  McLaughlin in this email too or is it completely

23  misdirected?

24  A. I was trying to get a message across to our

25  attorney but then in it on the paragraph two

Page 144

1  apparently that should have been --- oh, I know now.

2  Okay.  When I sent this to Mr. McLaughlin all right, I

3  actually put in there his accusation of me.  So that

4  way Mr. McLaughlin could have been aware of what was

5  going on but that was about it.  I'm sorry if I got

6  things a little mixed up here, but this rings true.

7  Q. Okay.

8  ATTORNEY COHEN:

9  Can we take a little break?

10  ATTORNEY SCHLEIGH:

11  Sure.

12  ATTORNEY COHEN:

13  Okay.

14                    ---

15  (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                    ---

17  BY ATTORNEY SCHLEIGH:

18  Q. So we were on F-5 and I was asking if any part of

19  the email was intentionally directed to John

20  McLaughlin, the labor attorney at Campbell Durrant.

21  A. This entire thing was directed towards him

22  because if I remember correctly, I was making him

23  aware of what Mr. --- the other gentleman, I can't

24  remember his name was accusing me of.

25  Q. If we look towards the bottom of F-5, there is

Page 145

```
1   the email from Mr. McFarland embedded in it.

2   Right?

3   A.Uh-huh (yes).

4   Q.And Mr. McFarland's name is fully there in the

5   from line.

6   Correct?

7   A.Uh-huh (yes).

8   Q.His email with --- I'm sorry you need to say

9   answer out loud of some type, yes or no or something.

10  What was the answer to the last question?

11  A.Yes.  This was directed towards John McLaughlin.

12  Q.That's my point.  Lower in F-5 there's an

13  embedded email from John --- I'm sorry, excuse me,

14  Jason McFarland.

15  A.Jason McFarland.

16  Q.The from says Jason McFarland.

17  Right?

18  A.Uh-huh (yes).

19  Q.We did it again.  You have to say yes, no, or

20  something else.

21  A.Yes, it says Jason McFarland.

22  Q.And his Delaware County, Pennsylvania official

23  email in the same kind of format as yours.  Last name,

24  first, initial is right there.

25   Correct?
```

Page 146

1   A.Yes.

2   Q.Okay.

3   And all the CCs that were on the initial email,

4   none of them were John McLaughlin.

5   Right?

6   A.No.

7   Q.Did John McLaughlin typically get involved in

8   employment issues that were non-labor union related?

9   A.No, but if I remember correctly, I just got in

10   touch with him because of the fact I was a little

11   concerned that Mr. McFarland had approached all the

12   powers that be about my behavior.  I don't remember

13   whether or not Mr. McLaughlin replied or anything like

14   that but ---.

15   Q.Did anyone instruct you to contact Mr. McLaughlin

16   about this issue?

17   A.Mr. McLaughlin or Mr. ---?

18   Q.McLaughlin, the attorney.  Anyone instruct you

19   to ---

20   A.I don't remember.

21   Q.--- talk to Mr. McLaughlin regarding the issue

22   with Mr. McFarland?

23   A.I don't remember.

24   Q.Okay.

25   Let's look at the way your email at 10:28 that

Page 147

```
1   morning, July 1st, is actually written.  Mr.

2   McLaughlin, good morning, thanks for putting the

3   statement together as it's certainly needed in order

4   to address the situation.  What statement did Mr.

5   McLaughlin put together?

6   A.I don't remember.

7   Q.Okay.

8   Let's look at the email that's below it that you

9   appear to be responding to from Jason McFarland

10  roughly 14 minutes earlier.  That was Exhibit F-4.

11  Didn't Mr. McFarland provide you a statement as an

12  attachment to that email?  Here, it's right here.

13  Right?  This one we just looked at as part of F-4.

14  A.I would have to say yes, I mean, again, this

15  is ---.

16  Q.The statement he provided to you says Jason

17  McFarland at the top, IT department.

18  Right?

19  A.Okay.  Maybe this was sent to John McLaughlin in

20  error.

21  Q.Okay.

22  A.That I admit to.

23  Q.Attention to detail matters, doesn't it?

24  A.In our game, yes.

25  Q.Okay.
```

Page 148

1    If an attorney gets an email and they're not an

2    internal department attorney, would it be reasonable

3    to expect them to review it and eventually build a

4    county for it?

5    A. That I'm not quite sure of.  I don't know if John

6    McLaughlin ever replied to this at all.

7    Q. Okay.

8    But if something gets misdirected to an attorney,

9    do you expect them to look at it if it's one of the

10   regular clients?

11   A. Yeah.

12   Q. Okay.

13   And if they spend the time to look at it ---.

14   A. They're going to charge us, yes.

15   ATTORNEY SCHLEIGH:

16   Mark this as F-6.

17                           ---

18   (Whereupon, Deposition Exhibit Figueroa-

19   6, Emails, was marked for

20   identification.)

21                           ---

22   BY ATTORNEY SCHLEIGH:

23   Q. Do you recognize this?

24   A. Yeah, I think I do.  And this was the

25   clarification of what had occurred that I had sent it

Page 149

```
 1   to John in error.  And like it says, he was overseas.

 2   Q.For the record, this is two page document marked

 3   F-6, starts with RFP 701 to 702.  Initially at the top

 4   it's a December 21st, 2002 (sic) email from Marc

 5   Woolley to Lauren Footman.  Embedded in that is a July

 6   1st, 2002 2:56 p.m. email from Jamal Johnson to you,

 7   John McLaughlin, Bill Martin, Marc Woolley. Right?

 8   A.Yep.

 9   Q.For identification.  And the context of the

10   message from Mr. Johnson says, good afternoon, I

11   appreciate the clarification note that the individual

12   writing the statement was Jason McFarland.  However,

13   poor John McLaughlin is still overseas and may be very

14   confused.  And then says, don't worry about sending

15   anything to McFarland.  Howard and the solicitor both

16   reached out to me and clarified the situation here.

17   All right.  This was in response to your earlier email

18   that day to John McLaughlin and others from 10:28 a.m.

19   Right?

20   A.That was sent earlier, yes.

21   Q.So you at least received in this email from your

22   direct supervisor that was copied to his direct

23   supervisor, including Marc Woolley and the County

24   Solicitor, a correction of your work.

25   Correct?
```

Page 150

1    A.Okay.

2    Q.Is that fair to say?

3    A.It's fair to say.

4    Q.Okay.

5    And hopefully John McLaughlin read this and then

6    didn't charge anybody anything.  But I don't know the

7    answer to that either.  Now where it says, my thoughts

8    are as follows and there's not enough here for

9    harassment claim for the statements of both parties,

10   their behavior began this week and attended to a

11   handful of messages that are at best embarrassing on

12   the party's sender.  There's no indication from Mr.

13   McFarland's statements that at any point he expressed

14   the messages were unwelcome and wished for them to

15   stop.  He simply ignored them. On Regine's end, she

16   admits to sending the initial messages on Thursday

17   6/23, but also indicate that she confessed sending

18   them to her husband to make him aware that she did so

19   sometime during the week at 6/25, that portion there.

20    Do you know whose work product that is?

21   A.That's hard to say because I had originally made

22   the statement that there just wasn't enough there. All

23   right.  That maybe we shouldn't follow up on this

24   because there just isn't enough.

25   Q.Okay.

Page 153

1    to take her home to make sure that she got home safe.

2    But insofar as the timeline, as far as that's

3    concerned, I can't remember.

4    Q. Okay.

5    Would it be fair to say that as of July 1st, 2022

6    --- strike that.

7    As of July 4th, 2022, that investigation had not

8    been fully concluded?

9    A. I would say it's a fair statement.

10   Q. Okay.

11   In light of that ongoing investigation, where did

12   that end as compared to when you started learning

13   about the Fitzgerald problems?

14   A. I can't say.  Sometimes those things happen one

15   right after another.  Whether or not it happened

16   within the same timeframe or a week or two, I can't

17   say.  I'm sure you got something that says the exact

18   date.

