1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                          - - -

3

   HECTOR FIGUEROA,            :   Civil Action

4                             :

            Plaintiff,         :   No. 23-cv-0515

5                             :

      vs.                     :

6                             :

   DELAWARE COUNTY,            :

7                             :

            Defendant.         :

8

                          - - -

9

10

11          Remote video conference deposition of

12   HOWARD S. LAZARUS, held on Tuesday, November 14, 2023,

13   commencing at 9:36 a.m., taken by and before

14   Marcy C. Muzyczka, Professional Court Reporter and

15   Notary Public.

16

17                        - - -

18

19

20

21

22

23

24

Page 6

```
 1                    (It is hereby stipulated and

 2           agreed by and between counsel for the

 3           respective parties that filing, reading,

 4           signing, sealing, and certification are

 5           waived; and that all objections, except

 6           as to the form of the question, are

 7           reserved to the time of trial.)

 8                         - - -

 9                     EXAMINATION

10                         - - -

11   BY MR. COHEN:

12           Q.    Good morning Mr. Lazarus.  Thank

13   you for being here.  So my name is Noah Cohen, as

14   I stated, and I represent Mr. Figueroa in this

15   matter against the County of Delaware.

16                    Have you ever had your deposition

17   taken before?

18           A.    I have been deposed before, yes.

19           Q.    Okay.  And when is -- are you

20   currently employed?

21           A.    I am not.  I mean, I do have a

22   potential part-time agreement that is being

23   executed, totally unrelated to County business.

24           Q.    Got you.  When -- when were you
```

Page 7

1    last employed by the county?

2            A.      March 31st of this year.

3            Q.      And what was your position with

4    the County?

5            A.      It was County Executive Director.

6            Q.      And when did you begin that position?

7            A.      July of 2020, the 15th.

8            Q.      And can you explain what your role

9    was as Executive Director?

10           A.      The Executive Director oversees

11   most of the day-to-day operations of the County on

12   behalf of the elected officials, Council members.

13           Q.      And in that position did you have

14   an opportunity to observe Hector Figueroa's work

15   performance?

16           A.      Not directly.

17           Q.      In that position, did you have an

18   opportunity to observe Jamal Johnson's work

19   performance?

20           A.      I did.

21           Q.      And how long did you work with

22   Mr. Johnson?

23           A.      He was hired, I believe, in

24   December of 2022.

Page 15

1    And Mr. Johnson was not paying attention to those items

2    which I felt were critical for him to address

3    during that time frame and those are the ones I

4    just mentioned.

5           Q.     The items are the items -- these

6    four matters that you are currently discussing; is

7    that right?

8           A.     That's correct.  It was the

9    electronic system that was in general development

10   with the Personnel Department.

11          Q.     Were you present when Mr. Johnson

12   was informed he was being demoted?

13          A.     I was.

14          Q.     And what was the -- did you tell

15   him why he was being demoted?

16          A.     Mr. Woolley was the one who provided

17   the background.

18          Q.     And what was that background?

19          A.     Mr. Johnson was not paying

20   attention to the things that I had just mentioned

21   and that caused other stresses within the

22   organization.

23          Q.     Got you.  So do you know whether

24   or not Mr. Johnson was demoted -- well, what position

Page 16

1   was Mr. Johnson demoted to?

2          A.     He was put in the position of the

3   Assistant Director for Labor Relations.

4          Q.     And before he was demoted to that

5   position, Mr. Figueroa held that position; correct?

6          A.     Yes.

7          Q.     And how long was the position empty

8   before Mr. Figueroa -- sorry -- before Mr. Johnson

9   was demoted to it?

10          A.     Those actions occurred simultaneously.

11          Q.     Were the decisions to terminate

12   Mr. Figueroa and demote Mr. Johnson made together?

13          A.     They were.

14          Q.     And who, ultimately, made that

15   decision?

16          A.     I did.

17          Q.     And who provided input into that

18   decision?

19          A.     It was primarily Mr. Woolley.

20          Q.     And do you know -- can you give a

21   time period of when you made that decision?

22          A.     It was in August of last year.

23          Q.     And how much time elapsed between

24   the decision being made and Mr. Figueroa being

Page 17

1    terminated?

2            A.     It wasn't more than a couple days,

3    as I remember.

4            Q.     So if Mr. Figueroa was terminated

5    on August 23rd, it's fair to say the decision was

6    made around August 20th or 21st?

7            A.     I don't remember the exact date.

8            Q.     Okay.  Would you say that it was

9    less -- the decision was made less than a week

10   prior to his termination?

