1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                      - - - - -

3

    HECTOR FIGUEROA,                    :

4                                       :

                Plaintiff(s)    : NO. 23-cv-0515

5                                       :

                vs                      :

6                                       :

    DELAWARE COUNTY,                    :

7                                       :

                Defendant(s)    :

8

9

                      - - - - -

10

                Wednesday, December 27, 2023

11               Via Zoom Videoconferencing

12                    - - - - -

13                Oral deposition of MARC WOOLLEY,

14    on the above date, beginning approximately 10:55

15    a.m., before Louis A. Manchello, Certified Court

16    Reporter (New Jersey Lic. No. 30XI00141800) and

17    Notary Public of Pennsylvania, held with all parties

18    attending via Zoom Video Conferencing.

19                    - - - - -

20

21

22

23

24

Marc Woolley

Page 7

1  resolution regarding that issue?

2  A.      I believe he entered into an agreement to

3  pay back the money.

4      Q.      Was there any other reason that you

5  did not want to hire Hector Figueroa for the second

6  time?

7  A.      No.  Well, I think that was enough.

8      Q.      Did you voice that concern to

9  Jamal Johnson?

10  A.      I don't recall.

11      Q.      Hector was Jamal's assistant, correct?

12  A.      Oh, I don't think he was -- I think he was

13  assistant director, not his assistant.

14      Q.      Hector reported directly to Jamal

15  while he worked for the County, correct?

16  A.      Yes.

17      Q.      As the assistant director of labor,

18  personnel, correct?

19  A.      Labor Relations, I believe.

20      Q.      Labor Relations.  Did Jamal Johnson

21  advocate to hire Hector back?

22  A.      Yes.

23      Q.      Did he advocate that to you?

24  A.      I don't know if it was to me directly, but I

Marc Woolley

1    think in meetings that I had with Jamal and

2    Howard -- I think we had weekly meetings at that

3    point -- he did.

4           Q.     Did he provide any rationale for

5    hiring Hector back?

6    A.        I don't recall.

7           Q.     Do you know if Hector was ever given a

8    written warning during his employment with

9    Delaware County?

10   A.        I don't know.

11          Q.     Who would have given him that warning,

12   if he had received one?

13   A.        Probably his immediate supervisor.

14          Q.     Who was most familiar with Hector's

15   job performance?

16   A.        Well, I don't know who most would have been.

17   I don't know that.

18          Q.     Was Hector ever given an oral warning

19   during his employment with Delaware County?

20   A.        I know that I had given him oral feedback on

21   work that was subpar.

22          Q.     Was that feedback a warning?

23   A.        It was a counseling.

24          Q.     Is there any documentation of that

Marc Woolley

Page 9

1   counseling?

2   A.        I don't know.

3           Q.       What did you do, if anything, to
4   prepare for today's deposition?

5                       MR. SCHLEIGH:  Without getting
6           into any discussions with counsel, you can
7           tell him if you looked at materials, if you
8           reviewed anything, those types of issues.

9   A.        I reviewed my notes from my discussions with
10  counsel about Hector and Jamal's performance and
11  some deposition testimony.

12          Q.       Did Hector commit a serious offense
13  that warranted immediate discharge?

14  A.        Well, the way you presented it, I don't know
15  exactly what you mean by that.  But there were a
16  culmination of events that occurred under his watch
17  that placed the County in jeopardy with regard to
18  relations -- relationships between the employees,
19  unionized employees, nonrepresented employees,
20  employees in general, and so there was a series of
21  these events, and that culminated in his
22  termination.

23          Q.       When you said a moment ago that you
24  orally counseled Mr. Figueroa, what, if anything, do

Marc Woolley

1   you remember about that?

2   A.      I asked him for a dynamic track with regard

3   to labor relation matters before the County.   And I

4   wanted that.   I explained to him before I counseled

5   him what I wanted in this tracker.

6                         Didn't get it by the deadline.

7   Had to track him down.   I believe he was either on

8   the road or at his house.

9                         And then he sent me an e-mail

10  that had bullet points, about eight to 10 bullet

11  points, with grammatical errors in it as well, and

12  any first-year associate would not have given that

13  to anyone.   So I found it subpar.

14       Q.      When you received Mr. Figueroa's

15  response to your request for a dynamic tracker --

16  or, sorry.   Dynamic tracking or tracker?

17  A.        Tracker.

18       Q.      Tracker.   (Continuing) -- is that when

19  you had the oral counseling with him?

20  A.        Yes.

21       Q.      Where was that oral counseling?

22  A.      Like I said, he was on the road.   He was on

23  the phone when I talked to him.

24       Q.      Did you indicate to him that it was

Marc Woolley

1    counseling in any way?

2    A.      Well, I think when your superior tells you

3    that your work product is subpar, it's a counseling.

4    And people -- especially a labor relation expert --

5    would know it's counseling.

6         Q.      When you mentioned that you gave him

7    oral counseling, were there any other incidents of

8    oral counseling that you are referring to?

9    A.      During my conversation with him?

10        Q.      Any other incidents.

11   A.      No.  He was not a direct report of mine.

12        Q.      Was Mr. Figueroa provided a written

13   statement with the reason or reasons he was

14   terminated?

15   A.      I don't recall.

16        Q.      What is the Delaware County

17   Administrative Code?

18   A.      That's the code by which we basically do

19   business in the county.

20                     MR. COHEN:  I will share my

21            screen.  I'm showing you what I will mark as

22            Woolley Exhibit 1.  It's a two-page document,

23            and Bates stamped PLS124, 125.

