```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

                         - - - - -
 3

    HECTOR FIGUEROA,                  :
 4                                    :
                 Plaintiff(s)   : NO. 23-cv-0515
 5                                    :
                 vs                   :
 6                                    :
    DELAWARE COUNTY,                  :
 7                                    :
                 Defendant(s)   :
 8

 9
                         - - - - -
10
                   Friday, November 3, 2023
11               Via Zoom Videoconferencing
12                       - - - - -
13               Oral deposition of LAUREN FOOTMAN,
14    on the above date, beginning approximately 9:30
15    a.m., before Louis A. Manchello, Certified Court
16    Reporter (New Jersey Lic. No. 30XI00141800) and
17    Notary Public of Pennsylvania, held with all parties
18    attending via Zoom Video Conferencing.
19                       - - - - -
20
21
22
23
24
```

Lauren Footman

1       Q.      Okay.  So when did you start your
2   employment with Delaware County?
3   A.      April of last year.
4       Q.      And how did you get that position?
5   A.      I interviewed with Athreon.  They were a
6   search firm.  And we did about six or seven rounds
7   of interviews, and then I was selected.
8       Q.      And what position were you hired for?
9   A.      Diversity, Equity and Inclusion Officer.
10      Q.      Is that still the position you are in
11  in the County?
12  A.      Yes.
13      Q.      Did you know anyone in the County
14  prior to getting that position?  Anyone on the
15  Council or in County leadership?
16  A.      What do you mean "know"?
17      Q.      Had you had any kind of friendship or
18  relationship with someone -- let me ask more
19  specifically.
20                  Did you know Dr. Monica Taylor
21  before getting that position?
22  A.      Yes.
23      Q.      How did you know her?
24  A.      Through a leadership fellowship.

Lauren Footman

1      Q.      In that position, did you have any
2  interaction with Dr. Taylor?
3  A.      Yes.   Only to participate in a public health
4  transition team meeting, because they were focusing
5  on a gun violence strategy as they were looking to
6  set up the Health Department, but that was an
7  invitation send broadly to stakeholders.
8      Q.      And prior to getting your position
9  with Delaware County, had you met Lisa Jackson?
10  A.      No.
11      Q.      What are your job responsibilities as
12  director of Diversity, Equity and Inclusion?
13  A.      It is to collaborate with the Executive
14  Director's Office, Council, and other departments to
15  see how we can get create a diverse, equitable and
16  inclusive workforce and also services that we
17  provide to the community.
18      Q.      And who do you report to?
19  A.      Bill Martin.
20      Q.      Have you reported to Bill Martin the
21  entire time that you have worked for the County?
22  A.      No.
23      Q.      Who was the previous person you
24  reported to?

Lauren Footman

1    Mr. Woolley and start reporting to Solicitor Martin?

2    A.      End of August, beginning of September of

3    this year.

4            Q.      So of 2023?

5    A.      Yes.

6            Q.      What led to that change?

7                    MR. SCHLEIGH:  Which change?

8                    MR. COHEN:  Fair.

9    BY MR. COHEN:

10           Q.      The change from reporting to

11   Mr. Woolley to Solicitor Martin.

12   A.      I filed a grievance against Mr. Woolley, and

13   the determination of Council was for me to report to

14   Bill.

15           Q.      But your position stayed the same; is

16   that right?

17   A.      Yes.

18           Q.      In your position, do you have an

19   opportunity to conduct investigations of

20   discrimination?

21   A.      I do not conduct them myself.  I typically

22   am brought in by Human Resources.

23           Q.      And I guess it's been about a year and

24   a half that you've had the position; is that right?

Lauren Footman

Page 11

1   A.        Yes.

2          Q.      Over that year and a half, how many

3   complaints of discrimination have you participated

4   in?

5   A.       That's not something that I could recall

6   right off the top of my head.   But I have

7   participated in some.   But I don't have the exact

8   figure.

9          Q.      Can you give an estimate?

10  A.        I don't feel comfortable doing that.

11         Q.      Do you feel comfortable saying whether

12  it's more five?