19   Q. So you're talking about you're having some

20   communication with Attorney Richman before you left

21   for AVI the first time.

22   Right?

23   A. Yes.

24   Q. Okay.

25   ATTORNEY SCHLEIGH:

Page 154

1   This is 7?

2   COURT REPORTER:

3   Yes.

4                       ---

5   (Whereupon, Deposition Exhibit Figueroa-

6   7, Emails, was marked for

7   identification.)

8                       ---

9   BY ATTORNEY SCHLEIGH:

10  Q.Did this refresh your recollection at all as to

11  when those communications were going on?  It's a two

12  page document, Bates stamped RFP 102 to 103.

13  A.Yeah, I remember these.

14  Q.So it looks like, starting at the bottom of page

15  one, there's communication from Stephen Richman dated

16  April 8th 2022, directed to you.

17  A.That was to me.

18  Q.Okay.

19  And it looks like he's asking for a bunch of

20  information.

21  A.Yes.

22  Q.What was the reason why he was asking for all

23  this?

24  A.For union negotiations.

25  Q.Okay.

Page 155

1   Does this refresh your recollection at all as to

2   when your first exit to go to AVI occurred?

3   A.It's about the same time because I remember

4   sending this.  Well, it was sent to Jamal, and I was

5   surprised when I got back that these things had still

6   had not been taken care of.

7   Q.Okay.

8   A.But that was his general request at that time.

9   Q.All right.

10   So also on April 8th, 2022, about an hour and a

11   quarter later, you forward Mr. Richman's request to

12   Lauren Williams, who's the warden of the prison, Jamal

13   Johnson, who was your direct supervisor, copy to

14   yourself and copy to Munsanda Brown.

15   Correct?

16   A.Uh-huh (yes).

17   Q.Okay.

18   You got to seek your answers out.

19   A.Oh, yes.  I'm sorry.

20   Q.Okay.

21   And your forwarding email basically says, oh, I

22   just received requesting listings from Steve Richman

23   we should discuss.  Was that discussed before you left

24   for AVI?

25   A.No.

Page 156

1    Q. Okay.

2    Can you say how much time had passed between you

3    asking to discuss that with everyone and when you

4    actually left for AVI?

5    A. It was not too long after that.  I would say

6    maybe a week or less or give or take a day here or

7    there.

8    Q. All right.

9    What, if anything --- strike that.

10   At the time you emailed this, had you given

11   notice that you were leaving?

12   A. You know what, I don't remember.

13   Q. Okay.

14   A. Sorry about that.

15   Q. Were you asked to prepare anything in relation to

16   this request for Mr. Richman before you?

17   A. No, I just made sure that everybody got a copy of

18   that.  And I just wanted --- I wanted everybody to be

19   aware of what he was requesting, because I think by

20   that time, I may have rendered a decision that I was

21   going to leave.

22   Q. There's nothing in your April 8th email

23   forwarding this on indicating that you were soon to be

24   leaving your position.

25   Right?

1   A.No.

2   Q.Okay.

3   Was there ever a communication sent to all these

4   same people saying, hey, you know I'm leaving.  You

5   need to follow up on this?

6   A.No.

7   Q.Okay.

8   Were you asked to create ---?

9   A.No.

10  Q.Let me finish my question.

11  A.Go ahead.

12  Q.I could change my question.  You've already given

13  me answer.

14  A.I apologize.

15  Q.You don't want that.  People ask questions like,

16  have you ever been a member of the Communist Party and

17  you're already answered yes.

18  A.You really want to know?

19  Q.You're in labor.  It happens.

20  A.Go ahead, man.  I'm sorry.  Go ahead.

21  Q.In all seriousness, like, any type of exit memo

22  or follow up on this about things that need to be done

23  to deal with this?

24  A.No.  As a matter again, excuse for the

25  assumption.  I had made the safe assumption that they

Page 158

1  were going to react to this request in a timely

2  manner.  That was an assumption on my part.

3  Q.Okay.

4  Did anyone ever give you anything in writing

5  saying, we're taking this from here?

6  A.No.

7  Q.Okay.

8  Did anyone ever give you an oral representation

9  that they would take care of it from there?

10  A.You know I can't remember.  I know that I may

11  have had a conversation with Laura Williams concerning

12  this and concerning the request, but to be frank with

13  you, I don't remember whether or not I did or I

14  didn't.  All I know is that they were aware of what

15  was requested.

16  Q.Did you ever follow up with Mr. Richman

17  indicating to him who would take care of the request?

18  A.No.  Again, I safely assumed that this is going

19  to be taken care of.

20  Q.Were you ever given any instructions as to who

21  was going to take over your responsibilities when you

22  left to go to the AVI?

23  A.No.  There's a very good there's a very good

24  chance that Jamal did, but I'm not quite sure.

25  Q.Did you have any meetings with him before you

Page 159

1   left about the status of things so he knew to pick up

2   where you left off?

3   A.Yeah, but I don't remember if I gave it to him

4   anything in writing.  Most of the time we had verbal

5   meetings, insofar as me letting him know exactly what

6   was outstanding.

7   Q.All right.

8   ATTORNEY SCHLEIGH:

9   Eight.

10                          ---

11  (Whereupon, Deposition Exhibit Figueroa-

12  8, Emails, was marked for

13  identification.)

14                          ---

15  BY ATTORNEY SCHLEIGH:

16  Q.When you came back, did you have to go through a

17  process to reactivate your email with accounting or

18  anything like that?

19  A.No, as a matter of fact, I was never taken out of

20  the fold, if I can put it that way.

21  Q.Just to clarify, they never deactivated your

22  account?

23  A.No.

24  Q.At any time between you left for AVI and when you

25  came back, were you able to access that account?

Page 162

```
1    A.Yeah.

2    Q.Right above that, there's an email dated

3    Wednesday, May 25th in the middle of the second page

4    of this exhibit directed solely to you.

5    Correct?

6    A.Uh-huh (yes).

7    Q.You have to answer out loud.

8    A.Yes.

9    Q.Sometimes I put a paper together that allows me

10   to put little shock collars on people.  They waive

11   their rights to zap them if they keep doing ---.

12   ATTORNEY COHEN:

13   In his defense he's interviewing at the

14   public defender next week.

15   ATTORNEY SCHLEIGH:

16   Okay.

17   ATTORNEY COHEN:

18   Going to be interviewing people, making

19   sure their moot court skills are up to par.

20   BY ATTORNEY SCHLEIGH:

21   Q.It's directed solely to you.  It's dated May

22   25th.  It says, Hector, I'm following up on the

23   attached email.  When can I expect a response,

24   question mark?  They obviously need information so the

25   union can move forward in its relation with the
```

1    county.  Thanks.  Nothing between those two emails.

2    Right?

3    A.Uh-huh (yes).  Yes.

4    Q.Okay.

5    Do you have any notion as to whether any type of

6    away message or response message was set up for your

7    account?  Were you directing people to who to contact

8    if they can't get a hold of you when you were leaving?

9    A.No.

10   Q.Did anyone ask you to create that?

11   A.No.

12   Q.Did you think yourself to put something saying,

13   I'm no longer available, please contact my supervisor

14   or somebody else?

15   A.I may have told some folks, but not everybody.

16   Things were moving so fast at that time.

17   Q.Do you remember having any communications with

18   Mr. Richman between April 8th and May 25 of 2022

19   indicating you were leaving your employment with the

20   county?

21   A.No. I just got together --- I just sent him

22   emails immediately after I came back.  Because there's

23   a very good possibility that some of these emails were

24   sent to my email box while I was away.