11           A.     I don't remember the exact time frame.

12           Q.     Okay.  Do you know of any memorialization

13   of the decision to terminate Mr. Figueroa?

14           A.     Mr. Woolley prepared documentation

15   which he first discussed with me and we discussed

16   with the County Council.  It was the overview of

17   the functioning of the HR, the Personnel Department

18   that Mr. Woolley had undertaken, with support from

19   some folks in my office.

20           Q.     And -- okay.  So I'll -- was it

21   drafted in the form of, like, a memorandum?

22           A.     It was.

23           MR. COHEN:  Okay.  So let me try

24           and see if I've got that document.

Page 22

1          Q.      Okay.  So was the decision to

2     terminate Mr. Figueroa and demote Mr. Johnson made

3     with input from any Council members?

4          A.      When you look at the time frame,

5     particularly what's stated in that memo, we were

6     looking at valuation of the personnel operations.

7     And as that memo says, it was in the May/June -- the

8     May time frame of the year.  Mr. Woolley led that

9     along with the staff members that are mentioned

10    there in that paragraph.  And then those findings

11    were presented -- the Council chair, Dr. Taylor,

12    was kept informed since she was liaison to

13    personnel and she and other Council members had

14    received a lot of complaints from different

15    department heads.  So they were aware of what's

16    going on as was I.  Mr. Johnson knew that we were

17    doing it, as well, so there was no secret to what

18    was going on at the time.

19                  But the end result of it was -- and

20    one of my concerns -- was Mr. Johnson was paying a

21    lot of time to Labor Relations matters which was

22    his forte but for which we had hired Mr. Figueroa.

23    So because Mr. Johnson had to spend so much time

24    on those kind of personnel matters, the other

Page 23

1    items, Broadspire, NEOGOV, the Union agreements

2    that were going on, the benefits enrollment were

3    all in various stages of disarray.

4                    MR. SCHLEIGH:  Noah, I have what I

5              think is the complete memo that he was

6              referring to and I can shoot to you by

7              email if you want it right now?

8                    MR. COHEN:  That would be great.

9                    MR. SCHLEIGH:  I just don't have

10             it Bates stamped yet like I would have

11             liked to for production.

12                    MR. COHEN:  Yeah, that's fine.

13                    MR. SCHLEIGH:  And I can put a

14             physical copy in front of him so he

15             doesn't have to get up and look at the

16             screen the whole time, if you want?

17                    MR. COHEN:  Yeah, that makes

18             sense.

19                    MR. SCHLEIGH:  On its way.

20                    MR. COHEN:  Okay.  (Pause.)

21                    Okay.  So I will mark this as

22             Lazarus Exhibit 2.

23                              - - -

24                    (Four-page email thread marked

```
 1                    MR. COHEN:  Yeah, exactly.
 2                    MR. SCHLEIGH:  I don't think I'll
 3           be able to get you that today, but I'll
 4           work on it.
 5                    MR. COHEN:  Sure.
 6                    THE WITNESS:  I've read the
 7           document.
 8   BY MR. COHEN:
 9           Q.    Okay.  Thanks.  So looking at
10   what's been marked as Lazarus Exhibit 2, is this
11   the document that you were referencing earlier
12   when you said that Mr. Woolley prepared -- and I
13   don't want to use an incorrect word -- but,
14   essentially, a memo regarding the decision to
15   terminate Mr. Figueroa and demote Mr. Johnson?
16           A.    This is a document that has his
17   recommendations and the background.
18           Q.    Right.  And when you said -- I think
19   you said there was a memorialization of the
20   decision.  Is this document -- what's been marked
21   as Lazarus-2 the -- that memorialization?
22           A.    This document in its completed
23   form -- I'm not sure that's what this is -- is
24   what was presented and discussed with the County
```

1    Council --

2           Q.     Okay.

3           A.     -- and it was the basis of my

4    decision to move forward.

5           Q.     All right.  And when was the

6    conversation with County Council?

7           A.     I think I previously stated, as

8    best I can remember, it was in August --

9           Q.     Okay.

10          A.     -- 2022.

11          Q.     Okay.  Did you have a conversation

12   with Mr. Figueroa regarding this document?

13          A.     Not that I recall.

14          Q.     Okay.  So the document, like you

15   said when you first received it, says one of six,

16   right, at the bottom?

17          A.     It does.

18          Q.     And it's a four-page document.  Do

19   you know why it -- let me --

20          A.     I don't.  That's why --

21                 MR. SCHLEIGH:  Let him finish his

22          question.  I don't know where he's going.