24                     (Whereupon Woolley-1 was marked for

Marc Woolley

1    Ms. Jackson was the instigator, correct?

2    A.      You are asking me to interpret what these

3    notes are?

4         Q.      I'm asking you about the investigation

5    relating to Mr. Fitzgerald's complaint against

6    Ms. Jackson.

7    A.      Right.  So what I know about this

8    investigation is that, when I was presented with

9    some conclusions by Mr. Johnson, I asked him a

10   question about did he interview Ms. Jackson.  He had

11   not.

12                So I don't -- and my statement

13   to him was, "I don't know how you can give me a

14   recommendation.  You have not interviewed everyone

15   that needs to be interviewed."

16                     And I also asked him, if there

17   was such raised voices, if he interviewed anybody in

18   the Controller's Office.  And the

19   Controller's Office is right next door to

20   Procurement, and you can hear things going back and

21   forth at a normal level.  If he interviewed anybody

22   from the Controller's Office.  And he said no.

23                     So, you know, I know what these

24   notes portend to say, but I don't know if we can

Marc Woolley

Page 28

1  garner that because we don't have enough information

2  from other sources who should have been interviewed.

3          Q.      So the subject of a complaint should

4  be provided an opportunity to give a statement,

5  correct?

6  A.          They should be given the opportunity, and --

7  yes, they should.

8          Q.      Was Ms. Jackson provided an

9  opportunity so give a statement regarding

10  Mr. Fitzgerald's complaint against her?

11  A.          The way I recall, after my questions, and

12  the answer was no, as to she had not given a

13  statement, I spoke to Ms. Jackson and told her to

14  make herself available to be interviewed.

15                      Whether or not she did, I am

16  unsure.

17          Q.      When you told Mr. Johnson that he

18  should -- I don't want to get your words wrong.

19                      When Mr. Johnson presented you

20  with his findings regarding Mr. Fitzgerald's

21  complaint against Ms. Jackson, you inquired as to

22  whether or not he had interviewed Ms. Jackson,

23  correct?

24  A.          I inquired about the thoroughness of the

Marc Woolley

1   investigation.

2       Q.     And fair to say you were critical of

3   his findings because Ms. Jackson had not provided a

4   statement?

5   A.       I told him there was nothing for me to

6   critique because he had missed, one, the person who

7   the complaint was made against, and also other

8   possible witnesses that were right next door.

9       Q.     Did Mr. Johnson inform you at that

10  time that he had attempted to interview Ms. Jackson?

11  A.       I don't recall that.

12      Q.     So looking at the first page of this

13  document, which is dated August 4th, 2022, do you

14  know whether or not the conversation you are

15  referring to that you had with Mr. Johnson occurred

16  before or after this document was sent to you on

17  August 4th?

18  A.       I don't know when the meeting I had with

19  Jamal occurred.  So I don't know.

20      Q.     And would you agree that, in this

21  document sent to you, there are notes of five

22  witnesses' interviews?

23  A.       You are going to have to show me.  I see

24  two.

Marc Woolley

1    complaint against Ms. Jackson?

2    A.      You would have to ask Mr. Johnson.

3          Q.      And you asked Mr. Johnson for a

4    recommendation regarding how to handle the complaint

5    made against Ms. Jackson, correct?

6    A.      No.  Before he gave it or after?  I think

7    there's a temporal thing here.  So ...

8          Q.      Okay.  Did you ask Mr. Johnson for a

9    recommendation regarding that issue?

10   A.      I don't know, because I believe there were

11   things happening, and I was objecting to the form of

12   the investigation and the conclusions drawn

13   therefrom, and I had a problem with the process, not

14   the recommendation.

15         Q.      Was it multiple problems or a single

16   problem you had with the process?

17   A.      Well, there are multiple problems that are

18   begotten from the same issue of not contacting all

19   the witnesses.

20         Q.      So I think you've identified the issue

21   of not interviewing Ms. Jackson, correct?

22   A.      Yes.

23         Q.      And also an issue of not speaking with

24   individuals in the Controller room?

Marc Woolley

Page 34

1   A.        Controller's Office, yes.

2             Q.        Controller's Office.   Okay.

3                       Are there any other concerns you

4   had with the process of the investigation into

5   Mr. Fitzgerald's complaint?

6   A.        Not with the process.

7             Q.        So the individuals in the

8   Controller's Office, how far away is the

9   Controller's Office from the Purchasing Department?

10  A.        They are in the same suite.

11            Q.        So why are the five individuals that

12  were interviewed, and the notes shown in the

13  August 4th e-mail to you, insufficient for that

14  investigation, outside of Ms. Jackson?

15  A.        Clearly, when you're doing an investigation,

16  you want to get all available witnesses and their

17  statements.   I think that's just buttoning up the

18  investigation.

19            Q.        How many additional witnesses, besides

20  Ms. Jackson, should Mr. Johnson and Mr. Figueroa

21  have interviewed regarding this complaint?

22  A.        I don't know if there were any other

23  witnesses.   They did not inquire of the

24  Controller's Office if anybody had heard this

Marc Woolley

1   kerfuffle that went on.

2          Q.     Was it a single incident, or was it

3   repeated incidents over time between Mr. Fitzgerald

4   and Ms. Jackson?

5   A.        So that, I don't know.  I know that there

6   was a seminal event that occurred, and I'm referring

7   to that seminal event.