13  A.        That I personally been involved in?

14         Q.       Correct.

15  A.        You have to give me a minute.

16                     I think it kind of depends on --

17  are you saying investigations that I was brought

18  into by HR specifically to assist on or things that

19  people have said to me in passing?

20         Q.      The former.   So, yes.

21  A.        Yes, it's been more than five.

22         Q.      Can you say if it's been more than 10?

23  A.        No, I don't feel comfortable doing that.

24  No, I can't.   Sorry.

Lauren Footman

Page 12

```
 1          Q.       Okay.   That's okay.   No problem.
 2                        So I understand that
 3    Jamal Johnson no longer works for the County.   But
 4    when he did, did you ask him to participate in
 5    discrimination investigations?
 6    A.       Yes.
 7          Q.       And at that time, when you asked him
 8    to do that -- well, let me ask you.
 9                        Prior to your employment with
10    the County, had you ever participated in
11    investigations of discrimination?
12    A.       Yes.
13          Q.       And can you give an estimate of how
14    many of those you had participated in prior to your
15    employment with the County?
16    A.       That's something I'm not able to quantify at
17    this time.
18          Q.       At all?
19    A.       No.   Sorry.
20          Q.       That's okay.   So did you participate
21    in investigations of discrimination with
22    Mr. Johnson?
23    A.       Yes.
24          Q.       And do you know which ones?
```

Lauren Footman

Page 18

1    A.       My understanding, that that was the

2    recommendation of Jamal.

3           Q.       And was Francine Locke the head of

4    Sustainability at that time?

5    A.       Yes.

6           Q.       What was your role in the meeting?

7    A.       We were having a meeting because we were

8    discussing a blowup that had happened in Purchasing

9    between Franklin and Lisa and understanding what had

10   been done.  Because at the time, my understanding

11   was that Lisa had filed complaints, and then

12   Franklin had filed complaints.  And figuring out

13   what the road forward was.  Because at this point --

14   because of the blowup, it was on display for people

15   in the office, and thinking about how do you kind of

16   address the acute situation and address the larger

17   challenges that people would then be working in.

18   Because how their office is set up, it happened in

19   front of other people.

20          Q.       Right.  So Ms. Jackson had made

21   complaints against Mr. Fitzgerald; is that right?

22   A.       Yes.

23          Q.       And Mr. Fitzgerald had made complaints

24   against Ms. Jackson; is that right?

Lauren Footman

Page 19

1    A.      Yes.

2         Q.      What was your role in the meeting with

3    Mr. Woolley and Mr. Johnson?

4    A.      My role in the meeting was helping to

5    understand what was actually happening in the

6    department and then to figure out a path forward,

7    making sure that the -- giving advice around

8    ensuring that, whatever the solution was, everyone

9    had equitable access to the process, the grievance

10   process.

11        Q.      At the time of that meeting, had any

12   interviews been conducted?

13   A.      I believe with Franklin they had.  They had

14   talked to Franklin.

15        Q.      Anyone else in the Purchasing

16   Department?

17   A.      I'm not sure if they had actually made

18   contact with them at the time.

19        Q.      Did you review any documentation

20   regarding complaints made either by Ms. Jackson or

21   Mr. Fitzgerald before that meeting with Mr. Woolley

22   and Mr. Johnson?

23   A.      No.

24        Q.      As we sit here today, have you had a

Lauren Footman

Page 25

1          Q.      Was the meeting in the Executive
2    Director's Office?
3    A.      Yes.
4          Q.      Did Marc want to know where Franklin
5    had been placed?
6    A.      Yes.
7          Q.      Did Jamal say he was being transferred
8    to Ms. Locke's supervision?
9    A.      Yes.
10         Q.      Did Jamal say he was being transferred
11   to Ms. Locke's supervision because there were no
12   other viable positions for Franklin?
13   A.       I don't recall.
14         Q.      Did Mr. Woolley tell Jamal that
15   Franklin should not be under Ms. Locke's
16   supervision?
17   A.       That's not how I remember it.
18         Q.      How do you remember it?
19   A.       I remember that there was a conversation as
20   to how was that decision made.
21                      Because, again, as I shared
22   previously, I believe Franklin was interviewed, but
23   I don't believe an actual interview was had with
24   Lisa.