25   Q.The message above that on the second page,

Page 165

1    Do you know if Mr. Richman had your phone number?

2    A.He had my private cell number.

3    Q.Okay.

4    Did he call you at any time between ---?

5    A.During that time, no.

6    Q.Let me finish a question.  Between April 8th and

7    June 13.

8    A.No.

9    Q.Okay.  All right.

10   And then starting on the bottom of the first

11   page, there's a response from you dated June 13, 2022,

12   to Mr. Richman.  And I'm going to paraphrase here.  It

13   says, Steve, I've been away from the county for close

14   to one month.  My apologies for not getting back to

15   you sooner.  When I originally received the

16   information request, it was forwarded to the warden

17   and other interested parties.  Let me get back with

18   them in an effort to get this information to you.  And

19   then take care, your signature.  Does that refresh

20   your recollection at all as to the timing of when you

21   returned?

22   A.Being that this was such an important thing to

23   take care of, I would have to say that it was within

24   that same week of June 13 or maybe --- I would have to

25   say June 13.

Page 178

1    Okay.  Right.  Well, sure, that meeting,

2    right.  Not meeting with Warden Williams.

3    BY ATTORNEY SCHLEIGH:

4    Q.Okay.

5    Do you recall --- I'll clean it up.  Do you

6    recall when the meeting with Solicitor Martin

7    regarding the resistance of Warden Williams to provide

8    you documentation occurred?

9    A.No.

10   Q.Okay.  All right.

11   COURT REPORTER:

12   Ten.

13                     ---

14   (Whereupon, Deposition Exhibit Figueroa-

15   10, Emails, was marked for

16   identification.)

17                     ---

18   BY ATTORNEY SCHLEIGH:

19   Q.Providing you a document we've marked F-10.  It

20   should be five pages long, beginning with RFP 51.  The

21   front page involves an email from William Martin, who

22   we discuss with solicitor to yourself. Copied to Jamal

23   Johnson dated Monday, June 27, 2022 at about 10:14

24   a.m.  There are other embedded emails in that we also

25   address, but feel free to take a minute or two to look

Page 179

```
 1   yourself over and familiarize yourself with it.

 2                        ---

 3   (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

 4                        ---

 5   BY ATTORNEY SCHLEIGH:

 6   Q.Okay.  Had a chance to look it over?

 7   A.Yeah.

 8   Q.Do you recognize the series of emails?

 9   A.I recognize all of them.

10   Q.All right.

11   Let's turn to the third page.  It's an email

12   dated June 24, 2022, from Stephen Richman, the

13   attorney we've been talking about, to you with a copy

14   only to another apparent attorney from his office by

15   name of Thomas Kohn, K-O-H-N.  This email says, I'm

16   again following up on the below.  We have yet to

17   receive any substantive response from the county.  As

18   I previously advised, we need the information requests

19   to move forward with negotiations and hope to resolve

20   other outstanding issues between the county and the

21   union.  We'd like to proceed without the need for any

22   litigation, but the county's failure to respond is

23   leaving the union without any choice.  I look forward

24   to a thought response from the county. Did I read that

25   correct?
```

 1   A.Yes.

 2   Q.And that's just over nine days after the previous

 3   email he sent to you requesting that information?

 4   A.Uh-huh (yes).

 5   Q.Again, you have to say yes, no, or something

 6   else.

 7   A.Yes.

 8   Q.Okay.

 9   Fair to say you've been back on the job about two

10   weeks at this point?

11   A.Yes.

12   Q.Okay.

13   Q.Possibly longer.  Possibly longer?

14   A.Two weeks.  I would say something to that effect.

15   Q.All right.

16   Were there any communications with anyone about

17   Mr. Richman's request to someone other than Jamal

18   Johnson by June 24, 2022?

19   A.Warden Williams was fully aware of all the

20   requests that were made of him, or rather, by him.

21   There was never an instance that his request for

22   information wasn't --- well, there may have been maybe

23   one, two.  But she was fully aware of what was

24   requested by Mr. Richman.

25   Q.When you said she was fully aware, are you

Page 181

1   referring to the fact that you made the forward to her

2   back in April, or are there other communications that

3   exist indicating that come June of 2022, Mr. Richman

4   was requesting these documents again?

5   A.All right, that was just my getting back to

6   everybody on board that we had not answered those

7   requests and that he was considering filing a ULP.

8   Q.Okay.

9   And I know that you sent something to Mr.

10  Johnson.  Did you send something directly to Warden

11  Williams that I'm not aware of by June 24 of 2022?

12  A.Well, I did make her aware, and like I said

13  before, I have never left her out of the picture.

14  Q.How did you make her aware?

15  A.Again, I made them aware when I first got back,

16  and taking care of other things that were on my desk.

17  Verbally, I kept on asking Jamal for this information.

18   I asked Munsanda for the information. She had things

19  to take care of.  And by this time, I had also gotten

20  in touch with John McLaughlin to see if I can get his

21  help in this.  But again, throughout this entire

22  period, the warden would not give me anything.

23  Q.Okay.

24  Are there any written communications prior to

25  June 24, 2022, to Warden Williams again, requesting

Page 182

1    this information that I'm not aware of?

2    ATTORNEY COHEN:

3    Objection.  You can answer.

4    BY ATTORNEY SCHLEIGH:

5    Q.All right.  You can't answer my statement.  Fair

6    enough.  Are there communications that you're aware of

7    prior to June 24, 2022, in writing from yourself to

8    Warden Williams requesting the information that Mr.

9    Richman had asked for in April and was renewing his

10   request in June of 2022?

11   A.No, only the response that I gave to all the

12   parties when I first got back that this stuff had to

13   be taken care of as quickly as possible.

14   Q.When was that?

15   A.We had gone over that already.

16   Q.In fairness, there's the June 15 email to Jamal

17   Johnson, which is F-9.  I'm not trying to hide the

18   ball on that.

19   A.It's okay.

20   Q.Is there any other communications you're aware

21   of?

22   A.We've gone over all of them.  But when I first

23   got back, I did send an email to all the parties

24   concerned saying that this had to be taken care of

25   because they had not been taken care of during the

Page 183

1    time that I was away.  Yeah, it says, dear colleagues,

2    please take care of this.

3    Q.Are you looking at F-7?

4    A.I don't know.

5    Q.Take a look at the sticker.

6    A.You got the request on April 8.  I know there's

7    one that says, Steve, please --- dear colleagues,

8    please, let's take care of this.

9    Q.All right.

10   Well, let me help you.  Looking at F-10.

11   Starting at the bottom of page two, which is Bates

12   stamp 52, there's a June 24, 2022 email at 2:57 p.m.

13   A.Oh, there it is.

14   Q.From yourself to Mr. Johnson to turn Attorney

15   McLaughlin to Warden Williams, copy to yourself,

16   copied to Mr. Richman, where it does say, colleagues,

17   I've sent out a number of requests for the information

18   Steve is requesting.  Please help me in getting this

19   out to him.  Or I suspect that you have much of the

20   information that Steve is asking for.  If so, can you

21   please forward what you have to his attention?  Take

22   care of Hector.

23   Did I read that correctly?

24   A.Yes.

25   Q.Okay.

Page 184

1    Would you agree with me that that gets sent out

2    20 minutes after Mr. Richman asks for it again on June

3    24, 2022?

4    A.Why shouldn't it?

5    Q.Okay.

6    So the answer is yes, you agree with me it got

7    sent out 20 minutes later.

8    A.Well, he had made the request all over again, and

9    I just wanted to make sure that all the parties that

10   were involved were informed that he still had not

11   gotten the information that he requested.

12   Q.I understand.  Your message says, I sent out a

13   number of requests for the information Steve has

14   requested.  My question is, when were those requests

15   made?

16   A.They would have to go back to the time before I

17   left and the time when I got back.  Again, between

18   that time of my leaving and coming back, I didn't make

19   any requests of anybody because I didn't have any need

20   to.

21   Q.I understand.  Other than the April 8th request

22   being forwarded to some of these stakeholders that we

23   just referenced in your June 24 email and the email on

24   June 15 to Mr. Johnson, are you aware of any other

25   written correspondences where you again, advised them

Page 185

1    that Mr. Richman still hadn't gotten the documents he

2    requested in April?