23                 MR. COHEN:  Yeah, strike that.

24   BY MR. COHEN:

Page 30

1          solicitor for advice.

2                    THE WITNESS:  To the best of my

3          knowledge, the first conversation I had

4          with the solicitor was the same time we

5          talked to Council on this matter.

6                    Now, that's a very specific answer

7          to this particular document (indicating),

8          not to other discussions that I had with

9          Mr. Martin on personnel matters over a

10         period of time.

11                    MR. COHEN:  Okay.

12                    MR. SCHLEIGH:  There's no question

13         pending.

14                    THE WITNESS:  I'm sorry?

15                    MR. SCHLEIGH:  I thought you were

16         about to say something.

17                    THE WITNESS:  No.

18                    MR. SCHLEIGH:  Okay.  It was just

19         you inhaling.

20    BY MR. COHEN:

21         Q.    So -- okay.  Were you aware of an

22    employee in the Personnel -- sorry -- the Purchasing

23    Department named Franklin Fitzgerald while you

24    were employed with the County?

Page 31

1      A.    Yes.

2      Q.    And was he a direct report of the

3 director of that department Lisa Jackson?

4      A.    Yes.

5      Q.    And was he transferred away from

6 that department?

7      A.    I don't believe the transfer was

8 ever completed.  He resigned before it was

9 completed, to the best of my recollection.

10     Q.    Okay.  What, if anything, do you

11 remember about Mr. -- well, is it your recollection

12 that Mr. Fitzgerald was in the Purchasing Department

13 when he resigned?

14     A.    He was assigned there, but he wasn't

15 working there on a daily basis.  So my answer, and

16 very precise, in that documentation had been

17 transferred was not completed and he was no longer

18 present in that office.

19     Q.    Understood.  What is your understanding

20 about the circumstances that led to him no longer

21 being present in that office prior to his

22 resignation?

23     A.    There was a very -- there was a

24 disagreement that was rather loud between him and

1   issue and the background check, as best I can

2   remember.

3        Q.     Okay.  And how long would that

4   generally take to get that approval from the Council?

5        A.     It depends.  I had another transfer

6   after this one where we moved someone and the

7   person was doing the job but it took a little bit

8   of time to get the paperwork completed.  I've had

9   a lot of success throughout my career finding

10  opportunities in large organizations for people

11  who ran into trouble in one -- problems in one

12  area to be exceptional performers in other areas

13  and when you do that everybody benefits.

14       Q.     Well, what efforts, if any, were

15  made to handle that compensation issue for

16  Mr. Fitzgerald?

17       A.     I don't recall the specifics, but

18  his decision to resign from the County terminated

19  any efforts that were going to take place.

20       Q.     And do you know when he resigned

21  from the County?

22       A.     I don't recall the date.

23       Q.     And can you estimate how long

24  elapsed between when he was no longer present in

1  a variety of subjects, so I would think this came

2  up in our conversations.  Also, remember that the

3  issue with Mr. Peterson was two-fold.  One was the

4  comparison of pay between Mr. Franklin's compensation

5  and the person doing similar work within Fair Acres.

6  So even if we moved Mr. Fitzgerald in the current

7  position he was in and title, he still had that

8  conflict along with the background check matter.

9          Q.      Right.  So the pay equity you're

10  saying is the second issue brought up by Dr. Taylor

11  regarding Mr. Fitzgerald's transfer?

12          A.      No.  That was brought up by

13  Mr. Damico who was the General Manager at Fair Acres

14  and he would have gotten that from Mr. Peterson.

15          Q.      Okay.  I thought you testified

16  that Dr. Taylor brought up three legitimate concerns

17  about Mr. Fitzgerald's transfer.  Am I correct

18  about that?

19          A.      No.  I said those are the things

20  that you have to do.  Dr. Taylor's concern was

21  about Mr. Fitzgerald going into the Sustainability

22  group.

23          Q.      Okay.  And --

24          A.      So there's also a concern -- as I

Page 45

1   recall now -- about Mr. Fitzgerald being on the

2   same floor and just around corner in the building

3   from Ms. Jackson.  And I don't remember who

4   brought that up.

5         Q.    Okay.  Right.  Because they had

6   conflict, Mr. Fitzgerald and Ms. Jackson?

7         A.     That's correct.

8         Q.    Okay.  So you remember somebody

9   bringing up the -- that concern regarding them

10  being in the -- or working close together; right?

11        A.     Because Ms. Jackson and the staff

12  also worked together frequently and I know in my

13  mind it was best to provide some physical separation

14  as well as organizational separation.