8          Q.     Can you identify any individuals that

9   should have been interviewed by either Mr. Johnson

10  or Mr. Figueroa regarding this investigation that

11  were not?

12  A.        There were people in the Controller's Office

13  who were employed at that time, and the question

14  could have been had of the Controller's Office, and

15  the controller in particular, you know, "Can I talk

16  to your staff about events that occurred on a

17  certain date?  And I want to know if anybody heard

18  anything or witnessed anything."  Because there is a

19  window going by.

20         Q.     Is there some reason why the five

21  individuals that were interviewed would be biased or

22  otherwise not provide correct information regarding

23  this complaint?

24                     MR. SCHLEIGH:  Objection to

Marc Woolley

1          Q.      Mr. Johnson explained that same day,

2     August 15th, how the county would be liable for

3     Ms. Jackson's harassment, correct?

4                        MR. SCHLEIGH:  Objection to

5               form.  You can answer.

6     A.       He reached the conclusion, yes.

7          Q.      Did you tell Ms. Jackson she would not

8     be disciplined as a result of the investigation?

9     A.       I don't recall.

10         Q.      After receiving Mr. Johnson's

11    recommendation to place her on administrative leave,

12    did you meet with Ms. Jackson?

13    A.       I would have met with her on a regular

14    basis, yes.

15         Q.      What, if anything, do you remember

16    about the meeting you had with Ms. Jackson following

17    receiving Mr. Johnson's recommendation to place her

18    on administrative leave?

19    A.       I met with her and said that she needed to

20    make herself available to be interviewed.

21         Q.      And at that point that you met with

22    her, had Mr. Johnson expressed to you that

23    Ms. Jackson had not made herself available?

24    A.       I don't recall that, but I knew that she had

Marc Woolley

1    not been, and I wanted her to make herself

2    available.

3         Q.     Do you know if she did make herself

4    available for an interview?

5    A.      I do not know.

6         Q.     Do you know if she was ever

7    interviewed?

8    A.      Not in relation to this matter, I do not.

9         Q.     And she never suffered any consequence

10   as a result of Mr. Fitzgerald's complaint against

11   her, correct?

12                   MR. SCHLEIGH:  Objection to

13          form.  You can answer.

14   A.      I think that any time anybody makes a

15   complaint against you, I think you suffer.

16        Q.     Regarding the terms of her employment,

17   did she suffer any consequence as a result of

18   Mr. Fitzgerald's complaint against her?

19   A.      To my knowledge, the investigation was never

20   completed.

21        Q.     What role, if any, did you have in not

22   completing the investigation?

23                   MR. SCHLEIGH:  Objection to

24          form.  You can answer.

Marc Woolley

1    A.      I was never involved in the investigation.

2            Q.      Well, did Howard Lazarus change his

3    mind regarding placing Ms. Jackson on

4    administrative leave?

5    A.      You'd have to ask him.

6            Q.      At one point he was onboard with

7    placing her on administrative leave, correct?

8                    MR. SCHLEIGH:  Objection to

9            form.  You can answer.

10   A.      From the document that you showed me,

11   apparently.

12           Q.      I'm sorry.  I missed the last word.

13   A.      I said, "Apparently."

14           Q.      Okay.  And at some point you expressed

15   your concerns to Mr. Lazarus about the process of

16   the investigation, correct?

17   A.      So, yes.  Well, there are two things that

18   concerned me with regard to my conversations with

19   Howard Lazarus.  One was the process of the

20   investigation.  The other is, having made all these

21   decisions outside of her direct supervisor, who at

22   the time was me, not being involved, made aware of

23   things that were ongoing by HR.

24           Q.      So we saw the e-mail to you on

Marc Woolley

Page 46

1   August 4th with the summaries of the investigation,

2   correct?

3   A.      Yes.

4          Q.     And we saw Mr. Johnson's response to

5   your request for a recommendation?

6   A.      Yes.

7          Q.     What more involvement in the

8   investigation did you want?

9   A.      For me, it was a timing issue.

10          Q.     Can you elaborate, please?

11   A.     There was a recommendation that was being

12   made about a direct report of mine; that the

13   investigation was not complete, and we should have

14   had conversations about that before a recommendation

15   was made.

16          Q.     Was Mr. Figueroa terminated in part

17   for not diligently investigating Mr. Fitzgerald's

18   complaint against Ms. Jackson?

19   A.      No, not by me.

20          Q.     Was your recommendation to terminate

21   Mr. Figueroa in part based on his role in the

22   investigation into Mr. Fitzgerald's complaint?

23   A.      No.

24          Q.     Do you know when Mr. Figueroa began

Marc Woolley

1   his investigation into Mr. Fitzgerald's complaint

2   against Ms. Jackson?

3   A.      I don't.

4                   MR. COHEN:  I will mark this as

5          Woolley Exhibit 5.

6                   (Whereupon Woolley-5 was marked for

7              identification.)

8   BY MR. COHEN:

9          Q.     Can you read this document all right

10   while my computer is loading?  Or do you want me to

11   make it bigger?

12   A.      If you could make it bigger.

13          Q.     Let me close it and restart it.  Give

14   it a second.

15                   MR. SCHLEIGH:  Noah, do you want

16          to take a break?

17                   MR. COHEN:  That's fine.  Sure.

18                   (Short recess taken at

19          12:16 p.m.)

20                   (Proceedings resumed at

21          12:20 p.m.)