Lauren Footman

1                         And so, at that point, because
2    there is the level of -- at the time we all reported
3    to Marc.  And so there was a question as it related
4    to Howard and Marc should have had an ability to
5    review before decisions were made.  And also that
6    they wanted Lisa to have been interviewed as well,
7    because there were conversations that Marc was
8    having with Lisa that this move, like, essentially
9    created a -- like, the executive office -- being
10   Howard and Marc -- was telling Lisa one thing, and
11   something else was happening, and so it was creating
12   issues because everyone wasn't on the same page.
13                        So Marc was saying in the
14   meeting, "How was this decision made?  Me and Howard
15   should have been part of the conversations.  We've
16   been having conversations with Lisa.  And was Lisa
17   ever interviewed?"
18                        So it was more of a process.
19   It's a process.  And it's a balancing act.  Because
20   although you are at HR, as directors, we're all
21   peers.  And so, at certain times, you have to go to
22   Marc and Howard to get kind of input and then
23   checking in, particularly because they were already
24   speaking to Ms. Jackson as well, and they didn't

Lauren Footman

Page 27

1   want the appearance that -- they were talking to

2   Lisa, promising her things; and then all these moves

3   were being made with Franklin.  And she didn't feel

4   like she had an opportunity to participate.  Because

5   that was what, I believe, she shared with Marc, is

6   that she hadn't been interviewed.

7                          She shared that there was an

8   issue.  She hadn't been interviewed.  And then she

9   felt she was disrespected.  And then Franklin was

10  just being moved and no one in a position of

11  authority, such as Howard and Marc, were involved in

12  or aware of what happened.

13          Q.     So one of the things you just said was

14  that Lisa had been promised something by Marc; is

15  that right?

16  A.        No, I wouldn't say she was promised

17  something.  I think she was told that the grievance

18  process that we have in place would be followed.

19                          I think "promise" makes it seem

20  like he gave her something that is not offered to

21  every employee.  And that was why I was involved,

22  because of an equity opportunity because of us

23  trying to be, at the time, more cognizant of how

24  directors, particularly directors of color, were

Lauren Footman

1   being supported.

2          Q.     So you're saying that, during the time

3   that this was happening -- right? -- in other words,

4   the investigation of Franklin's complaint, Marc and

5   Lisa were talking.  You just said that in your

6   statement just now, correct?

7   A.      Yes.  He was her direct supervisor, so they

8   have check-in meetings.

9          Q.     What, if anything, do you know about

10  what they were talking about as it pertains to the

11  investigation of Franklin's complaints?

12  A.      That they would follow the process.

13         Q.     And I think you said Lisa felt she was

14  disrespected, right?

15  A.      Mm-hmm.

16                    MR. SCHLEIGH:  You have to speak

17         your answer.

18                    THE WITNESS:  Yes.

19  BY MR. COHEN:

20         Q.     Was that disrespect -- I don't mean to

21  put words in your mouth.

22                    What was the basis of that

23  disrespect?

24  A.      The blowup between her and Franklin in the

Lauren Footman

 1    office, and then she not being talked to and he just

 2    being moved, to get her side of the story.  So it

 3    was twofold.  The interaction between her and

 4    Franklin, she felt was disrespectful.  Then she felt

 5    that she was disrespected by the process, with how

 6    HR handled the situation.

 7          Q.      And this is from conversations between

 8    Marc and Lisa?

 9    A.       No.  She told me this directly herself.

10          Q.      And when did she tell you this?

11    A.       I can't recall exactly.  But supervisor

12    contact, it's very common for directors,

13    particularly diverse directors, to come to me and

14    share their concerns around policies and procedures

15    and/or how policies we have in place -- and

16    practice -- are coming.  And that's just a part of

17    my job description.

18                        She told me she didn't feel like

19    she was being respected and treated fairly by the

20    process that was carried out by HR.

21          Q.      And was her concern -- I think you've

22    said it.  So her concern about the process was that

23    she wasn't given an opportunity to say her side of

24    the story; is that right?

Lauren Footman

1    A.       Yes.

2            Q.      And did you make any inquiries into

3    whether that was accurate?