3    A.Just correspondence that you have and that's it.

4    Q.Okay.

5    And if you look further up --- excuse me.  If you

6    look further up the email, second page 152 of Exhibit

7    F-10, there's a correspondence from Warden Williams to

8    yourself, Mr. Johnson, Mr. McLaughlin, and to Mr.

9    Richman, where she says, aside from the first request,

10   I have not had any further follow up from any parties.

11    I will follow up with John McLaughlin. Mr. Richman,

12   in order to reduce delays, please reach out to me or

13   John McLaughlin, and we will group in the other

14   members.  I demonstrate responsiveness through the

15   joint filing and postings because the communications

16   was directed to me or the solicitor. Did you have a

17   chance to review this around the time that you

18   received it?

19   A.Sure.

20   Q.Did you have any information at that time to

21   indicate that what Warden Williams said was

22   inaccurate?

23   A.I believe not.

24   Q.Do you have reason to believe that other than the

25   April request, which I believe she's referring to,

Page 186

1   that she had any other communications from you or Mr.

2   Richman requesting the documents?

3   A.Besides all the emails that have gone back and

4   forth, there was an understanding on everybody's part

5   that these things had to get done.  And again, I have

6   to reiterate that if you would look at page --- the

7   last page of Exhibit 10, right.  These are all the

8   requests, and these are the ones that she would not

9   cooperate with.  So I was kind of ---.

10  Q.What evidence do you have that she wasn't

11  cooperating when she says on June 24, other than the

12  first time I got them I haven't seen any follow up

13  from any of the parties about it?

14  A.Because we had discussed it on the phone.

15  Q.Okay.

16  What did she say and when?

17  A.I don't remember what she said.  All right.  All

18  I do remember is that she refused to let go of some of

19  the information because it was proprietary,

20  specifically that of the techniques for interviews,

21  the personnel files, the number of individuals that

22  were not going to be led back into the facility.  That

23  was part of the conversation that I had with her.

24  Q.Okay.

25  Let's turn to the first page of F-10.  So there's

1   an email from Warden Williams to Bill Martin dated

2   June 27, 2022 at 10:12 a.m.  Admittedly, you're not

3   copied on this particular email, in which Warden

4   Williams writes, Bill, need your help.  Who could

5   assist with advisement?  It seems that Hector has been

6   getting this communication instead of me, and now

7   there's pressure for a response, and John McLaughlin

8   is out of the country until July 6.  Have you had a

9   chance to see that?

10  A. Yeah.

11  Q. That's just a reference point.  Immediately above

12  that is the email from Bill Martin to you asking

13  Hector, please call me in my office to discuss.  You

14  received an email from Dely.

15  Right?

16  A. It's there, yes.

17  Q. And that included email from Warden Williams.

18  Correct?

19  A. I don't quite remember but it probably did.

20  Q. Okay.

21  Would you have read forwarded emails when an

22  email gets sent to you as a matter of practice?

23  A. Sure.

24  Q. And at that time, were you aware John McLaughlin,

25  the labor attorney, was out of the country?

Page 188

1    A. Yes.

2    Q. Okay.

3    A. If you remember correctly, I had made that

4    mistake insofar as sending the wrong email.

5    Q. So there was things going on with John

6    McLaughlin, same time things were going on with the

7    investigation regarding Mr. McFarland.

8    Correct?

9    A. Probably, yes.

10   Q. But details matter.

11   Right?

12   ATTORNEY COHEN:

13   Objection, asked and answered.

14   BY ATTORNEY SCHLEIGH:

15   Q. These details matter, don't they?  All right.

16   Did you eventually talk to Mr. Kumar Novello what

17   was going on with the labor issues?

18   A. I went with Jamal, yes, we had a meeting with

19   him.

20   Q. What happened?

21   A. Basically he said --- quite frankly, he said,

22   listen, don't worry about her, we all know that she's

23   a pain in the ass.  Verbatim.

24   Q. Okay.

25   A. And that was it.  He said, just do the best you

HECTOR FIGUEROA vs
COUNTY OF DELAWARE

HECTOR FIGUEROA

Page 190

1    A. All right.

2    Q. We know that you had a final day of around August

3    23, 2002, can you tell me approximately how long

4    before you were terminated that Mr. Richman got

5    documents he was asking for?

6    A. I don't know.

7    Q. How did he receive them?

8    A. I think there were a number of documents that was

9    sent to him via email, but I don't quite remember when

10   that occurred.

11   Q. Did you yourself personally send them out?

12   A. I probably did because I was responsible for it.

13   Q. Did there come a time where any of the superiors

14   and management were asking questions about how you

15   kept track of your assignments?

16   A. Yes.

17   Q. When did that first start occurring?

18   A. That probably occurred maybe a week before my

19   termination, maybe two weeks before my termination.

20   Q. And how did it occur?

21   A. What do you mean, how did it occur?  He sent me

22   an email, Marc Woolley.

23   Q. Did you have any communication with him about

24   that outside of the email?

25   A. No.

Page 191

1    Q.And how did you respond to him?

2    A.I responded, I gave him a listing of what was

3    outstanding and what I was doing.  And then I got

4    together with Jamal and we put together a very

5    detailed listing because Jamal felt that he had to

6    also make him --- well, Marc Woolley made Jamal and

7    myself --- if I remember correctly, he wanted to know

8    what was in the hopper, you know, everything that was

9    in the hopper.

10   Q.And why was that?

11   A.I don't know.

12   Q.Were you involved in a communication about why

13   he's requesting it?

14   A.No.

15   Q.Were you also asked to be involved in the

16   compilation of any information regarding a spreadsheet

17   that compiles tracks regarding open job searches?

18   A.No.

19   Q.Outside your wheelhouse, so to speak?  Outside,

20   out of your wheelhouse, so to speak?

21   A.So to speak.

22   Q.Were you aware whether the department was ever

23   looking for any additional employees while you were

24   there?  Your department?

25   A.There was a situation that we were considering,

1   stamped PLF 10 through 12 for the next series of

2   questions.

3                          ---

4   (Whereupon, Deposition Exhibit Figueroa-

5   11, Emails, was marked for

6   identification.)

7                          ---

8   BY ATTORNEY SCHLEIGH:

9   Q.Are you generally familiar with the emails that

10  are referenced on this document?

11  A.I'm fully familiar with it.

12  Q.Okay.

13  You had some testimony earlier about a list of

14  projects that you provided to Marc.

15  A.Yes.

16  Q.Is that reflected on page two of this document?

17  A.To the best of my recollection, yes.

18  Q.Okay.

19  So just for setting up our timeline, you provide

20  the list of things that you're working on to Marc

21  Woolley.  And keep saying --- Marc Woolley and Jamal

22  Johnson and copy to yourself on July 22nd, 2002 at

23  3:52 p.m.

24  A.Yes. Uh-huh (yes).

25  Q.And that was in response to an email that was

1   sent to you earlier that day from Lauren Footman,

2   apparently on Marc Woolley's behalf, requesting.

3   Is that correct?

4   A.Uh-huh (yes).

5   Q.You have to say yes.

6   A.Yes.  I'm sorry.

7   Q.And the subject is Grievance CBA Tracker.  Can

8   you explain exactly what that refers to?

9   A.Grievance is basically those particular

10  occurrences where you have a difference of

11  interpretation between a union member and the

12  facility.  And the CBA tracker is basically just

13  making everybody aware of contract negotiations that

14  are ongoing.

15  Q.Okay.

16  So CBA stands for collective bargaining agreement

17  in this context.

18  A.Yes.  And that's what I named it at that time.

19  Q.Were you being asked to provide information about

20  any other things that you were working on at this

21  time?