15        Q.    And in terms of the decision of

16  who would be moved, do you remember -- were you a

17  part of that decision, if either Mr. Fitzgerald or

18  Ms. Jackson were to be moved of who would -- who

19  was going to be moved?

20        A.     Well, Mr. Franklin was going to be

21  moved to a different position.

22        Q.    And why was he the one that was

23  moved?

24        A.     Because there's only one Director

Page 46

1    of Central Purchasing in the County structure, but

2    there are other areas where a Procurement Specialist

3    could be placed within the County.

4            Q.     So were any solutions tendered

5    regarding the pay equity issue?

6            A.     I think I previously stated that

7    before any of those issues were addressed

8    Mr. Fitzgerald resigned.

9            Q.     So going back to Lazarus Exhibit 4,

10   this is the email from Mr. Johnson on August 18th.

11   Fair to say at this time Mr. Fitzgerald was still

12   employed by the County?

13           A.     Yes.

14           Q.     Okay.  Do you know if this email

15   from Mr. Johnson was ever responded to?

16           A.     I don't recall.

17                  MR. COHEN:  Okay.  And I'll mark

18           this as Lazarus Exhibit 5.  It's a

19           three-page document starting at D Response

20           to RFP00646 and going to 648.

21                           - - -

22                  (Email Bates stamped D Response to

23           RFP00646 and going to 648 marked

24           Lazarus-5 for identification.)

Page 66

1    determination made by Mr. Johnson; correct?

2         A.    You asked that question.

3         Q.    Right.  Was a credibility

4    determination made by Mr. Johnson in regards to

5    what I'm looking at as Lazarus Exhibit 6?

6              MR. SCHLEIGH:  Objection to form.

7         You can answer.

8              THE WITNESS:  Can you scroll down

9         a little bit?

10             MR. COHEN:  Sure.  (Scrolling.)

11             THE WITNESS:  That's good.

12        (Witness reviewing document.)  Can you

13        scroll down a little bit more?

14             MR. COHEN:  Yeah.  (Scrolling.)

15             THE WITNESS:  (Witness reviewing

16        document.)  So the last sentence in that

17        email says Ms. Jackson should be afforded

18        every opportunity to respond and provide

19        witnesses, but so far every interview

20        conducted in accordance with each other.

21             So in that case, Mr. Johnson could

22        not have the opportunity to talk to

23        Ms. Jackson, so it does seem in that

24        email that he's prejudging before he had

Page 67

1           all the information.  That doesn't mean

2           that what he presented in that email is not

3           serious.  It just means it's not complete.

4   BY MR. COHEN:

5           Q.     Right.  Okay.  So was there a

6   credibility determination made by Mr. Johnson?

7           A.     It appears so.

8           Q.     Okay.  And are you saying that

9   Mr. Johnson's credibility determination was

10  premature?

11          A.     If he didn't have the opportunity

12  to talk to Ms. Jackson, yeah, I think it is.

13          Q.     And was Ms. Jackson, to your

14  knowledge, provided an opportunity to interview

15  with either Mr. Figueroa or Mr. Johnson?

16          A.     I don't recall and I don't know

17  that I have any way of knowing that.

18          Q.     Should Ms. Jackson have been

19  provided an opportunity to tell her side of the

20  story?

21          A.     Oh, absolutely.

22          Q.     And if she was afforded that

23  opportunity but refused, should the investigation

24  have halted until she was interviewed?

Page 84

1   that we reviewed from Mr. Johnson -- which was

2   Lazarus Exhibit 6 -- I'm happy to go back there --

3          A.      Okay.

4          Q.      -- Mr. Johnson states here in the

5   second sentence of the final paragraph, Furthermore,

6   the accounts we have about the behavior of Ms. Jackson

7   are not only alarming they easily meet the threshold

8   of workplace bullying and retaliation.  Do you

9   see that?

10         A.      I see that, but I also see the

11  last sentence that says Ms. Jackson should be

12  afforded every opportunity to respond.

13         Q.      Do you know whether the investigation

14  into this allegation from Mr. Fitzgerald was ever

15  concluded?

16         A.      I don't -- I don't know that.

17         Q.      Should it have been concluded?

18         A.      It should have.

19         Q.      And who would have been responsible

20  for -- for concluding it?

21         A.      It would have been Mr. Johnson.

22         Q.      And what would Mr. Johnson have

23  needed to do, in your opinion, after August 15th,

24  to conclude the investigation?

Page 85

1          A.      He should have given a formal

2     response with the recommendation and then a

3     summary of the investigation including, you know,

4     the resume of those who are interviewed and what

5     the responses were.