22   BY MR. COHEN:

23          Q.     Were you disappointed in the way that

24   Mr. Johnson conducted the investigation into

Marc Woolley

1    Mr. Fitzgerald's complaint against Ms. Jackson?

2    A.       Yes.

3           Q.       Was that disappointment part of the

4    reason you demoted him?

5    A.       Yes.

6           Q.       In order to demote him, did you need

7    to terminate Mr. Figueroa?

8    A.       No.

9           Q.       Well, he took Mr. Figueroa's position,

10   correct?

11   A.       Yes.

12          Q.       And if Mr. Figueroa had still been

13   there, demoting Mr. Johnson would not have made

14   sense, correct?

15                   MR. SCHLEIGH:   Objection to

16          form.   You can answer.

17   A.       I could have had both of them on the

18   payroll.

19          Q.       What was Mr. Johnson's position after

20   he was demoted?

21   A.       I don't know.   Either assistant director of

22   Labor Relations or director of Labor Relations.   I

23   can't -- I don't recall.

24          Q.       Well, prior to his demotion, he was

Marc Woolley

1    the director, correct?

2    A.       Director of Human Resources.

3         Q.       Was Mr. Johnson still a director after

4    his demotion?

5    A.        In terms of benefits, yes.

6         Q.       What about in terms of job duties and

7    responsibilities?

8    A.       Well, he wasn't a director in charge of a

9    department.

10        Q.       And what department was Mr. Johnson

11   part of after his demotion?

12   A.        Human Resources.  Well, Personnel we called

13   it.

14        Q.       After Mr. Johnson's demotions, were

15   his job duties and responsibilities the same as

16   Mr. Figueroa's had been prior to his termination?

17   A.        No.  Because we required of Jamal more -- in

18   terms of background information about some of the

19   benefit things that had been going on when he was in

20   charge.  So there was a different role in terms of

21   how we utilized Mr. Johnson.  His role was broader

22   than Mr. Figueroa's.

23        Q.       Can you give me any examples?

24   A.        Any questions we had about the

Marc Woolley

Page 50

1    implementation of NEOGOV, PlanSource, or Broadspire,

2    we would be able to ask Mr. Johnson about those.

3          Q.      After Mr. Johnson was demoted, who

4    took over his role?

5    A.       I did.

6          Q.      How long were you in that role for?

7    A.       I think six months.

8          Q.      And then who took over the position

9    from you?

10   A.       I hired Christine Kay.

11         Q.      Is she still in this position?

12   A.       Yes.

13         Q.      What is her job title?

14   A.       Now she is the chief human resources

15   officer.

16         Q.      Who reports to her, if anyone?

17   A.       A number of people.  Helen Dyer.  A number

18   of people.  I'm blanking on them.  But assistant

19   director of Labor Relations, assistant director of

20   labor counsel, a project manager.  Those are all

21   that are coming to mind now.

22         Q.      Who is the current assistant director

23   of Labor Relations?

24   A.       I can't recall his name.  I can see his

Marc Woolley

Page 56

```
 1        Q.      Well, this was for Monday, August 1st,
 2   right?
 3   A.       Yes.
 4        Q.      And the other document that I showed
 5   you, which was marked as Woolley Exhibit 6, was for
 6   an interview on August 15th, correct?
 7   A.       Yes.
 8        Q.      So would you agree that he attempted
 9   to --
10   A.       Twice, yes.
11        Q.      -- interview her on multiple
12   occasions?
13   A.       Twice.  What you showed me was twice, right?
14        Q.      Right.  Yes.  August 1 and August 15.
15   Yes.
16                     In that two-week period between
17   when he had tried to interview her on August 1 and
18   on August 15, did you meet with Ms. Jackson?
19   A.       Probably.  But about this investigation, I
20   don't know.
21        Q.      So if Ms. Jackson was refusing to
22   participate in the investigation by not coming to
23   speak with Mr. Johnson or Mr. Figueroa, is that
24   Mr. Johnson's fault?
```

Marc Woolley

Page 57

```
 1                    MR. SCHLEIGH:   Objection to
 2          form.  You can answer.
 3   A.      I'm not ascribing fault to anyone.  What he
 4   should have done is gone to either myself or to
 5   Howard and compelled her.  And have her compelled, I
 6   should say.
 7          Q.    Did Mr. Figueroa investigate a labor
 8   issue between co-workers in the IT Department?
 9                    MR. SCHLEIGH:   Objection to
10          form.  You can answer.
11   A.      I think he did, yes.
12          Q.    Was one of the co-workers a male and
13   the other a female?
14   A.      Yes.
15          Q.    And was the female employee found to
16   have violated County policy by drinking alcohol
17   during working hours and hiding bottles of alcohol
18   in the County building?
19   A.      As part of the same investigation?
20          Q.    Well, what do you consider to be the
21   scope of the investigation?
22   A.      What I know is that there were complaints
23   lodged by a male employee against a female employee
24   for sexual harassment in the IT Department.
```

Marc Woolley

1   a month later?

2   A.      He was rehired, yes.

3          Q.      And was an unfair labor practices

4   charge filed against Delaware County as a result of

5   Mr. Figueroa's poor work performance?

6   A.      There was an unfair labor practice that was

7   filed because the County did not respond timely.

8          Q.      And was that untimely response on

9   account of Mr. Figueroa's poor work performance?

10  A.      I believe responding to that would have part

11  of his bailiwick, yes.