4    A.       I took it to Marc.

5            Q.      When was that?

6    A.       When she brought it to me.  That was the day

7    of that meeting with Jamal.

8            Q.      Okay.  Do you keep a calendar?

9    A.       A calendar of?

10           Q.      Like, is there a way to know when that

11   meeting was?

12   A.       No, because at the time, we all sat -- I sat

13   upstairs.  So no.  It was very easy to just go in.

14   No, not necessarily, no.

15           Q.      So is you going to Marc about that

16   concern from Ms. Jackson what led to the meeting

17   with Jamal in the Executive Director's Office?

18   A.       No.  Marc found out somehow that Franklin

19   was switched from another department -- switched to

20   another department.

21           Q.      Okay.

22   A.       So I did my own thing, what she said to me

23   that I was hearing with Marc, and then it provided

24   context to why she was upset to Marc, because he

Lauren Footman

Page 31

1    heard about Franklin being looped.  So it was
2    like -- it was like, you got the other half of it.
3                    Because Lisa also told -- so
4    Marc and Franklin repeatedly know how Lisa -- and he
5    was like, "Oh, well, of course, Lisa's upset,
6    because in our one-on-one, we told her these are our
7    next steps."
8                    Franklin then being moved, it
9    makes it seem like we are gaslighting her,
10   essentially.
11        Q.     By transferring Franklin without her
12   approval?
13   A.      Not even without her approval, but she
14   hadn't been interviewed.  And so the executive
15   office, Marc and Howard, they had said, "This is
16   what the process will be" to Lisa.  The process did
17   not follow that same through line because HR went
18   and just moved Franklin.
19                    They solved the situation, and
20   it didn't align with HR -- with what the executive
21   office had told Lisa would be, like, the next step
22   in the process.
23        Q.     Got you.  So it sounds like the reason
24   for the meeting wasn't Ms. Jackson's concerns, but

Lauren Footman

1    it was brought to Marc by you, correct?

2                    MR. SCHLEIGH:  Objection to

3          form.  You can answer.

4    A.      So the reason -- the reason for the meeting

5    was he was already asking -- well, there were

6    multiple things happening that day, just so you're

7    aware.

8                    There was a director who had

9    ammunition on his desk.  It was a crazy day.  So

10   there were multiple reasons why Jamal -- it was like

11   a list, a laundry list I think Marc was talking to

12   Jamal about.

13                   However, I did share with Marc,

14   "This is what Lisa said to me."

15                   And Marc knew about Franklin,

16   and so that was one of the things that Marc then

17   brought up to Jamal.

18                   It was a laundry list of things

19   that was happening.  Like, they had security

20   concerns because they didn't know why ammunition was

21   on someone who was going to be at his desk.  There

22   were a laundry list of things that were happening

23   that day.

24        Q.    Got you.  And that concern that Lisa

Lauren Footman

Page 33

1   brought to you, had that been from the night before?

2   A.      Yes.

3          Q.      And had you and Lisa been together

4   outside of work the night before?

5   A.      No.  She called me.  Which, I supervise -- a

6   lot of things I do -- it's a part of the job to sit

7   with people, to talk to them, to help them figure

8   out a path forward.  I've done it countless times.

9                  She shared that she was having

10  an issue.  And I said, "Okay."

11                 And it is my job to let Marc

12  know.

13         Q.      Was Lisa ever interviewed regarding

14  Franklin's complaints against her?

15  A.       I'm not sure at this point.  At that point,

16  it appeared no.

17         Q.      And in the meeting, was that brought

18  up to Jamal, that Lisa felt she should be

19  interviewed?

20  A.       Not in -- the meeting primarily focused on

21  how did Franklin get moved.  We should have had a

22  conversation.  Lisa had a concern about this.  We

23  understand -- I understand her concern, because we

24  told her this would be her next step.  And we have

Lauren Footman

Page 34

1   to figure out what is the messing up -- like, how

2   did you get to that decision.  We should review it,

3   X, Y, and Z.

4                    So then I believe Jamal had a

5   report, the memo that I mentioned earlier.  And then

6   a meeting happened between Howard, Bill, Marc, and

7   Jamal.

8        Q.     Okay.

9   A.      And I believe it was addressed then that

10  Lisa was not interviewed.

11                   Because she was going to be put

12  on leave.  I think the recommendation was she was

13  going to be put on leave.