22  A.I was just asked to give a listing of CBA about

23  outstanding grievances and CBA negotiations, and

24  that's what I responded to.  The response that I got

25  from Marc Woolley is that he had made a couple of

Page 195

```
1   grammatical changes, and then I discussed it with

2   Jamal and we decided to put together a very detailed

3   listing of what was outstanding at that particular

4   time.

5   Q. And in the first page of F-11, there's exchange

6   communications between you and Mr. Johnson and general

7   tone is that indicates that there are other things

8   we'll be putting on the list that were things that you

9   may not have been aware of.

10  A. Yes.

11  COURT REPORTER:

12  Twelve (12).

13                       ---

14  (Whereupon, Deposition Exhibit Figueroa-

15  12, Graph, was marked for

16  identification.)

17                       ---

18  BY ATTORNEY SCHLEIGH:

19  Q. Okay.

20  Giving you a copy of some type of spreadsheet

21  that the Bates numbers got cut off, but it's

22  originally from Plaintiff's production and it looks

23  like it's entitled Labor Relations Log on the first

24  left hand page.  Eleven (11), looks like it's 11 pages

25  long.  Feel free to confirm me or tell me if I can't
```

Page 207

1   A. That I can't answer.

2   Q. Okay.

3   A. All right.  There's a very good chance that we

4   both played some catch up baseball with this and so

5   far getting as much information on this tracker as

6   possible.

7   Q. Okay.

8   You don't think anything from Ms. Jackson's July

9   1st proposed employee discipline would have appeared

10  on the tracker at that time?

11  A. I don't think so.

12  Q. Okay.

13  A. And I don't know why not.

14  Q. And then is it correct that --- I think you

15  touched on this a bit earlier.  Ms. Jackson did submit

16  on July 28th a proposed notice of discipline to Mr.

17  Fitzgerald again?

18  A. A. Uh-huh (yes).  Well, that was the only

19  one that we have, yeah.

20  Q. The only one you have.

21  A. That was the only one that I saw.

22  Q. You never saw the July 1st one?

23  A. No.

24  Q. I thought we established earlier was the one

25  directed to you.

1   A. The one that you showed me a copy of, that's the

2   one that I saw.

3   Q. Okay.

4   You never saw one she wrote July 28th?

5   A. No.

6   Q. All right.

7   A. Not to my knowledge, anyway.

8   COURT REPORTER:

9   Fourteen (14)

10                          ---

11  (Whereupon, Deposition Exhibit Figueroa-

12  14, Emails, was marked for

13  identification.)

14                          ---

15   BY ATTORNEY SCHLEIGH:

16  Q. Okay.

17  F-14 is Lisa Jackson's Thursday, July 28, 2022

18  email to you with a carbon copy to Mr. Johnson

19  indicating as a subject, employee notice of

20  discipline, Franklin Fitzgerald, an attachment being

21  employee notice of discipline, Franklin Fitzgerald,

22  number two with 07/27/22, also listed in the title of

23  the PDF document that was attached.  Body says, Good

24  morning, Hector.  Attached, please find my formal

25  employee notice of discipline for my staff member

1   Franklin Fitzgerald.  His behavior outburst yesterday

2   afternoon was unacceptable.  With this being the

3   second occurrence within the month, see previous email

4   below, I'm recommending a three day suspension.

5   However, as instructed prior to sending this notice

6   directly to him, I am sending to you for review and

7   guidance.  I look forward to hearing from you and/or

8   speaking with you at your earliest convenience next

9   week.  Thanks and have a great holiday.

10  Do you recall receiving this?

11  A.No.  It's there, but I don't recall.

12  Q.How soon after this or before it do you think you

13  received the Fitzgerald complaint?

14  A.Which one?  The first one or the second one?

15  Q.Is there a second one?

16  A.It says it's the second one.

17  Q.Right, I'm sorry, bad context.  Where on the

18  timeline did you receive the complaint from Mr.

19  Fitzgerald?

20  A.I would have to say sometime in mid-July, I

21  think.  I don't have the dates in front of me.  Again,

22  he made formal complaints with Munsanda, as we stated

23  before.

24  Q.Do you know if it was before or after the second

25  request for review and guidance of an employee

Page 210

1   discipline from Ms. Jackson?

2   A.I don't know.  It has to before, probably.

3   Q.Do you remember responding to Ms. Jackson

4   regarding this email?

5   A.No, I don't.

6   Q.When we looked at the tracker, that was marked as

7   Exhibit number 12, and there's a reference to July 28

8   being a submitted date, do you know if Mr. Fitzgerald

9   submitted his complaint on the same date?

10  A.No.

11  Q.Did you do anything to act upon Ms. Jackson's

12  request for advice and guidance regarding a potential

13  three day suspension of Mr. Fitzgerald?

14  A.As stated before, we tried to get together with

15  her, both Jamal and myself, but she wasn't available.

16  And then when we tried again, she had gone on

17  vacation.  So we did try, but quite frankly, I think

18  she was trying to dodge it.  But that's as far as I

19  can go.

20  Q.When you were trying to contact Ms. Jackson,

21  wasn't that in relation to the fact that you received

22  a complaint from Mr. Fitzgerald and not in response to

23  her request for guidance for her attempts to

24  discipline Mr. Fitzgerald?

25  A.I don't recall.

1 Q.Around the same time that Fitzgerald complaint

2 was brought to your attention, were you also trying to

3 conduct interviews with prison guards in relation to

4 some discipline issues there?

5 A.No, I never interviewed the prison guards.

6 Q.Never?

7 A.No.

8 Q.Were you ever asked to make any interviews at the

9 prison?

10 A.No.  That was done by either Munsanda or Warden

11 Williams, but I did not interview everybody.

12 Q.Okay.

13 Did Jamal do that?

14 A.I'm not quite sure.  I know I didn't.

15 Q.All right.

16 Just to be more specific, because I'm not trying

17 to keep this --- were you involved in any

18 investigations involving Major Richard Leech?

19 A.I know there was an investigation that was being

20 rendered.  One of the young ladies from the

21 correctional institute had filed a complaint of

22 harassment.  I don't remember the names, but that was

23 done.  But I can't remember her name.  I know as a

24 result of the investigation, one individual was

25 terminated, another individual was --- he went from

Page 212

1    one grade to one --- well, he was demoted, but I don't

2    quite remember what it was.

3    Q.Do you remember being involved in any way, I'll

4    rephrase the question, of an interview of Major

5    Richard Leech.

6    A.I think I was there in Jamal's office, but I

7    didn't interview him.  I know that he was there with

8    Jamal and myself.

9    Q.Same question with respect to Major Elder

10   Pleasant?

11   A.That I don't know.

12   Q.Same question.  Sergeant Joshua Thamarus.

13   T-H-A ---

14   A.No.

15   Q.--- M-A-R-U-S.

16   A.No.

17   Q.Sergeant Berlia, B-E-R-L-I-A, Mae Russell.

18   A.No.

19   Q.How about Officer Cassandra Hall?

20   A.That rings a bell.  I think that was the young

21   lady that filed an original complaint of harassment.

22   And then he rendered the investigation of two

23   individuals who are like I said, one was terminated,

24   the other was demoted.  But the investigation got very

25   difficult because we found out that she was bearing a

Page 213

1   child of one of the correction officers, so it made it

2   very difficult.

3   Q.You said bearing.

4   Right.

5   A.Yes.  She's pregnant.

6                        ---

7   (Whereupon, Deposition Exhibit Figueroa-

8   15, Emails, was marked for

9   identification.)

10                       ---

11  BY ATTORNEY SCHLEIGH:

12  Q.I know these are cut off places in here.  Let's

13  take a look at this.  It's a two page document marked

14  as F-15.  It's Bates stamped RFP 847, 848.  And I

15  believe the top email on the first page is from you.

16  A.Yeah.

17  Q.Okay.

18  I don't have it in front of me.  What's the date

19  of the email from you?

20  A.It says July 29.

21  Q.Okay.  2022?

22  A.Yes.

23  Q.All right.

24  And it's directed to Warden Williams, Jamal

25  Johnson, Marc Woolley, Iris Wiley.  She was employed

1   by the prison.

2   Right?

3   A.Yes, she was the personnel director.

4   Q.Cheyenne Marquette.

5   A.I don't know who that is.

6   Q.Laura Barrett.

7   A.I think they both worked within the HR

8   department.