6          Q.      Would Lisa Jackson have needed to

7     be interviewed in order to conclude the

8     investigation?

9          A.      She should have been.

10               MR. COHEN:  I'll mark this as

11          Lazarus Exhibit 9.

12                     -  -  -

13               (Email thread Bates stamped

14          PLF00031 through 33 marked Lazarus-9

15          for identification.)

16                     -  -  -

17               (Document on screen.)

18                     -  -  -

19               THE WITNESS:  Can you make that

20          larger?

21               MR. COHEN:  Yeah.  And this is a

22          three-page document starting at PLF00031

23          and ending at 33.

24               THE WITNESS:  Okay.  (Witness

Page 93

1        Q.      So in this email from Mr. Johnson,
2   would you agree that he is expressing concern that
3   Mr. Fitzgerald might be penalized for his complaint?
4        A.      Can you scroll down to the last
5   paragraph?
6        Q.      (Scrolling.)
7        A.      So what was your question?
8        Q.      Is Mr. Johnson expressing in this
9   email a concern that Mr. Fitzgerald be penalized
10  as a result of his complaint?
11       A.      The last paragraph states his
12  belief that separating the parties -- his comment
13  is Ms. Jackson can't stay in the office.  That's
14  his final comment in that email.
15       Q.      Right.  And he also says that the
16  Complainant, Mr. Fitzgerald, should not be
17  adversely affected; correct?
18       A.      Yes.
19       Q.      So what, if anything, was done to
20  insure that Mr. Fitzgerald not be adversely
21  affected by -- from his complaint?
22       A.      We were looking to provide him
23  with an opportunity in another county department
24  with no loss in title, no degradation in title, no

Page 94

1   loss of income, with duties that were consistent

2   with what he was doing, what his job required him

3   to do.

4          Q.     In your opinion, was sufficient

5   effort made to insure Mr. Fitzgerald not be

6   penalized for making his complaint?

7          A.     Yes.  But, again, he resigned

8   before we had the opportunity to find a position

9   that would give him a chance for long-term success

10  and growth.

11         Q.     How long would it have taken to do

12  that?

13         A.     Conjecture.  We would have done it

14  as expeditiously as we could have.

15         Q.     Can you give any estimate for how

16  long it would have taken?

17         A.     I would have told him we could have

18  done it within a couple of weeks at the longest.

19  But, again, I think the diligent efforts were

20  there to do it.

21         Q.     Well, would you agree with me that

22  it was more than a couple weeks that he was not

23  present in the Purchasing Department without

24  giving him a place to transfer to?

1          A.      I think the documentation shows it

2     was longer than a couple of weeks.

3          Q.      Right.  So how long -- can you

4     give any estimate as to how long it would have

5     taken, had Mr. Fitzgerald not resigned, to find

6     him a position in the county at his same salary?

7          A.      That's conjecture.  Part of the

8     reason it took long was the pushing of a rope to

9     try to get him into the Sustainability group by

10    personnel.  But, you know, we were and would have

11    made diligent effort to find a position where he

12    could have been successful with no degradation in

13    his responsibility status or pay.

14         Q.      And would the failure to make those

15    diligent efforts be a penalty to Mr. Fitzgerald?

16              MR. SCHLEIGH:  Objection to form.

17         You can answer.

18              THE WITNESS:  Mr. Fitzgerald was

19         still being paid his salary and so he was

20         not harmed financially and he was not

21         harmed in terms of reputation.

22    BY MR. COHEN:

23         Q.      Was he harmed in terms of job

24    security?

Page 102

1    on.  Whether they're in those files or not that

2    Mr. Woolley had, I don't know.

3          Q.     Did those notes go into the -- into

4    a computer?

5          A.     I don't believe so.

6          Q.     Did those notes go into a specific

7    file?

8          A.     There was no official file, no.

9          Q.     Fair to say at the time you spoke

10   to Ms. Jackson about Mr. Fitzgerald's complaint,

11   you knew Ms. Jackson had not been interviewed

12   regarding that complaint?

13         A.     It's probably right.  I'm not sure.

14         Q.     Do you know if Ms. Jackson was

15   ever -- well, strike that.

16                Was your questioning of Ms. Jackson

17   in that meeting an interview of her regarding

18   Mr. Fitzgerald's complaint?

19         A.     No.

20         Q.     Was she ever interviewed regarding

21   Mr. Fitzgerald's complaint?

22         A.     I don't know.

23         Q.     What do you remember her telling

24   you about Mr. Fitzgerald's complaint against her?