12         Q.      Are you aware of a concern regarding

13  pay discrepancy brought to Mr. Figueroa by

14  Ms. Footman?

15  A.      Regarding?  Regarding whom?

16         Q.      Regarding a County employee.

17  A.      Yes.

18         Q.      The concern that was brought to

19  Mr. Figueroa, are you aware of how that resolved?

20  A.      I don't think Mr. Figueroa did anything.

21         Q.      Was it otherwise resolved in some way

22  that you are aware of?

23  A.      I don't know.

24         Q.      Did you have any conversations with

Marc Woolley

1        Q.      Did you make the decision to place

2    Franklin Fitzgerald in Fair Acres?

3    A.        Yes.

4        Q.      Why did you place him in Fair Acres?

5    A.        The investigation had to continue, and there

6    had been a complaint made against his superior, and

7    I did not want there to be any further conflict, so

8    I wanted to separate the two.

9        Q.      And why move him instead of

10   Ms. Jackson?

11   A.        Ms. Jackson was in charge of Central

12   Procurement.  Her office and the people that report

13   to her are in one location.  There are multiple

14   other departments throughout the County that have a

15   procurement need.  And one in particular --

16   especially because of what they do -- Fair Acres,

17   had people that were doing a job similar to that of

18   Mr. Fitzgerald, so he would not be impacted in terms

19   of job duties, function, or pay.

20       Q.      Did you speak with Dr. Taylor at all

21   about the decision to place Mr. Fitzgerald in

22   Fair Acres?

23   A.        I'm sure at some point I did.

24       Q.      Why would you have spoken to

Marc Woolley

Page 63

1    Dr. Taylor about that decision?

2    A.      At that point, like I said, there were a lot

3    of issues coming out of HR.  Council -- with an I --

4    was receiving a number of complaints from internal

5    and external constituents about backlogs, about

6    inability of getting in touch with people, and so

7    this was high on their priority list, and so I would

8    update them accordingly.

9          Q.      Are you aware of any friendship

10   between Dr. Taylor and Ms. Jackson?

11   A.      No.

12         Q.      Were you against Mr. Fitzgerald

13   working in the Office of Sustainability?

14                 MR. SCHLEIGH:  Objection to

15         form.  You can answer.

16   A.      No.  I was concerned about the process.

17         Q.      What do you mean by that?

18   A.      There was no job available in Sustainability

19   for him.

20         Q.      Mr. Fitzgerald did not have the

21   ability to stay at Fair Acres long term, correct?

22   A.      I did not envision his placement at

23   Fair Acres as a permanent placement, correct.

24         Q.      How long did you envision his

Marc Woolley

Page 64

```
 1    placement at Fair Acres?
 2    A.       It was dependent upon the length of the
 3    investigation and the conclusion of the
 4    investigation.
 5             Q.      What, if anything, did you do to
 6    ensure that he could come back to the Procurement
 7    Department?
 8    A.        There was no overt action needed.
 9             Q.      Why is that?
10    A.        Because he was still in his position.
11             Q.      At Fair Acres?
12    A.        He was still in his position.  And so he,
13    physically, was out of Fair Acres, but his position
14    was still in the Central Procurement Department.
15             Q.      In order for Mr. Fitzgerald to return
16    to the Procurement Department, would you agree that
17    the investigation into his complaint had to be
18    resolved?
19    A.        Yes.
20             Q.      Why couldn't Mr. Fitzgerald stay at
21    Fair Acres long term?
22    A.        If that's something that he had wanted and
23    something that Jim Peterson and the director of
24    Fair Acres would have wanted, we would have made it
```

Marc Woolley

Page 65

1   happen.

2          Q.      Did Franklin express an interest in

3   any specific transfer or any specific location to

4   work in?

5   A.        The only thing that I knew that he wanted or

6   would have liked to have had is a position in the

7   Office of Sustainability, as I recall.

8          Q.      Do you recall why was that not

9   possible?

10  A.        There were no buyers -- there are no buyers

11  in Public Works facilities or any of the departments

12  that are in Sustainability.

13         Q.      Did Jim Peterson express to you

14  whether or not Franklin could stay at Fair Acres?

15  A.        "Stay," meaning?

16         Q.      Meaning that Mr. Fitzgerald could be

17  transferred to Fair Acres from the Procurement

18  Department.

19  A.        On a permanent basis?  Temporary basis?  I'm

20  trying to figure out --

21         Q.      Fair enough.  On a permanent basis.

22  A.        That was never my intention, so we didn't

23  have that discussion.

24         Q.      What, if anything, did you do to

Marc Woolley

Page 66

1   effectuate your intention for Franklin Fitzgerald's

2   long-term employment with the County?

3   A.      I think I did exactly what I should have,

4   and that, in terms of when there is an issue that

5   arises like that, is separate the two to ensure that

6   he has a safe place of employment and that we

7   recognize his complaint and we are taking it

8   seriously.

9           Q.      When you became the director of

10  Labor Relations upon --

11  A.      I never became director of Labor Relations.

12          Q.      Okay.  Fair to say, though, that you

13  took over the job responsibilities of Mr. Johnson

14  upon his demotion and those responsibilities

15  included the role of director of Labor Relations?

16  A.      No.  Mr. Johnson was the CPO.  He was

17  demoted to director of Labor Relations.

18          Q.      Upon Mr. Johnson's demotion, who was

19  responsible for continuing the investigation into

20  Mr. Fitzgerald's complaint?

21  A.      Mr. Johnson.

22                  MR. COHEN:  I will mark this as

23          Woolley Exhibit 8.  It's a one-page document,

24          645.