14                   And when I first started, I had

15  made the observation to Howard that I was noticing a

16  pattern of women of color being put on

17  administrative leave and that not necessarily being

18  a consistent process across the board for

19  progressive discipline.

20       Q.     Did you disagree with Ms. Jackson

21  being put on administrative leave?

22  A.      I didn't disagree with it because I didn't

23  have a say in it.  That was a decision that was

24  going to be made between Bill, Marc, Howard, and

Lauren Footman

Page 35

1    Jamal in their meeting.

2                         I will say that that is

3    something that I would hope was part of their

4    analysis, to be thoughtful.  Because when I had

5    first started, the way that progressive discipline

6    was handled with another black woman director was

7    not appropriate.

8         Q.    And did --

9    A.      So the decision was made, in that meeting of

10   the four that I was not a part of, on what the next

11   step would be.

12                        My understanding was that they

13   were going to meet, they were going to review the

14   report, and then they would discuss the next steps

15   amongst themselves.

16        Q.    Was it your opinion that Ms. Jackson

17   should not be placed on administrative leave?

18   A.      I didn't have an opinion because I wasn't --

19   I didn't have an opinion on what should happen.

20                        I just said the clear process

21   should be followed, and it should be a consistent

22   process.  So if this is something that we are doing

23   in one case, that needs to be standard across the

24   board.

Lauren Footman

Page 36

```
 1                          That's always my thing:  Are we
 2    following the same process?
 3                          And also, stakeholders, at this
 4    time being the executive office and HR, need to be
 5    in synch because you have a direct supervisor
 6    telling Lisa this, and then you have HR doing this,
 7    and so it creates confusion.
 8                          So that's my thing:  Clear
 9    process, it's equitable, just, and fair, and the
10    communication is in alignment via the direct
11    supervisor, in this case, which would be Marc and
12    HR.
13                          Because miscommunication between
14    the executive office and HR can exacerbate issues,
15    which we then saw here.
16         Q.     What, if any, procedural concerns did
17    you have regarding the investigation into
18    Ms. Jackson's actions towards Mr. Fitzgerald?
19    A.     I think there's a couple different things.
20    I think that if she was not interviewed, that's a
21    huge issue for me.  If she was going to be put on
22    administrative leave and not interviewed, that would
23    be an issue for me.  And then the timeliness of it.
24    Because by the time the blowup happened, both sides
```

Lauren Footman

Page 37

1    had already been reaching out for intervention to

2    HR.

3         Q.    So regarding the first issue, do you

4    know whether Jamal ever reached out to -- or anyone

5    ever reached out to Ms. Jackson to be interviewed?

6    A.      I'm not aware, but what I will say is this:

7    In that situation, that's when the process is you

8    bubble it up.  So if there is, like, the -- some

9    tension is rising, you can then go to Marc or Howard

10   and say like -- or Bill, "We have this issue.  Lisa

11   is evading the process, X, Y, and Z.  Can you help

12   us?"

13                   That's something that we

14   actually had to explain to Jamal and Hector multiple

15   times, even when they were on another case at the

16   prison, is that yes, people may not follow up with

17   you, but you have to have the business acumen to

18   bubble it up to the necessary parties to not let it

19   drag on.

20                   MR. COHEN:  Can we take a

21        five-minute break?

22                   MR. SCHLEIGH:  Sure.

23                   (Short recess taken at

24        10:20 a.m.)

Lauren Footman

1   such as when Lisa and Franklin first reached out to

2   the office for intervention.

3          Q.      And right before we went on the break,

4   I think you were saying that, you know, it's up to

5   someone in HR to go up to someone in the executive

6   level to help them -- well, I don't want to

7   mischaracterize.

8                  So what were you saying

9   regarding, you know, Jamal or Hector getting help

10  from, you know, the executive level regarding

11  interviewing?