9   Q.Okay.

10   And Mr. Lazarus.  And you're responding to an

11   email from Warden Williams who says, I've already

12   contacted three gentlemen that have been suspended in

13   an effort to set up interviews for the beginning of

14   the week.  I will keep you abreast.  Email earlier

15   that day from Laura Williams says the prison has

16   provided the contact information for all the

17   interviews.  As Hector is leading the investigation,

18   we are subject to his schedule.  I would ask that all

19   interviews are scheduled to be completed by Tuesday so

20   the reports can be reviewed and dispositions provided.

21    Does that give you a refresher context on what we're

22   talking about with prison interviews?

23   A.It may, but there were so many interviews, I

24   don't remember which ones I actually took part in or

25   actually did.

Page 215

1   Q. Okay.

2   There's an earlier email from Jamal Johnson from

3   that day, about 5:58 p.m.  And there's the list of the

4   names of the prison staff I just talked to you about.

5    Do you recall which of the three suspended gentlemen

6   ---

7   A. No, I don't.

8   Q. --- you were supposed to interview?

9   A. No, I don't.

10   Q. Do you have any recollection today as to whether

11   you followed through with interviewing those three

12   gentlemen?

13   A. Yeah, as a matter of fact, we interviewed Mae

14   Russell, I think we interviewed Joshua Thamarus, if I

15   remember correctly, Richard Leech, I think, and

16   Cassandra Hall.

17   Q. What was the urgency that they'd be completed by

18   Tuesday?

19   A. That was her urgency, not mine.

20   Q. Okay.

21   What was her urgency ---

22   A. I didn't know.

23   Q. --- about Tuesday?

24   A. I have no idea.

25   Q. These emails were Friday night after normal

Page 221

1                          ---

2    (Whereupon, Deposition Exhibit Figueroa-

3    17, Emails, was marked for

4    identification.)

5                          ---

6    BY ATTORNEY SCHLEIGH:

7    Q.All right.

8    I'm showing you a one-page document, RFP 107,

9    that's been marked as F-17.  It's from you to John

10   McLaughlin, copies to Jamal dated August 3rd, 2022,

11   which was a Wednesday. Do you recall sending this

12   document?

13   A.Yeah, I remember.

14   Q.Okay.

15   What is the context of what the two of you are

16   talking about?

17   A.Well, there had been a Labor Relations Board

18   complaint that was filed in a notice of hearing and

19   John McLaughlin looked into it and he was able to

20   address it and change the date of possibly the

21   negotiations to 1020 or something to that effect, but

22   I was aware of it.

23   Q.What was it concerning?

24   A.If I remember correctly, the union had filed a

25   complaint so far as the negotiations were being

1    stalled.  I think.  I'm not quite sure.  I don't have

2    all of the details right now on top of my head.

3    Q.All right.

4    And your message to him says john, thanks so much

5    has been going on that I missed opening the messages

6    mentioned.  What did that mean?

7    A.I don't know.

8    Q.The message John McLaughlin sent to you ---.

9    A.Was at 4:30.

10   Q.Right.  Same day.  Says, yes I dealt with this

11   last week, got the hearing moved after speaking with

12   Bill, sent around an email last week and one earlier

13   this week.  New date is October 20, 2022.  I've

14   attached them for your convenience and to forward to

15   the prison.  I even copied the warden on them because

16   of the importance.  Does that refresh your

17   recollection at all of what this was all about?

18   A.No.  I know that there was an issue with a Labor

19   Relations Board complaint and they had taken care of

20   it.

21   Q.Was there any issue with you not opening emails

22   during this period of time?

23   A.No.

24   Q.Okay.

25   COURT REPORTER:

Page 224

1    those folks.

2    Correct?

3    A.Uh-huh (yes).

4    Q.All right.

5    There's been some allegations in this matter that

6    there was some type of leak in the HR department about

7    this investigation to Ms. Jackson.  Are you familiar

8    with that allegation?

9    A.No.

10   Q.Okay.

11   Are you aware of whether anyone was leaking

12   information out of HR to her?

13   A.I had heard but ---.

14   Q.What had you heard?

15   A.Well, it was just innuendo insofar as who did

16   what, who said what to whom.

17   Q.As a matter of protocol, if HR is conducting an

18   investigation, how do you approach the target of that

19   investigation to advise them to something, if

20   anything, is going on?

21   A.Well, usually a target of an investigation, they

22   are told that it's to be held with full confidence

23   insofar as the investigation is concerned, not to

24   divulge any information.  That's usually done at the

25   very beginning.

Page 225

1   Q.Is there any explanation of any kind about what

2   allegations have been made against them?

3   A.Against who?

4   Q.Target.  Target told the following allegations

5   made. What's the extent of the information?

6   A.Yeah.  Usually when you run an investigation you

7   do tell the target exactly what the complaint is about

8   or what the allegation is about.

9   Q.Okay.

10   So when you first had a communication with Lisa

11   Jackson, would you have explained to her that the

12   complaint was made by Mr. Fitzgerald?

13   A.I don't remember.  Probably.

14   Q.All right.

15   That would not be unusual protocol ---

16   A.No.

17   Q.--- to say so and so made a complaint about you?

18   A.Uh-uh (no).

19   Q.You have to answer out loud.

20   A.No.  Yeah.

21   Q.That was a confusing answer on the record.  So

22   we're going to try again.  Is it normal protocol to

23   explain the target of investigation that a certain

24   person has made a complaint against them?

25   A.Yes.

Page 226

1    Q. What other information is then provided to the

2    target of the investigation?

3    A. That's it from the very beginning.  And that's

4    when you tell them, we need to talk, we need to have

5    an interview.

6    Q. Nothing about the nature of the complaint is

7    explained to them at that point.

8    A. Usually you tell them exactly what the allegation

9    is, but usually save all the good stuff when you get

10   together with them.

11   Q. All right.

12   And what, if anything, have you heard that

13   someone would have made something to Ms. Jackson other

14   than your initial representation?

15   A. That I don't know.

16   Q. Is there anyone you're aware of who has

17   information that such a leak occurred?

18   A. I had heard some rumors, but I wasn't quite sure

19   where it may have come from.

20   Q. Well, who did you hear the rumors from?

21   A. I don't remember.

22   Q. Okay.

23   Well, who all did you talk about this case with

24   that could have provided you that information?

25   A. Pardon?

1    Q.Who else did you talk to about these allegations

2    that would have potentially made mention that someone

3    would have leaked it to her?

4    A.The only ones that knew about the investigations

5    were the individuals from within her department that

6    were being interviewed, Munsanda, Jamal and myself.

7    But you also have to remember that was a very small

8    department, and if the information got out or someone

9    talked to somebody inadvertently, there's a good

10   chance that may have happened.

11   Q.Okay.

12   Have you ever spoken to anyone in the purchasing

13   department, in the actual physical department?

14   A.No.

15   Q.Okay.

16   A.Not to my knowledge.

17   Q.Are you aware of whether or not, so to speak, the

18   walls are thin in that particular unit?

19   A.The entire building is.  The walls are thin.

20   Q.So it's possible that people may have overheard

21   things?

22   A.Maybe.  I'm not quite sure.  I don't want to

23   point the finger at anybody without being absolutely

24   sure.

25   Q.Do you understand why it was decided that Mr.

Page 228

1    Fitzgerald should be moved to Fair Acres?

2    A. Well, at that time, there was concern about

3    whether or not the situation was going to get worse

4    between them two.  And in all fairness to everybody I

5    thought --- everybody thought that the best thing to

6    do was to get him out of there to avoid future

7    complaints, to avoid it flaring into something that

8    was uncontrollable.  So it was best decided just to

9    get him out of there.

10   Q. With regards to relations with managerial

11   employees, would you agree with me that it would be

12   important that when they seek advice on discipline,

13   write ups, things of that nature, that you should

14   regularly and appropriately respond in a timely manner

15   so that they have faith in the HR department?

16   A. I would have to say it depends on the situation.

17   Q. If there was a managerial employee who never had

18   their concerns about discipline of an employee

19   acknowledged or responded to at all or in a timely

20   manner, could you see why they may be cautious in

21   dealing with the HR department when they're advised

22   that they suddenly have a complaint against them.