1          A.     We spoke about her need to

2   maintain the office decorum, the office working

3   environment.  That it is her responsibility to

4   deescalate.  She had mentioned that she brought

5   the complaints forward to personnel previously

6   about Mr. Fitzgerald's behavior.  I spoke to her

7   about reasonableness in demanding responses to

8   work requirements that she had.  Her input was

9   that she didn't get responses she needed within a

10  timely time frame.  But, again, it's not reasonable

11  to send someone a note at 9:00 in the evening and

12  have something on your desk by 8:00 in the morning.

13  It's not a reasonable thing to do.  And that,

14  again, as a senior person in the relationship,

15  it's her responsibility to deescalate.

16          Q.     And were you aware that other than

17  Mr. Fitzgerald, additional male direct reports

18  made complaints against Ms. Jackson?

19          A.     I'm aware Mr. McGong (ph) wanted

20  to be reassigned, which we did.  I spoke to Mr. Furman

21  and we had conversations about a variety of things

22  and he said he felt the tension in the office, but

23  I'm note aware that he made a complaint.

24          Q.     And were you aware that Mr. Fitzgerald's

Page 108

```
 1   investigation; correct?
 2          A.     Correct.
 3          Q.     Do you know whether or not Mr. Johnson
 4   was demoted prior to -- well, let me ask you
 5   this -- and I think you said your -- well, do you
 6   know whether or not the investigation was ever
 7   concluded?
 8          A.     I don't know the answer to that.
 9          Q.     If Mr. Woolley -- well, I will
10   represent to you that Mr. Figueroa was terminated
11   on August 23, 2022.  Based upon that, do you know
12   when Mr. Johnson was demoted?
13          A.     Same date.
14          Q.     Okay.  And so fair to say Mr. Woolley
15   would have assumed the Personnel Director position
16   also on August 23, 2022?
17          A.     I believe so.
18          Q.     Would -- at that point, if the
19   investigation into Mr. Fitzgerald's complaint had
20   not been finished, would that have been the
21   responsibility of Mr. Woolley as Director of Personnel?
22          A.     It would still have been
23   Mr. Johnson's responsibility as Assistant Director
24   over Employee Labor Relations to finish the report
```

Page 109

1    and provide it to Mr. Woolley as the Personnel

2    Director.

3            Q.      Okay.  Do you know whether or not

4    Mr. Fitzgerald was over -- was ever informed as to

5    the status of the -- of his complaint?

6            A.      I do not.

7            Q.      Should he have been?

8            A.      I previously stated that he should

9    have been made aware of the final results of the

10   investigation.

11           Q.      Do you, ultimately, know how many

12   complaints were made against Ms. Jackson in 2022?

13                   MR. SCHLEIGH:  Objection to form.

14           You can answer.

15                   THE WITNESS:  I do not know.

16   BY MR. COHEN:

17           Q.      And were you ever made aware of a

18   concern that information regarding Mr. Fitzgerald's

19   complaint was being leaked to Ms. Jackson?

20           A.      I'm not aware of that.

21           Q.      And would it be against policy for

22   the County for information in an ongoing complaint

23   under investigation to be provided to the subject

24   of that complaint?

Page 115

1          A.      Depends on what the termination is for.

2          Q.      If it is for job performance.

3          A.      There should have been performance

4    coaching along the way, yeah.

5          Q.      And, to your knowledge, was Mr. Figueroa

6    ever provided performance coaching?

7          A.      That's something that Mr. Woolley

8    and Mr. Johnson would be able to tell you.

9          Q.      Did Mr. Johnson -- who did Mr. Johnson

10   report to prior to his demotion?

11         A.      He reported to Mr. Woolley.

12         Q.      And do you know whether -- well,

13   I think you've already stated -- do you know if

14   Mr. Figueroa was involved in the investigation of

15   Mr. Fitzgerald's complaints against Ms. Jackson?

16         A.      I wasn't aware of it at the time.

17         Q.      Okay.  Do you know whether Mr. Figueroa's

18   involvement in that complaint was part of the

19   decision to terminate him?

20         A.      The reasons for his termination

21   are laid out in Mr. Woolley's communication.