Marc Woolley

Page 70

```
 1        Q.     So going to the last page, this is an
 2   e-mail from you to Mr. Johnson on August 9th asking
 3   where Franklin is, correct?
 4   A.      Yes.
 5                    MR. SCHLEIGH:  Can you make it a
 6        little larger, please?
 7                    MR. COHEN:  Sure.
 8                    MR. SCHLEIGH:  Bifocals just
 9        aren't cutting it.
10   BY MR. COHEN:
11        Q.     So going to the first page, which is
12   638 at the bottom, this is an e-mail from you to
13   Mr. Johnson on August 9th at 3:52 p.m. saying that
14   Franklin needs to be placed at Fair Acres
15   immediately, correct?
16   A.      Yes.
17        Q.     Do you know how long relative to you
18   sending that e-mail it took for him to be placed
19   there?
20   A.       No, but my hope is that it happened
21   immediately.
22        Q.     Is part of the reason why you wanted
23   him to be placed at Fair Acres so that he not be in
24   the same building as Ms. Jackson?
```

Marc Woolley

1    A.       No.  My concern was that he had a job

2    function that he was trained to do and have limited

3    contact with Ms. Jackson.

4         Q.    Are most of the jobs for

5    Delaware County in the main Delaware County

6    building?

7    A.     I don't know.  We have a lot of satellite

8    offices.  So I couldn't say that a majority of them

9    are here.  Unless you are including the courts.

10   Maybe.  Yes.

11        Q.    What is the name of that building?  Or

12   how do you call that building?

13   A.     Where we were right now is the

14   Government Center.

15        Q.    The Government Center.  Thank you.

16                    Would transferring

17   Mr. Fitzgerald within the Government Center have

18   been a viable option?

19   A.     Depends on where and the opportunity.

20        Q.    If there was a job that worked for his

21   skill set and pay, would working in the

22   Government Center have been a viable option?

23   A.     Possibly.

24        Q.    Did you have --

Marc Woolley

Page 73

1   not there's a position in Francine's shop.

2         Q.    And Ms. Brown is saying there is a

3   position under Danielle Floyd?

4   A.      Yes.  I don't know what position that would

5   have been, because that's Public Works, and

6   Public Works needs engineers.  So that seems odd to

7   me.  But okay.

8         Q.    Well, did Mr. Fitzgerald resign?

9   A.      I believe so.

10        Q.    Do you know why?

11  A.      No.

12        Q.    Did he have performance issues prior

13  to his resignation?

14  A.      You'd have to ask his direct supervisor.

15        Q.    Did Mr. Fitzgerald suffer consequences

16  as a result of complaining against his direct

17  supervisor, Ms. Jackson?

18                  MR. SCHLEIGH:  Objection to

19        form.  You can answer.

20  A.      Not to me.  He was making the same money and

21  the same job.

22        Q.    When you say "the same job," what job

23  are you referring to?

24  A.      Being a purchasing agent.

Marc Woolley

```
 1          Q.      At Fair Acres?
 2   A.      Yes.
 3                  MR. COHEN:  I will mark this as
 4          Woolley Exhibit 11.  This is a four-page
 5          document, Bates stamped 19A through D.
 6                  (Whereupon Woolley-11 was marked for
 7            identification.)
 8   BY MR. COHEN:
 9          Q.      Do you recognize this document?
10   A.      Yes.
11          Q.      Did you author this document?
12   A.       I did, and in conjunction with Ms. Footman.
13          Q.      What was Ms. Footman's contribution to
14   this document?
15   A.      Just some gathering facts about what was
16   going on in HR at the time.
17          Q.      So I will give you an opportunity to
18   look through the whole document, if you'd like.
19   A.      No.  You can --
20          Q.      Okay.  Is this the final version of
21   this document?
22                  MR. SCHLEIGH:  You should look
23          at the whole document.
24                  MR. COHEN:  That's fine.  I
```

Marc Woolley

Page 75

```
 1         know.
 2                         (Brief pause.)
 3                         THE WITNESS:  Looks like it is.
 4   BY MR. COHEN:
 5         Q.     Do you know why there are only four
 6   pages?
 7   A.       Because there were probably -- there were
 8   edits.
 9         Q.     Okay.  Who completed the document?
10                         MR. SCHLEIGH:  Objection to
11         form.  You can answer.
12   A.       I did.
13         Q.     Do you know when you completed it?
14   A.       No.  But it was before my meeting with
15   Council.  So whatever that date was.  I don't know
16   what that date was.  I've have to look at my diary.
17         Q.     By Council, you mean I-L?
18   A.       Yes.
19         Q.     In that meeting with Council, did you
20   discuss the demotion of Mr. Johnson?
21   A.       Yes.
22         Q.     And did you discuss Mr. Johnson's
23   investigation into the complaint against
24   Ms. Jackson?
```

Marc Woolley

Page 76

```
 1   A.      I don't think so.  So to put it in context,
 2   this investigation -- if the process had gone
 3   through where I would have been satisfied and they
 4   had made a recommendation to terminate -- and Jamal
 5   had made a recommendation to terminate Ms. Jackson,
 6   I would not have objected.
 7         Q.     So based upon the interviews
 8   conducted, you think terminating Ms. Jackson was
 9   warranted?
10   A.      No.
11                     MR. SCHLEIGH:  Objection to
12          form.
13   A.      No.  It would be premature, because I don't
14   think there's a proper process that was followed.
15   There were other interviews that needed to be
16   completed before coming up with that recommendation.
17         Q.     On the first page it's dated as 2022,
18   correct?
19   A.      Yes.
20         Q.     Do you know why it's dated 2022
21   generically?
22   A.      Because this is not -- so I was debating
23   whether or not this was going to be a memo that was
24   going to be distributed to Council or just going to
```

Marc Woolley

Page 77

1  be talking points.  So between edits and things like

2  that, and me needing to discuss this with Council --

3  I-L -- these are talking points.

4         Q.     And earlier when you were asked about

5  any warnings you had provided to Mr. Figueroa, you

6  talked about the conversation you had after asking

7  him for the dynamic tracker, correct?