12  A.      Yes, absolutely.  The expectation would be,

13  for any of us, that, if we have people that we are

14  struggling to nail down or pin down for an interview

15  that it is of import, that we should be bringing

16  this to our supervisor so they can help us navigate

17  so it doesn't exacerbate or prolong projects or, in

18  this case, grievance investigation.

19         Q.      So if Lisa Jackson did not respond to

20  Jamal's request for an interview, who had the

21  responsibility to ensure that Lisa Jackson would be

22  interviewed?

23                 MR. SCHLEIGH:  Objection to

24         form.

Lauren Footman

Page 42

1   it would be one of their responsibilities to bubble

2   it up to Marc or Howard.

3         Q.      Okay.  So once Lisa is informed that

4   Jamal wants to interview her, she has no

5   responsibility to get back in touch with Jamal to

6   set up an interview?

7                   MR. SCHLEIGH:  Objection to

8            form.  You can answer.

9   A.        So we can talk about if people should

10  respond to e-mails, but then we probably don't want

11  to have that conversation on the reverse, of how

12  many e-mails Hector wasn't responsive.

13                   So with that being said, I think

14  that there's an expectation, as professionals, for

15  us to do our best effort to certainly respond, but

16  if there's things of a time-sensitive matter that

17  we're not getting help with, it is the

18  responsibility of the project person or the director

19  of the department to then go -- so, like, two things

20  can be true at once, right?

21                   So Lisa should make best-faith

22  effort to respond.  But it's of import to prevent

23  escalation in a department -- which ultimately did

24  happen -- because of lack of intervention.  HR is

Lauren Footman

Page 43

1    responsible to bubble that up to Howard or Marc.

2         Q.    Do you know where Franklin eventually

3    was transferred?

4    A.      I believe to Fair Acres.

5         Q.    And was that on Marc's directive?

6    A.      Yes.

7         Q.    And was Franklin supported in his

8    position at Fair Acres?

9    A.      I can't speak to that.

10        Q.    You said there was a memo that you saw

11   regarding Franklin's complaint; is that right?

12   A.      No.  I said that there was a memo --

13   Franklin's complaint was part of it, but it was

14   really a memo on recommendations for Lisa, was the

15   gist of it.

16                   So, yes, it was all a part of

17   it.  But ...

18        Q.    Was that memo you're referring to a

19   letter direct -- and I will wait for your counsel to

20   return.

21                   MR. SCHLEIGH:  I'm still in the

22            room.  Go ahead.

23                   MR. COHEN:  Okay.  No problem.

24   BY MR. COHEN:

Lauren Footman

Page 48

1          Q.      What do you know about that?

2     A.      Marc asked the assistant talent manager -- I

3     believe that was her role -- to start sourcing

4     candidates.

5          Q.      And was that in relation to Franklin's

6     complaint against her?

7     A.      I can't say for sure.  I don't believe

8     that -- just from my recollection of the timeline, I

9     don't think there was enough, like -- the interview

10    hadn't taken place yet to be able for them to know

11    that there were -- so part of the issue is -- like,

12    when you bring these things up -- the complaints

13    started earlier in the summer.  Some of these

14    interviews didn't take place until late July and

15    into August, and that is part and parcel to what the

16    problem is, because the conversation around what was

17    happening in the department started well before.  So

18    a lot of them are referencing that big blowup.  They

19    both had been making complaints to folks in HR

20    needing intervention.  And that's part of what the

21    issue is, is that, people bring complaints.  They

22    don't get addressed timely.  You leave people

23    working in a toxic environment.

24                           And then, like, the pressure

Lauren Footman

1    cooker combusts.  And then we're all left, like,

2    "Well, how did this happen?"

3                        And it's, like, "Because you

4    didn't respond timely."

5            Q.    Okay.

6    A.      So even those interviews are weeks after

7    they should have been.  And so, like, in theory, if

8    interviews were done when complaints were first

9    brought up on both sides, Lisa, in this blowup,

10   wouldn't even have been a part of interview.

11           Q.    Okay.  In terms of Ms. Jackson -- in

12   terms of Marc -- so I think my question was, the

13   search to replace Ms. Jackson related to the

14   complaint made against her by Franklin, right?