23   A. If you're asking whether that occurred within the

24   HR department that we had known.

25   Q. I'm asking a hypothetical question based upon

Page 230

1   sorry.  I kind of lost.

2                         ---

3   (WHEREUPON, PREVIOUS QUESTION WAS READ BACK.)

4                         ---

5   THE WITNESS:

6   No, I don't think so.

7   BY ATTORNEY SCHLEIGH:

8   Q.Okay.

9   When you came on the position back in March, I

10   think we're talking about, fair to say you

11   familiarized yourself with employee handbook, policies

12   and procedures, things of that nature?

13   A.Well, yeah.  Well, the handbook was basic insofar

14   as the do's and the don'ts and the EEO and diversity

15   and inclusion and the harassment.  But policies and

16   procedures, no.  I became familiar with them as went

17   on.

18   Q.When you first started, did you become familiar

19   with an employee probationary period policy?

20   A.I knew it existed but I didn't read it.

21   Q.Okay.

22   Was there a time when you did become familiar

23   with the probationary employee policy?

24   A.Only insofar as other employees were concerned?

25   Yes.

Page 231

1  Q.Okay.

2  When considering potential progressive discipline

3  against an employee, would knowing whether or not they

4  are still in the probationary period be important?

5  A.Yes.

6  Q.Okay.

7  When we were talking about the situation in the

8  IT department with the amorous employee, was she a

9  probationary employee at the time?

10  A.She was on probation, yes.

11  Q.And do you recall whether there was any

12  recommendations that she received progressive

13  discipline?

14  A.No.  Once you're in a probationary period and you

15  don't meet standards, you're eligible to get

16  terminated.

17  Q.Did you ever make any recommendations that there

18  be progressive discipline with her rather than just

19  termination while she was no she was in the

20  probationary period.

21  A.That had been primarily built by Jamal.  Can you

22  give me a chance I have to check my SEPTA schedule?

23  ATTORNEY COHEN:

24  Sure.

25  THE WITNESS:

Page 232

1   Can I step out for a second?

2   ATTORNEY COHEN:

3   Yeah, sure.

4                        ---

5   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

6                        ---

7                        ---

8   (Whereupon, Deposition Exhibit Figueroa-

9   19, Emails, was marked for

10  identification.)

11                       ---

12  BY ATTORNEY SCHLEIGH:

13  Q.You're looking at the August 12th, 2022 email

14  from Marc to Lauren at the top.  We have marked as F-

15  19, a two page document Bates stamped RFP 132 and 133.

16  At the top of page one is an August 12th email from

17  Marc Woolley to Lauren Footman, subject matter is

18  forward questions per discipline form. You're not a

19  recipient of that email, but there is reference there

20  to some emails that were forwarded to Mr. Woolley that

21  it appears to be responding to.  Directly below that,

22  there is one dated August 12th, 2022 at 6:45 p.m. from

23  you to Mr. Woolley with copies to John Becht and Jamal

24  Johnson, Munsanda Brown and Michael Campellone.  Am I

25  pronouncing that correctly?

 1  A.Yes.

 2  Q.Question number one.  Who is Michael Campellone?

 3  A.If I'm not mistaken, he is --- he may have been

 4  the union rep or the shop steward, but right now I

 5  can't remember who it is.

 6  Q.Okay.  All right.

 7  Your email from August 12th says, Marc, if she's

 8  still under a probationary period, then of course the

 9  situation is a lot simpler.  Just need documentation

10  as to why she has not met the county standards.  No

11  steps needed.  I was more so describing one who is

12  past probation.  Just pardon slight confusion.  Marc,

13  thanks for the clarification.  Hector.

14  That appears to be in response to an email early

15  in the day from Mr. Woolley at about August 12th,

16  2002, at about 6:29 p.m. to you, Mr. Becht, Mr.

17  Johnson, Ms. Brown, Mr. Campellone.  I think I already

18  said you, where he asked, isn't she on probation?

19  Isn't the next step just failure of probationary

20  period.  No need to make it complicated. Please

21  advise.

22  That in itself appears to have been in response

23  to an email from you to John Becht earlier that day at

24  3:56 p.m. that was copied to Jamal Johnson, Ms. Brown,

25  Mr. Campellone, Mr. Woolley, and yourself answering a

Page 234

1   question from Mr. Becht regarding how to discipline

2   somebody.  Do you remember who the person was in the

3   context of this particular inquiry?

4   A.The lady who was caught, who was an alcoholic.

5   Q.Okay.

6   And the advice that you gave at 3:56 p.m. was

7   John, the process usually runs in three steps; verbal,

8   written warning, and then final warning. Usually when

9   it reaches this stage more than likely it will result

10  in termination.  When reaching the final and a PIP, I

11  guess that's personal improvement plan?

12  A.Yes.

13  Q.It's suggested.  It is the practice that the PIP

14  is usually for 60 to 90 days.  But depending on the

15  severity of the situation, the number of days you want

16  to issue is up to you.  You can go down to as low as

17  30 days.  Please, if you have any concerns or need for

18  some additional guidance, do not hesitate to contact

19  me.

20  So if this series of emails was in relation to, I

21  believe her name's Ms. Strey, Regine Strey, who was an

22  alcoholic but had made some inappropriate advances to

23  a coworker, and she was in the probationary period,

24  were you giving Mr. Becht advice that she should get

25  on a performance improvement plan?

Page 235

1   A.No.  He was a little confused as to how to

2   address the situation.  Right?

3   Q.Okay.

4   A.And I responded to him based on the premise that

5   she --- at this time, I may or may not have been aware

6   that she was on probation.  But anyway, that's neither

7   here nor there.  I was just giving him an idea of how

8   to handle a termination or discipline of someone that

9   was regularly on staff.  And then I responded to Marc

10  Woolley that, of course, if she's not a full time

11  staff, if she's a probationary, then it's always wise

12  to have some sort of documentation if you're going to

13  let somebody go.

14  Q.Okay.

15  Was Mr. Becht's inquiry specifically regarding

16  this instance involving the amorous employee?

17  A.Yeah.

18  Q.Okay.

19  Then why weren't you giving recommendation

20  immediately that she was on probation if you're able

21  to be terminated for any reason?

22  A.Because I didn't know she was on probation.

23  Jamal told me she was on probation.  The initial

24  inclination was to give him advice insofar as taking

25  care of a situation that was an individual that was

1  past probation.  And then I reiterated that if she

2  isn't past probation, then she could be terminated.

3  Q.Mr. Becht was looking for your expertise and

4  advice.  That's correct?

5  A.Yes.

6  Q.And he assumably rely upon it.

7  Correct?

8  A.I gave him both scenarios.

9  Q.Okay.

10  Did you only give him a scenario about

11  probationary after it was pointed out to you that the

12  lady was in the probationary period?

13  A.That's when I responded to him on Friday at 6:45

14  p.m. about the ins and outs of the probationary

15  period.

16  Q.Shouldn't you verify whether or not the lady was

17  full time or probationary in the first place?

18  A.That's a toss up, to be frank with you, because I

19  had no idea that she had been there for a short period

20  of time.

21  Q.Had you consulted her personnel file to

22  determine ---?

23  A.No.

24  Q.--- what her background was?

25  A.No, I had not.  Again, we rarely looked at

Page 237

1  personnel files, and that includes myself, Jamal,

2  Munsanda, everybody.

3  Q.Do you think maybe you should?

4  A.In hindsight, maybe.

5  Q.And do you think that's perhaps a performance

6  issue?

7  A.No.

8  Q.All right.

9  We talked about Sharon Coleman earlier, and I

10  think you said that Ms. Footman never followed up

11  about that?

12  A.She never --- I did ask her, let's get together,

13  but I don't recall getting an answer from her insofar

14  as let's get together on this day or at this time so

15  we can sit down and talk about it.