22         Q.      And that communication, would that

23   be --

24                 MR. SCHLEIGH:  Talking about this.

Page 118

```
 1                        - - -
 2    BY MR. SCHLEIGH:
 3         Q.      Mr. Lazarus, I'm going to refer
 4    you to page four of what's been marked as Lazarus-2
 5    at about two-thirds away down the paper where it
 6    says, Below is an outline of behaviors by Mr. Figueroa
 7    that we believe should result in termination.
 8    There is a bullet point three referring to issues
 9    at the county jail know as the George W. Hill
10    Correctional Facility.  Would you take a look at that?
11         A.      (Witness reviewing document.)  Okay.
12         Q.      Can you give us any additional
13    context of what issues were going on with the
14    County jail that were causing problems from
15    administrative point of view?
16         A.      I can.  So one of the goals of the
17    County Council was to de-privatize the operation
18    of the prison.  We went through all the planning
19    process and that became effective on April 6th of
20    2022.  That required the hiring a large number of
21    people.  It also required that the existing unions
22    which were -- had agreements with the private
23    operator become public unions and that required
24    that we negotiate with the union to incorporate a
```

Page 119

1    variety of things, pay scale, county benefits.

2                    And during that -- the course of

3    that, there were two Correctional Officers who

4    were not hired by the County.  There was an

5    allegation that they were not hired because they

6    were involved in the union.  Warden Lewis (ph)

7    spoke to me about it.  I read their -- their files

8    and they were both guilty of abuse of people who

9    were in our custody and care.

10                   So, as a result, they were not

11   hired.  It had nothing to do with their union

12   status.  However, they chose to make the charge of

13   unfair practices under the Public Employees

14   Relations Act.  Had responded for some information.

15   As it says here, Mr. Figueroa is not clear upon a

16   timely basis.  If he had asked George W. Hill for

17   the information and had given it to the union, if so

18   it could have precluded the unfair legal practices

19   charge.

20                   During that course of the negotiations

21   with the union, the Warden had informed me that

22   Mr. Figueroa either did not show up to meetings,

23   was not timely, in some case was not prepared.

24        Q.     And did that factor into any

Page 120

1   determination into terminating Mr. Figueroa?

2           A.      Yes.

3           Q.      Why is that?

4           A.      Because inability to do the job

5   properly, subjected potentially to the unfair

6   labor practices.  And also, to some extent, you

7   can say contributed to the union negotiations

8   being prolonged.

9           Q.      With regards to the next two

10  bullet points on those lists regarding grievance

11  track and timeliness of investigation, were you

12  familiar with those complaints about Mr. Figueroa

13  as well?

14          A.      That -- yes.  Could you project

15  up?

16          Q.      Yes.  I'm sorry.

17          A.      The County, as we've established,

18  is a pretty large place with lots of people at

19  different points of view.  Complaints would come

20  up and it was incumbent upon Mr. Figueroa to track

21  those and respond promptly and to keep people

22  informed as to the status.  Mr. Woolley had asked

23  for a tracker and he did not receive it in a

24  timely manner.  As a result, we were unable to be

Page 121

1    responsive to other department heads and to

2    members of Council who had heard about those

3    complaints.

4          Q.    Okay.  And is there something that

5    would have triggered your knowledge about that

6    being an issue?

7          A.    I had complaints forwarded to me

8    through Council and there are issues that I

9    brought with up with Mr. Johnson and Mr. Woolley

10   when we met on our weekly basis.

11         Q.    And would you have expected

12   Mr. Johnson to follow up with Mr. Figueroa about

13   those complaints to make sure investigations were

14   completed in a timely manner?

15         A.    I would have and I do.

16         Q.    Skipping down a few bullet points

17   to -- in reference to the Director of IT.  Could

18   you explain what that situation was about?

19         A.    There was a case where there's a

20   woman employee in IT who made some unacceptable

21   comments to another staff member in the IT

22   Department.  She claimed that she was inebriated

23   and I think subsequently it became clear that she

24   had an alcohol addiction problem.  When it came

Page 122

1    up, the impacted employee felt that this complaint

2    was not being taken seriously by Mr. Figueroa

3    because he was a man and the -- I guess the

4    oppressor in that case was a woman.

5            Q.      And what is this referring to when

6    it talks about the probationary status of the

7    complaint about employee?

8            A.      Was still in her ninth day probationary

9    period.  If Mr. Figueroa had brought that up we

10   could have moved quickly terminate during the

11   probationary period so that that would have saved

12   us time and effort.

13           Q.      And when there's a probationary

14   period for an employee, is there any required

15   remediation of the employment of the employee's

16   behavior?

17           A.      Yeah, there is, if there's a

18   complaint filed.

19           Q.      But does the employee of who is

20   being complained about, can they be fired for any

21   reason, do they have to get an improvement plan?

22                   MR. COHEN:  Objection to form.

23                   THE WITNESS:  So during the

24           probationary period, the employee can be

Page 123

1          terminated without cause.