8  A.     Yes.

9         Q.     And his response to that request was

10 part of the rationale for recommending his

11 termination, correct?

12 A.      It was one part of it, yes.  Well, not his

13 response.  It was what he sent to me as the document

14 as the dynamic tracker, which was nothing dynamic at

15 all.  It was an e-mail.

16        Q.      And the information you were looking

17 for, essentially, was what he was working on?

18 A.      No.  It would have included that and

19 anything else that Jamal may have been working on

20 that we could literally track all the labor issues

21 that were current -- that the County currently

22 faced.

23                     And by dynamic, if they have --

24 in Microsoft, you can have some kind of document

Marc Woolley

Page 78

1    that you can update and share with people, and this

2    is what I wanted, and I told him, and he didn't do

3    it.

4         Q.    A few days after Mr. Figueroa

5    responded to that request, you received the

6    requested information from Mr. Johnson, correct?

7    A.    I don't know.  I know that Mr. Johnson

8    hesitated to provide some things, so I'm not sure.

9    I'm not sure.

10                   MR. COHEN:  Why don't we take

11          five, and then I think I don't have that much

12          more.

13                   (Short recess taken at

14          1:19 p.m.)

15                   (Proceedings resumed at

16          1:26 p.m.)

17                   MR. COHEN:  I will mark this as

18          12.  This is a three-page document starting

19          at PLF13 to 15.

20                   (Whereupon Woolley-12 was marked for

21            identification.)

22    BY MR. COHEN:

23         Q.    So here at the bottom of page 2 of

24    Woolley Exhibit 12, this is an e-mail from

Marc Woolley

1  Ms. Footman to Mr. Figueroa, copying you and

2  Mr. Johnson, titled Grievance, slash, CBA Tracker,

3  correct?

4  A.     Yes.

5       Q.     And she asks that you provide a copy

6  of outstanding grievances and CBA negotiations by

7  Monday, correct?

8  A.     Yes.

9       Q.     Was this the issue you were referring

10  to regarding the dynamic tracker?

11  A.     The issue is that there was no dynamic

12  tracker.  So we had to distill what we were looking

13  for at the time, and that would be a list of the

14  grievances.

15       Q.     So Mr. Figueroa responds a little more

16  than an half an hour later with this e-mail to

17  yourself, correct?

18  A.     Yes.

19       Q.     And that e-mail was insufficient, in

20  your opinion, regarding what was asked of him,

21  correct?

22  A.     So it wasn't insufficient in this specific

23  request.  It was insufficient in the total request

24  of a dynamic tracker.  But I needed information

Manchello Reporting, L.L.C.
www.ManchelloReporting.com                    856-482-7207
                                  loumanchello@manchelloreporting.com

Marc Woolley

1   regarding these specific things, and so he sent

2   that.

3          Q.      Going to the first page of the

4   document, Mr. Johnson responded shortly thereafter

5   saying that he was assembling a comprehensive list

6   and submitted on Monday, correct?

7   A.      Yes.

8          Q.      And then on Monday he did submit a

9   copy of an LR Tracker, correct?

10  A.      I mean, that's what it says.  I don't see an

11  attachment, but he probably did.

12         Q.      And there was an attachment to this

13  e-mail, correct?

14  A.      I think so.  I see a Labor Relations log,

15  yes.

16         Q.      Do you remember receiving this e-mail

17  from Mr. Johnson?

18  A.      I mean, it looks familiar.

19         Q.      And the information provided in the

20  Labor Relations log that was attached, was that the

21  information you had requested?

22  A.      I need to see the log, but it was late,

23  so ...

24         Q.      What makes you say it was late?

Marc Woolley

1   A.      Because I had requested this from Hector

2   well before I received it.  I believe I asked -- I

3   don't know the exact day that I asked him for it,

4   but I had wanted it by a certain date.  He didn't

5   get it to me, which is why I had Lauren reach out to

6   him to get certain information.

7       Q.      After you received this attachment

8   from Jamal, what follow-up, if any, did you do to

9   get this requested information?

10  A.      I don't understand the question.

11      Q.      So you were looking for certain

12  information from Hector, correct?

13  A.      So let me -- this dynamic tracker would have

14  been all-inclusive of what was happening under

15  Labor Relations and CBAs and all this stuff that

16  would have been in there.  Prior to -- well, he did

17  not meet my deadline.  I needed some information, so

18  I had Lauren reach out to him.  He provided that

19  information.

20              Subsequent to that, Jamal then

21  sent the larger tracker which is what he's talking

22  about here.

23      Q.      That larger tracker, in what ways, if

24  any, was it deficient?

Marc Woolley

Page 83

1    way?

2    A.       Not to my knowledge.

3          Q.       Did you get subsequent versions of the

4    document?