15   A.      Yes.

16           Q.    So --

17   A.      The interviews hadn't happened then.

18           Q.    How do you know that?

19   A.      Because of the date.

20           Q.    So when was the search to replace

21   Lisa Jackson?

22   A.      That was earlier in the summer.

23           Q.    And when you are referencing the

24   dates, I will reshare my screen.

Lauren Footman

Page 74

```
 1                    THE WITNESS:  Okay.
 2                    (Brief pause.)
 3                    THE WITNESS:  Okay.
 4                    (Brief pause.)
 5                    THE WITNESS:  Okay.
 6     BY MR. COHEN:
 7          Q.    And that's it.
 8                    So looking at that, can you tell
 9     me what happened about, you know, the meeting that
10     was set up?
11     A.     Yes.  A couple things.  So this was in
12     relation to, I believe, a meeting at the prison that
13     we were going to.
14                    And again, that was another case
15     where there were complaints running, I think as
16     early as May-June, around sexual harassment, which
17     continued to escalate, and they were not looked into
18     timely between Jamal and Hector's division of labor.
19                    We started to try to meet with
20     certain people at the prison to rectify the
21     situation.  Because the warden actually was here at
22     a meeting, said that she was having some problems
23     and giving clarity, asked if I could assist.
24                    I shared that with Marc.  And
```

Lauren Footman

Page 75

1    again, I was aware of the complaints because they

2    were sexual harassment in nature so they were sent

3    to me.

4                          And so we had a meeting.  Marc

5    had to come in from his vacation to meet with me and

6    Laura to discuss those things.  That was later.  But

7    this is something that predated that.  So just to

8    set the table.

9                          And so we were going to go and

10   do a site visit, but the meetings kept being pushed

11   off.  Because there's even e-mails back in July,

12   where we were meeting weekly and nothing was really

13   being done.  So this is probably, again, August.

14                         And with that in mind, Hector

15   invited me to go to a meeting.  There were a couple

16   different things.  Something that's not shown in the

17   e-mail, Hector inappropriately went to my assistant

18   at the time, Pam Pitts, and told her that he's

19   driving me to the prison and she didn't need to

20   arrange for a car.

21                         As an HR professional, we know

22   that's completely inappropriate because he didn't

23   get consent from me.  And you don't make decisions

24   for me.

Lauren Footman

Page 76

1                     And so I then had a

2    conversation, called Jamal on the phone, brought it

3    to Marc's attention.

4                     And, you know, part of the

5    challenge there is, is that that's inappropriate, on

6    so many levels, and then you're an HR person, and we

7    want to actually address some stuff around

8    sexual harassment.

9                     Nonetheless, part of what we

10   also found out is, is that there was this secret

11   mission, so to speak, as it relates to doing an

12   investigation to Warden Williams.  I was not given

13   the heads-up about that.

14                     And the plans kept changing.

15   And I talked to Marc and ultimately decided not to

16   participate.  And then I was taken out of the

17   situation.  That then it was taken to Bill.

18                     And so at that point, we were

19   meeting routinely with Marc, Emily Mullen, Hector,

20   and Jamal to talk about the stuff at the prison.  It

21   still wasn't making any inroads.

22                     And through all of this, this

23   covert mission that they were doing was never

24   brought to our attention.  We back-handed found out.

Lauren Footman

```
 1   And then Marc got involved.

 2                    Which again, not going to

 3   leadership is, is that, you're, number one, taking

 4   my autonomy away.  Number two -- well, multiple

 5   parts.  That you are going to drive me without my

 6   permission.  Number two, you're putting me in a

 7   situation that I wasn't prepared for, even though we

 8   were meeting weekly Mondays.

 9                    Marc didn't know anything about

10   it.  Marc was meeting Jamal's supervisor at the

11   time.  And so, by the end of it, it was very

12   convoluted, unprofessional on multiple fronts, and

13   so I decided not to attend.

14                    And I discussed this with Marc

15   directly, as my supervisor.

16   BY MR. COHEN:

17        Q.    Did you tell Marc that Hector's

18   inappropriate acts towards you were gender based?

19   A.      I told Marc that I think that is

20   inappropriate for any colleague to do that.

21        Q.    And I think a few minutes ago you used

22   the term "sexual harassment," correct?

23   A.      Mm-hmm.  Yes.  We were talking -- there was

24   sexual harassment complaints at the prison.
```

Lauren Footman

Page 78

1        Q.      Right.   Okay.   So the meeting happens,

2   right?   The meeting between Hector and -- I guess it

3   was Laura Williams; is that right?