16  ATTORNEY SCHLEIGH:

17  Twenty (20).

18                        ---

19  (Whereupon, Deposition Exhibit Figueroa-

20  20, Emails, was marked for

21  identification.)

22                        ---

23  BY ATTORNEY SCHLEIGH:

24  Q.All right.

25  Let's take a look what's been marked into F-20.

1    This is an email from Lauren Footman to you with a

2    copy to Marc Woolley dated August 14, 2022.

3    Correct?

4    A.Uh-huh (yes).

5    Q.So yes, no, or something else?

6    A.Yes.

7    Q.It's Bates stamp pages RFP 190 through 192, and

8    it's a three page document.  All right.

9    Let's take a look at page --- let's start at the

10   top.  Ms. Footman writes, hi, Hector, circling back to

11   see if you ever found a resolution to this case after

12   our discussion on June 29.

13   Do you recall whether you responded to her about

14   this?

15   A.No, I don't recall.  This was during that time

16   that I had just come back.

17   Q.All right.

18   June 29, you have an email to Lauren saying,

19   Lauren, good morning.  Let's discuss --- 8:38 in the

20   morning.

21   A.She never came to my office to discuss that.

22   Q.She's saying in her August 14 email that she had

23   a discussion with you on June 29.

24   A.No, she didn't.

25   Q.Okay.

Page 239

1   So you deny that ever happened?

2   A.Yes, she never came to my office to discuss it.

3   Q.Whether she came to your office or not, do you

4   have any type of communication with her on June 29.

5   A.No.

6   Q.But based on the June 29 email you sent to her,

7   you least acknowledge her June 28th email forwarding

8   on the information regarding Shannon Coleman?

9   A.Sure.  Yeah, but she never came to my office.

10  She never gave me details.

11  Q.She forwarded you other emails from a Pamela

12  Pitts.

13  Correct?

14  A.Pam Pitts is the individual that was the

15  executive assistant to Mark Lazarus (sic).

16  Q.Okay.

17  And Pam Pitts' email from June 28th that was

18  forwarded to you indicated that Sharon Coleman was a

19  clerk for the MDJ.  MDJ means magisterial district

20  judge.

21  A.I think so.

22  Q.Okay.

23  And that she was tasked with some

24  responsibilities of a court coordinator for months at

25  a time without receiving the appropriate salary for

1   performing those duties.  Is that the issue were

2   talking about earlier?

3   A.Yeah.

4   Q.And was that someone in addition to the other

5   person that you said had a pay disparity issue?

6   A.No, this was her, from what I remember.  But this

7   is the first time that I see these details.

8   Q.Okay.

9   The first time you saw Pamela's email?

10  A.This is the first time that I see that there's

11  issues with her pay, and that was her position, so on

12  and so forth.

13  Q.Okay.

14  So just so I understand your position correctly.

15  Are you saying that when Lauren forwarded you an email

16  on June 28th, 2022, the original email that she would

17  have sent you does not have the information provided

18  by Pamela Pitts attached to it?

19  A.It may have, but I just looked at the very top of

20  it, and that was it.  This is the first time that I

21  see this.

22  Q.Okay.

23  But you responded to it on June 29, didn't you?

24  In the middle of page one there.

25  A.I mean, she asked me, let's get together on the

Page 241

1   28th.  Can we please discuss this?

2   Q.Right.

3   A.And I said, Lauren, good morning.  Yeah, let's

4   discuss. She never came to my office.

5   Q.Fine.  The question is not whether or not she

6   came to your office.  The question is, did you have

7   the information that was forwarded to you?  I mean,

8   when you sent an email on the 29th saying, good

9   morning, let's discuss, did you know what you were

10  going to be talking about?

11  A.I don't remember seeing this.

12  Q.Okay.

13  A.Sorry about that.

14  Q.Do you make it a practice to respond to emails

15  saying, yes, let's discuss something, and have no

16  context for what you're about to have a conversation

17  about?

18  ATTORNEY COHEN:

19  Objection.  You can answer.

20  BY ATTORNEY SCHLEIGH:

21  Q.You can answer.

22  A.No, I'm not going to answer.

23  Q.Okay.

24  You read the embedded emails that were forwarded

25  to you from Pamela Pitts, did you not?

Page 242

1  A.No, I don't think so.  If not, I would have

2  responded in some other way, but this is the first

3  time I see this.

4  Q.So you never took the initiative to read the

5  embedded emails from Pam Pitts that identified the

6  person who was having the problem, give you some idea

7  of what the problem was, and would give you

8  information to start any type of investigation that

9  might be necessary to determine whether there was a

10  pay disparity issue?

11  A.I don't remember.

12  Q.If you didn't do that, would that be a job

13  performance issue?

14  A.It depends upon the situation and the urgency of

15  the matter.

16  Q.Do you recall whether you had any conversations

17  with Lauren Footman about her inquiry from August 14,

18  about whether you did any follow up that would resolve

19  the case?

20  A.No. Lauren and I --- and again, I reiterate this.

21  We never had any further discussions about Ms.

22  Coleman, about her complaint, about her disparity or

23  anything like that.

24  Q.And is it fair to say that you didn't initiate

25  anything to learn more about it?

1   A.Maybe I was just --- I was too busy and this was

2   one of these particular issues that I depended upon

3   her to get in touch with me.

4   Q.Were you busy such that you requested any help

5   with this particular issue?

6   A.No.

7   Q.Did you make anyone alerted, like Jamal Johnson,

8   that you could use some assistance with this

9   particular project?

10  A.No.

11  Q.Turn back to F-11, please.  Take a few moments,

12  page through it.  Tell me if I'm wrong.  The name

13  Sharon Coleman doesn't employ --- it doesn't appear

14  anywhere on the employee name column, does it?

15  A.I don't know.

16  Q.Well take a look.  Let me know.

17  A.It doesn't.

18  Q.Okay.

19  Do you know whether her name ever appeared in

20  early --- any earlier iteration of this document?

21  A.No.

22  Q.And this was something that was asked to be made

23  and was produced by Mr. Johnson at least once at the

24  end of July of 2022.

25  Correct?

1   occurring before your conversation with Mr. Johnson

2   regarding the search, or are you saying that the

3   conversation about the search occurred before this

4   email or something else?

5   A.The search had not begun yet.  The search was

6   suggested by Marc Woolley.

7   Q.I'm talking mainly the conversation where you

8   said you're having a conversation with Mr. Johnson

9   about finding a replacement.

10   A.About putting together a search, yeah.

11   Q.Yeah.  Do you know whether or not that occurred

12   before August 15, on August 15 or after August 15?

13   A.I can't tell you.

14   Q.All right.

15   You had a chance take a couple of breaks, we're

16   coming to the end, thankfully.  Upon reflection, is

17   there any testimony that you gave today that you think

18   you need to correct, amend, or further explain?

19   A.No.

20   Q.After everything that we've gone through today,

21   do you think there were any job performance issues

22   that you were having in 2022 that may have led to you

23   being fired?

24   A.Not that I was made aware of.  There may have

25   been times that I may have been a little late with

Page 248

1   doing things, but depending upon the circumstance and

2   the things I was involved in, no, I don't think so.

3   Q.Your employment stayed full time after you

4   returned from AVI.  Would that have been during a

5   probationary period?

6   ATTORNEY COHEN:

7   Which date?

8   BY ATTORNEY SCHLEIGH:

9   Q.When you returned from AVI?

10  A.No.

11  Q.No?

12  A.I got the letter.

13  Q.Let me ask a better question.

14  When you returned from AVI, that was in June?

15  A.Uh-huh (yes).

16  Q.You returned to a full time employment position.

17  A.Uh-huh (yes).

18  Q.You got the yes or no or something else.

19  ATTORNEY COHEN:

20  You got to answer.  Okay.  Go ahead.

21  BY ATTORNEY SCHLEIGH:

22  Q.There's a little book that gets made up.  So, if

23  you returned to full time employment with the county

24  in June of 2022 and you were let go before the end of

25  August, wouldn't you have been in a probation period?