2    BY MR. SCHLEIGH:

3          Q.     Okay.  And are you aware whether

4    Mr. Figueroa was a probationary employee at the

5    time of his firing?

6          A.     He was.

7          Q.     Going down to the last bullet

8    there was concern about according plea.  Can you

9    give the context of that particular point?

10         A.     Fair to say, I don't remember that

11   particular case.

12         Q.     Okay.

13                MR. SCHLEIGH:  I have nothing

14         further at this time.  Mr. Cohen.

15                      - - -

16                   EXAMINATION

17                      - - -

18   BY MR. COHEN:

19         Q.     How do you know that Mr. Figueroa

20   was a probationary employee at the time he was

21   terminated?

22         A.     He was hired in May as a full time

23   county staff member.  90 days would have taken

24   that in, I think, to September.  Is it may or

Page 124

1   June?  So if you count back the number of days of

2   his termination to the time of his employee, it

3   was within the 90-day period.

4          Q.      He was initially hired in March;

5   right?

6          A.      He was initially hired as a

7   contract employee for a temp service.  He wasn't a

8   county employee.

9          Q.      And somebody made the decision to

10  hire him full time off of that temp position; right?

11         A.      Correct.

12         Q.      Who was that?

13         A.      Mr. Johnson.

14         Q.      Did Mr. Johnson seek your approval

15  for that decision?

16         A.      He did.

17         Q.      And why did you grant -- or did

18  you grant him your approval?

19         A.      I did.

20         Q.      Why?

21         A.      We talked at the beginning of this

22  deposition that some of the challenges Mr. Johnson

23  was facing was with modernizing the Personnel

24  Department, implementing some new systems, as well

Page 127

```
 1              period of this termination.
 2   BY MR. COHEN:
 3         Q.      I'm saying in total did he work
 4   for the County for -- well, the probationary
 5   period is 90 days; correct?
 6         A.      Correct.
 7         Q.      In total, did he work for the
 8   County for more than 90 days?
 9         A.      So the time he worked as a temp
10   through the service doesn't count.  He was, basically,
11   a contractor.  Then there was a break in service
12   that he had.  So the effective date of his employment
13   was in May.  So that's the date when the clock
14   started.
15         Q.      But in terms of judging his
16   overall job performance, was the period prior to
17   him being hired full time and then his initial
18   full-time position before his resignation
19   considered when looking at his job performance?
20         A.      So based upon the limited amounts
21   of work he did as a temp, Mr. Johnson felt comfortable
22   with offering him a full-time position.  And then
23   there were some things we had to do to address
24   that because of the terms of the contract we had
```

Page 132

1   Ms. Jackson was able to get her feet on the
2   ground, improve the functioning of the office, and
3   provide improved processes and support to the
4   departments the relationship got better.  And a
5   lot of that was based on feedback from the
6   department heads and back to the Council members.
7           Q.      So in August of '22, that's about
8   18 months after Ms. Jackson was hired; correct?
9           A.      Correct.
10          Q.      So fair to say by that time her
11  relationship with Dr. Taylor was strong?
12          A.      I can't characterize it.  I don't
13  have -- all I know is that based on conversations
14  I had with Dr. Taylor, she noted the improvements.
15  I don't have any information on their personal
16  relationship.
17          Q.      When were those conversations you
18  are referencing with Dr. Taylor?
19          A.      I talked -- as I said before, I
20  talked to Dr. Taylor particularly in her role as
21  Council Chair which coincided about when Ms. Jackson
22  was hired.  I talked to Dr. Taylor at least before
23  every council meeting to go through the agenda and
24  other items.  We spoke on occasion about other

Page 133

1    things that came up.  There was morning conversations,

2    as well, about items that were not initially on

3    the Council agenda but items of interest.  And I

4    spoke with all the Council members at least once a

5    month on a one-on-one basis, sometimes more frequently,

6    on occasion less.  They all had outside jobs.

7    They're pretty busy people.

8         Q.    The decision to not take Mr. Johnson's

9    recommendation to place Ms. Jackson on administrative

10   leave was made by you; correct?

11        A.    I believe so, to the best of my

12   knowledge.

13        Q.    And you changed your mind at some

14   point about that decision in order to not place

15   her on leave?

16        A.    That's what the documentation

17   would show.

18        Q.    Do you know why you changed your mind?

19        A.    So it's a well-considered thought.

20   I spoke with Mr. Woolley, Mr. Johnson.  I had a

21   conference with the County solicitor.  Based upon

22   my conversation with Ms. Jackson, we talked about

23   her obligations as a county leader, those things

24   weighed into my decision.