5    A.       Unsure.  I think so, but I'm not positive.

6          Q.       Okay.  So going back to this document,

7    which I believe was Woolley-10, but it's identified

8    as Bates stamp 19A through D here, and its subject

9    is A Recommendation for the County of Delaware's

10   Personnel Department.

11                  Looking at the final page, it

12   states, "Below is an outline of behaviors by

13   Mr. Figueroa that we believe should result in

14   termination," correct?

15   A.       Yes.

16         Q.       So there's one, two, three, four,

17   five, six, seven bullet points, correct?

18   A.       Yes.

19         Q.       Were there any other reasons why you

20   recommended his termination than those seven bullet

21   points?

22   A.       No.  The seven bullet points are the seven

23   bullet points.

24         Q.       So the first bullet point references a

Marc Woolley

Page 84

1    complaint of sexual harassment filed in the

2    IT Department, correct?

3    A.       Yes.

4            Q.      And the sixth bullet point also

5    references IT.  Is that the same department as the

6    first bullet point references?

7    A.       No.

8            Q.      How is it different?

9    A.       The people that were involved in the first

10   complaint had been with the County for a number of

11   years, so they would not have been in their

12   probationary period.

13           Q.      The final bullet point references the

14   pay discrepancy that we talked a little bit about

15   earlier.  It states, "Ms. Footman followed up on

16   August 14th to find out the status update, and

17   Mr. Figueroa confirmed he had not begun the

18   investigation into the complaint," correct?

19   A.       Yes.

20           Q.      Using that and any other thing from

21   this document, can you provide any estimate of when

22   you finalized this document?

23   A.       No.  I don't know.

24           Q.      When did you make up your mind to

Marc Woolley

1          Q.     Just to set the stage, again, this was

2    previously marked as Woolley-18, and it's an e-mail

3    communication dated August 18, 2022, from

4    Mr. Johnson to yourself, Mr. Lazarus --

5                         MR. COHEN:  I think Woolley-8,

6          not 18.

7                         MR. SCHLEIGH:  I'm sorry.

8          Eight.  Excuse me.

9    BY MR. SCHLEIGH:

10         Q.     (Continuing) -- and Bill Martin, who

11   was, and still is at least for a day or so, County

12   solicitor.  At this point, was the investigation

13   still going on regarding Mr. Fitzgerald's complaints

14   about Ms. Jackson?

15   A.     From my knowledge, it never ended.

16         Q.     And in the course of this

17   communication, is there anything indicating for

18   Mr. Johnson that Ms. Jackson was not cooperating

19   with his request for an interview?

20   A.     Nothing in this and nothing that I recall

21   either.

22         Q.     Subsequent to this e-mail, have you

23   ever received any communications from Mr. Johnson

24   indicating to you that Ms. Jackson failed to

Marc Woolley

1    cooperate with his request for an interview?

2    A.      No.

3          Q.      Has Mr. Johnson ever, in continuing

4    his investigation of Mr. Fitzgerald's complaints

5    against Ms. Jackson subsequent to August 18th, 2022,

6    asked your assistance in compelling Ms. Jackson to

7    provide an interview?

8    A.      No.

9          Q.      Did Mr. Johnson ever give you a final

10   report about his investigation involving

11   Mr. Fitzgerald's complaints about Ms. Jackson?

12   A.      Not to my knowledge.  I don't recall.

13         Q.      If Mr. Johnson or his department had

14   completed the investigation of Fitzgerald's

15   complaints about Ms. Jackson and came to the same

16   conclusions regarding his earlier recommendation, is

17   there any particular action you would have taken?

18   A.      I would have followed his recommendation and

19   placed her on administrative leave.

20         Q.      And if it was substantiated that

21   Mr. Fitzgerald's complaints were accurate as shown

22   by his fellow employees' statements and the

23   completed investigation, what, if any, disciplinary

24   actions would have been on the table for

Marc Woolley

Page 88

1    Ms. Jackson?

2    A.      Anything up to and including termination.

3                      MR. SCHLEIGH:  No further

4         questions.

5    BY MR. COHEN:

6         Q.     Just a couple on those.

7                      So you were asked if subsequent

8    to August 18th, 2022, Mr. Johnson asked you to

9    compel Ms. Jackson to provide a statement, right?

10                     What about before August 18th,

11   2022?  Did Mr. Johnson ever ask for your assistance

12   in having Ms. Jackson sit down to provide a

13   statement?

14   A.      No.  I told her to make herself available.

15        Q.      And you also told her that she would

16   not face any disciplinary action as a result of the

17   investigation, correct?

18   A.      No.

19                     MR. COHEN:  I will mark this as

20        Woolley-14.  This is a one-page document

21        Bates stamped 650.

22                     (Whereupon Woolley-14 was marked for

23         identification.)

24   BY MR. COHEN:

Marc Woolley

Page 90

1        Q.     So we are looking at Woolley-14, and
2    that's correspondence you just admitted sending to
3    Mr. Johnson.
4                    Did Mr. Johnson ever respond to
5    this e-mail indicating that after this Ms. Jackson
6    still wouldn't provide an interview?
7    A.      I don't recall.
8        Q.      Had you been informed that, after
9    specifically instructing Ms. Jackson that she was to
10   provide an interview and she did not, that would
11   have been an action of insubordination to your
12   instruction?
13   A.      Yes.
14       Q.     Were you ever informed that she was
15   insubordinate in such a manner?
16   A.      No.
17                    MR. SCHLEIGH:  No further
18        questions.
19                    MR. COHEN:  Nothing further.
20                    (Deposition concluded at
21        1:49 p.m.)
22                         - - - - -
23
24