4   A.      I didn't attend the meeting.   So you would

5   have to get that information from Hector.

6        Q.      Well, in this document it says that

7   they have the meeting, right?

8   A.      I don't -- the document can say that, but

9   you would have to ask Hector and Laura if the

10  meeting happened.

11       Q.      Okay.   Were you involved in the

12  decision to terminate Hector?

13                  MR. SCHLEIGH:   Objection to

14           form, asked and answered.   But you can answer

15           again.

16  A.       What do you mean by that?

17       Q.      Did you talk to Marc about terminating

18  Hector?

19  A.      I talked to Marc about my experiences

20  working with Hector.

21       Q.      And what did you tell Marc in relation

22  to that?

23  A.      He doesn't follow up.   He's not timely.   And

24  not transparent.

Lauren Footman

Page 79

```
 1        Q.      And was him -- and by "him" I mean
 2   Hector.  Was Hector assuming that he would give you
 3   a ride to this meeting one of the things that you
 4   found was a performance issue for Hector?
 5   A.      I wouldn't say it's a performance issue.  I
 6   think there's a training opportunity there about
 7   autonomy for other colleagues.
 8        Q.      When would you say that you -- if you
 9   know -- gave Marc this feedback about Hector?
10                      When I say, "this feedback," I'm
11   referring to what you just stated in terms of, you
12   know, his issues about following up and being
13   timely.
14   A.      It at least had to be June and July.
15   Because we were meeting weekly.  And Marc saw it for
16   himself.  We were meeting weekly with Jamal, Emily.
17                      Because the thought was like, is
18   there grievances?  There's macro issues happening.
19   How can we get to training?  So that was why Emily
20   was there.
21                      And Pam had set routine
22   meetings, Pam Pitts.  We would have an agenda.  And
23   they would come every week -- being Jamal and
24   Hector -- with no updates.
```

Lauren Footman

Page 81

1          Q.      Okay.

2                       MR. SCHLEIGH:  There's no point

3          in scrolling through it if we can't really

4          see it, anyway.

5                       MR. COHEN:  That's fair.

6      BY MR. COHEN:

7          Q.      So looking at this document, what are

8      these e-mails regarding?

9      A.      It's the grievance tracker.

10         Q.      Okay.  Going to -- the first e-mail is

11     your e-mail to Hector at 3:15 on July 22nd, 2022.

12     Do you see that?

13     A.      Yes.

14         Q.      What led you to be sending him that

15     e-mail?

16     A.      Because we were meeting -- having those

17     weekly meetings, and we would never have anything to

18     talk about.  And you could never see anything.

19         Q.      And then he responded about 40 minutes

20     later, correct?

21     A.      Mm-hmm.  Yes.

22         Q.      And was his response inadequate?

23     A.      Yes.

24         Q.      And why is that?

Lauren Footman

Page 82

1   A.      Because in the meetings we discussed having

2   an actual tracker, which you had at the bottom,

3   which Jamal actually provided.

4                    Jamal knew that it was

5   inappropriate as well.  That's why he said, "Don't

6   worry about it.  I'll get you something."

7                    It was supposed to be a living,

8   dynamic, password-protected tracker that was

9   supposed to help us with talent -- Munsanda was

10  doing one for talent acquisition, and they were

11  supposed to do one for grievances, because the

12  department was getting so many complaints around

13  turnaround time.

14          Q.     Got you.  So --

15  A.      And the reason that it was necessary is,

16  because things were so bad, Marc was then being

17  asked to speak to this stuff in realtime.  Council

18  didn't really want to talk to Jamal and Hector as

19  much.  And so he needed to be able to go in and say,

20  like, "This is where we are with this.  This is

21  where we are with this requisition."

22                   Because it was, like, all eyes

23  on HR as it relates to grievances and TA.  And

24  Munsanda did create the tracker that was requested.